## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| SUGARLOAF CAPITAL BUFORD, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>LA QUINTA FRANCHISING, LLC, and WYNDHAM HOTELS & RESORTS, INC.,<br><br>    Defendants. | Civil Action No.: 1:19-cv-03623-WMR |

## AMENDED COMPLAINT AND
## <u>PETITION FOR DECLARATORY JUDGMENT</u>

COMES NOW Plaintiff Sugarloaf Capital Buford, LLC ("SCB"), pursuant to Federal Rule of Civil Procedure 15(a)(2), and hereby files this Amended Complaint and Petition for Declaratory Judgment against Defendants La Quinta Franchising, LLC and Wyndham Hotels and Resorts, Inc.[1]

1.

Plaintiff Sugarloaf Capital Buford, LLC is a Georgia limited liability company with its principal place of business in Duluth, Georgia.

---

[1] Defendants' counsel's written consent to file this amended complaint is attached hereto as Exhibit P.

2.

Defendant La Quinta Franchising, LLC ("La Quinta") is a Nevada limited liability company with its principal place of business in New Jersey.  La Quinta does business in Georgia and maintains a registered agent in the State.  La Quinta may be served with process by service upon its registered agent, Corporate Creations Network Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia.  This Court has personal jurisdiction over La Quinta pursuant to O.C.G.A. § 9-10-91(1).

3.

Defendant Wyndham Hotels and Resorts, LLC ("Wyndham") is a foreign limited liability company that does business in Georgia and maintains a registered agent in the State.  Wyndham may be served with process by service upon its registered agent Corporate Creations Network Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia.  This Court has personal jurisdiction over Wyndham pursuant to O.C.G.A. § 9-10-91(1).

4.

The Court has jurisdiction over the subject matter of this dispute, and venue is proper in this Court.

## BACKGROUND

**A.**      **SCB Entered into a Franchise Agreement with La Quinta.**

5.

SCB is a family-owned business whose sole significant asset is a hotel (the "Hotel") located at 2370 Stephens Center Drive in Duluth, Georgia.

6.

During January 2016, SCB and La Quinta entered into a franchise agreement (as modified and amended the "Franchise Agreement") for SCB to operate the Hotel as a La Quinta Inn hotel.[2]   A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A.

7.

The Franchise Agreement consists of "Basic Terms" and "Supplemental Terms".

8.

The Franchise Agreement's Supplemental Terms include the fees SCB must, or may, have to pay under the agreement.

---

[2] The Franchise Agreement was subsequently amended for the Hotel operate as a La Quinta Inn & Suites hotel.

9.

The Supplemental Terms were prepared by La Quinta and are standard terms in its franchise agreements.

10.

The Supplemental Terms were not negotiated by the parties.  They were simply provided to SCB.

11.

The initial term of the Franchise Agreement is twenty (20) years, though either party may, upon proper notice, terminate the agreement on the fifteenth anniversary of the effective date.[3]

12.

The Franchise Agreement specifies certain recurring fees due from SCB.  The specified fees include: (1) a Royalty Fee (5% of the Hotel's Gross Room Revenues);

---

[3] As originally executed, the Franchise Agreement allowed either party to terminate the agreement with or without cause on the fifth, tenth or fifteen anniversary of the effective date.  The parties subsequently modified the Franchise Agreement to allow such termination only on the fifteenth anniversary of the effective date.

(b) a Reservation Fee (2% of Gross Room Revenues); and (c) a Marketing Fee (2.5% of Gross Room Revenues).[4]

13.

The Franchise Agreement also purports to require SCB to pay unspecified amounts for "Booking Fees and Commissions" and "Other Charges".

14.

The Franchise Agreement defines "Booking Fees and Commissions" as:

The amounts of any travel agency commission, global or electronic distribution systems fees, fees associated with the use of other electronic booking systems by guests or travel agents, DPM fees (as hereinafter defined) and other related fees that we may require or that we pay third parties on your behalf in connection with reservations for rooms at your Facility.

15.

The Franchise Agreement defines "Other Charges" as:

All amounts due to us or any of our Affiliates under this Agreement or in connection with your Facility (other than the Booking Fees and Commissions and the fees described in Sections 4.01-4.04), including training program fees, conference fees, La Quinta Returns fees, guest assistance charges, computer system hardware and software and installation costs pertaining to your Facility, fees or charges for participation in sales or marketing or other promotional programs, and

---

[4] The Royalty Fee was 4.5% of Gross Room Revenue during the first 24 months after the effective date of the Franchise Agreement.

reimbursements for costs incurred by us or our Affiliates on your behalf for the benefit of your Facility.[5]

16.

The Franchise Agreement gives La Quinta or its successors unlimited

discretion as to the Booking Fees and Commissions and Other Charges it imposes

upon SCB stating:

> You agree to pay us[6] all Booking Fees and Commissions and Other Charges.  You shall comply with all of our rules and regulations (including payment procedures) regarding Booking Fees and Commissions and Other Charges and any modifications that we in our sole discretion make to those rules and regulations.  Booking Fees and Commissions and Other Charges may, in the future, be directly invoiced to you by one or more third-party billing clearinghouses.  These clearinghouses may require you to pay them an additional administrative or related fee for their services.  You agree to participate fully in the billing clearing houses in which we participate and agree to pay on a timely basis the amounts of invoices that you receive from these clearinghouses, including the administrative or related fees imposed by the clearinghouses.

> You must participate in our Digital Performance Marketing Program ("DPM").  DPM markets the La Quinta brand through major Internet search engines, web site portals and other Internet websites, including call center and mobile websites and applications, using key words, banner display ads and textual links.  You must pay a fee for stays at your hotel resulting from DPM marketing.  The fee will be no less than

---

[5] Sections 4.01 through 4.04 refer to an Initial Fee, Expansion Fee, credit card interface costs, and Monthly Fees, respectively.

[6] The Franchise Agreement defines "Franchisor", "we", or "us" as "[t]he party identified as the Franchisor in the Basic terms [i.e., La Quinta], or its successors or assigns."

ten percent (10%) and no greater than fifteen percent (15%) of Gross
Room Revenues from the applicable stay.  The current fee is ten percent
(10%) of the applicable Gross Room Revenues.  We have the right to
change the commission percentage in our discretion at any time up to
fifteen percent of applicable Gross Room Revenues.  The DPM fee is
in addition to all other applicable reservation fees.  The fee applies to
revenue you receive in respect of no-show, changed and canceled
reservations that you receive through DPM.  The fee does not apply to
certain reservations as described in our DPM policy.  We have the right
to change the DPM policy in our discretion at any time.

17.

The Franchise Agreement also purports to allow La Quinta or its successors

to charge other fees without any specification of or agreement upon the amount of

such fees.   For example, section 8.04 of the Franchise Agreement grants the

franchisor unfettered discretion to establish marketing programs and requires SCB

to participate in the programs and to "incur expenses and pay reasonable fees to us."

Similarly, the Franchise Agreement requires SCB to participate in any internet or

extranet system that may be developed and to "pay any fee imposed from time to

time by us or a third party service provider in connection with hosting such system."

18.

The Franchise Agreement also provides for unspecified "Marketing Fees" for

contribution into a Brand Marketing Fund ("BMF"), the purpose of which is to

"maximiz[e] general recognition and patronage of the Marks in the United States

and throughout the work for the benefit of all La Quinta Lodging Facilities of the

Facility Type and, at our option, one or more other types of La Quinta Lodging Facilities or Affiliated Lodging Facilities in the United States and elsewhere."

19.

La Quinta or its successor "may use BMF contributions in [its] sole discretion for any purpose related to sales, marketing or advertising initiatives or programs that [it] may adopt from time to time . . . ."

20.

The Franchise Agreement relieves the franchisor from any accountability for any results of the BMF, providing that it "cannot assure [SCB] that any particular La Quinta Lodging Facility will benefit directly or pro rata from the placement of advertising."

**B.    Wyndham Worldwide Corporation Purchased La Quinta.**

21.

During January 2018, Wyndham Worldwide Corporation ("WWC") announced it was purchasing La Quinta and would complete the acquisition in or about June 2018.

22.

When WWC announced the acquisition, there were about 900 La Quinta managed or franchised hotels.  WWC, on the other hand, had about 8,000 hotels

operating under various hotel brands including (but not limited to) Wyndham, Super 8, Days Inn, Ramada, Microtel Inn & Suites, Wingate, and Hawthorn Suites.

23.

On June 1, 2018, an entity known to SCB as "Wyndham Hotels and Resorts" ("Wyndham") spun off from WWC and became La Quinta's ultimate parent company.[7]

**C.  Wyndham's Control of La Quinta Injured, and Continues to Injure, SCB.**

    **1.  Wyndham Significantly Increased SCB's Franchise Related Fees.**

24.

Since Wyndham acquired La Quinta, SCB's fees, as a percentage of income, have increased dramatically.

25.

The Hotel's franchise-related fees increased from 14.7% of the Hotel's Gross Room Revenue for January 1, 2018 through March 31, 2018 to 18.7% for January 1, 2019 to March 31, 2019, a 27% increase.

---

[7] When SCB filed the original complaint in this case, it named Wyndham Resorts and Hotels, LLC as the Defendant parent entity. Defendants' counsel has since advised SCB that the Wyndham Hotels & Resorts, Inc. is La Quinta's ultimate parent.  SCB is filing a motion to substitute Wyndham Hotels & Resorts, Inc. for Defendant Wyndham Hotels and Resorts, LLC concurrently herewith.

26.

On April 1, 2019, Wyndham announced it completed the integration of La Quinta into Wyndham (the "Integration").

27.

The Integration included moving all La Quinta hotels onto Wyndham's technology platforms. It also included discontinuing the "La Quinta Returns" loyalty program and forcing La Quinta hotels into the "Wyndham Rewards" program.

28.

SCB, who had no choice about the Integration, was billed more than $9,000.00 to have the Hotel included on the Wyndham platforms.

29.

In connection with Integration, Wyndham created a new fee structure (the "New Fee Structure") for La Quinta hotels that imposed new fees, increased certain existing fees, and decreased a few fees, with the overall effect of substantially increasing the total fees burdening SCB.

30.

During May 2019, SCB's franchise-related fees were 21.9% of the Hotel's gross revenue. (See Exhibit B.)

31.

One example of a new fee included in the New Fee Structure is a referral fee for the "Referral Rewards by Wyndham Program" under which SCB is required to pay a 10% fee on revenue received for rooms booked as result of certain referrals.

32.

Other fees charged under the New Fee Structure that are not identified in the Franchise Agreement include "Member Benefits Commissions," "Agency Commissions," and a "Loyalty Program Charge."

33.

The Member Benefits Commission is a fee of up to 10% of commissionable revenue plus a 1.5% service charge on reservations booked and consumed through Wyndham's Member Benefits Program.  This fee is not identified in the Franchise Agreement.

34.

Agency Commissions are fees of up to 20% of commissionable revenue, part of which reimburses Wyndham for fees paid to outside agencies and part of which Wyndham keeps for "related administrative costs".  Wyndham has not disclosed to SCB how much of this fee is for commissions as compared with "related

administrative costs".  This is another new fee that was not identified in the Franchise Agreement and was not previously collected by La Quinta.

35.

The Loyalty Program Charge is a fee of 5% of all amounts on which members earn points or other program currency as part of the Wyndham Rewards program.

36.

Customers who book online are automatically enrolled in Wyndham Rewards, such that SBC is forced to pay the 5% Loyalty Program Charge even if the customer is not aware he is enrolled in Wyndham Rewards.  Moreover, SCB is forced to pay the 5% fee for customers who enroll in Wyndham Rewards *after* they stay at the Hotel.

37.

Additionally, Wyndham is double-charging franchisees for technology fees, requiring them to pay for both the old La Quinta system, LQ Connect, even though it is no longer used and for Wyndham's system, Synxis.

**2. The Wyndham Takeover Has Caused the Hotel to Lose Guests and Revenue.**

38.

Although SCB and other franchisees are still required to fund the BMF, Wyndham's revenue manager for the Hotel, Teresa Mallory, advised SCB that La

Quinta suspended all national marketing at the end of 2018 and that there is currently no national marketing effort for La Quinta brands.

39.

Since Integration, the Hotel's business from online travel agencies ("OTAs," e.g., Priceline, Expedia, TripAdvisor) has decreased significantly.

40.

The Hotel's OTA revenue during April 2019 and the first week of May 2019 was $11,000 as compared with over $60,000 during April 2018 alone. (See Exhibit C.)

41.

The Hotel's visibility on OTA websites and its page views through those sites have decreased since Integration.  Upon information and belief, the decreases are due to La Quinta's lack of marketing and Wyndham's promotion of other brands over La Quinta.

42.

Wyndham actively cross-sells companies in which it has a financial interest or from which it derives an economic benefit to the detriment of the SCB and the Hotel.

43.

Searches entered on wyndhamhotels.com, expedia.com, and priceline.com on June 6, 2019 for hotels in Duluth, Georgia for stays that night all listed the Wingate by Wyndham Duluth/Atlanta above the Hotel, thus promoting the Wingate property at the Hotel's expense.

44.

Wyndham even uses the "La Quinta® Official Site" to cross-market other brands. The search results for a La Quinta hotel in Duluth, Georgia made on the La Quinta® Official Site include other Wyndham hotels, including the Wingate by Wyndham Duluth/Atlanta and Wyndham Garden Duluth, at prices lower than the price for the Hotel. Such cross-marketing diverts customers from the Hotel.

45.

 During a recorded mystery guest call to the Wyndham reservation center, the Wyndham representative suggested booking at another Wyndham hotel rather than the Hotel.

46.

The Hotel has also lost an untold number of repeat corporate accounts because Wyndham did not load the Hotel's rate correctly into its systems and because the

clients refuse to stay at any Wyndham-affiliated hotel due to prior bad experiences.
(See Exhibit D.)

47.

Further, overall guest satisfaction dropped significantly since Integration.
(See Exhibit E.)

48.

Since the Wyndham take-over, the Hotel's average revenue per room is consistently lower than its competitors'.  For example:

- during the week of March 31, 2019 through April 6, 2019, the Hotel's revenue per available room ("RevPAR") was only $34.52, as compared with RevPAR of $60.23 for the Hotel's Competitive Set.[8]

- from April 7, 2019 through April 13, 2019, the Hotel's RevPAR was $59.82, as compared with $78.30 for the Competitive Set;

- from April 14, 2019 through April 20, 2019, SCB's RevPAR was $43.95, as compared with $66.90 for the Competitive Set; and

- from April 21, 2019 through April 27, 2019, SCB's RevPAR was $63.44, as compared with $74.46 for the Competitive Set.

---

[8] The Competitive Set for the Hotel is comprised of: Holiday Inn Express Duluth, Wingate by Wyndham Duluth, Hampton Inn & Suites Duluth / Gwinnett County, Clarion Suites Duluth I85, and Best Western Gwinnett Center Hotel.

(<u>See</u> Exhibit F.)

49.

The Hotel's average RevPAR during April 2018 was consistently higher than in 2019. During the weeks of April 1-7, 2018; April 8-14, 2018; April 15-21, 2018; and April 22-28, 2018, the Hotel's RevPAR was $57.40; $72.00; $64.98; and $85.43, respectively. (<u>See</u> Exhibit G.) Importantly, the Hotel's RevPAR for April 2019 was 28.6% lower than for April 2018. (<u>See</u> Exhibit H.)

50.

On May 3, 2019, Wyndham's revenue manager for the Hotel, Teresa Mallory, acknowledged that the Hotel lost more occupancy and had a greater year-over-year RevPAR loss than the competitive set, writing:

> We continue to see occupancy loss in the market and, while we lost more than the comp set, we saw less than previous weeks. ADR also took a hit and we lost the exact same amount as the comp set. RevPAR had greater YoY loss due to our occupancy loss, much of which came from OTA business.

(<u>See</u> Exhibit I.)

51.

Ms. Mallory continued to acknowledge these problems in subsequent communications with SCB writing on May 10, 2019:

> Last week we had some occupancy growth, but the comp set grew more. We did finish behind the comp set for the week...ADR continues

16

to have strong growth YoY and over the comp set, but it is not enough to make the RevPAR positive. RevPAR finished behind the comp set for the week"

(see Exhibit J); on June 11, 2019:

We saw occupancy loss last week with growth in the comp set. Occupancy index finished at 88% with negative change. ADR also had loss and the comp set had loss, but not as much as we did. RevPAR index fell short of fair share at 86% and with negative change YoY and over the comp set. Occupancy rank finished at 4/6 for the week and 5/6 for the running 28. ADR rank finished 3/6 for both the week and running 28. RevPAR finished at 4/6 for both the week and running 28,

(see Exhibit K); and on July 1, 2019:

We continue to see occupancy loss in the market but are losing more than the comp set. Occupancy index was good over Wednesday and Thursday due to Dish Network group in house. Occupancy index finished at 83% but with negative change. ADR had some positive movement 5 of the 7 days in the week and we lost just less than the comp set. ADR index finished right at fair share with a slight positive change. RevPAR index finished the week at 83% with negative change YOY and to the comp set,

(see Exhibit L).

### 3. Wyndham has Performed, and Continues to Perform, as the Franchisor.

52.

Since WWC/Wyndham acquired La Quinta, Wyndham has performed as the

Franchisor under the Franchise Agreement.

53.

As La Quinta's ultimate parent, Wyndham has handled the franchisor functions formerly handled by La Quinta. Among other things, Wyndham established a new fee system, required SCB to pay fees directly to WHR through WYN-PAY, integrated La Quinta into Wyndham's reservation system, and addressed revenue management issues with SCB.

54.

Since Wyndham acquired La Quinta, all of SCB's franchisor-related communications have been with Wyndham. Presently, SCB does not regularly communicate with any La Quinta personnel.

55.

SCB has repeatedly advised Wyndham that the changes related to its (indirect) ownership of La Quinta have severely affected the Hotel's financial viability asked Wyndham for relief from the increased and a plan to reverse the Hotel's worsening financial condition. Wyndham responded to SCB's requests but did not offer any meaningful assistance.

56.

The Franchise Agreement allows La Quinta to freely transfer or assign the agreement "and all or any part of [its] rights or obligations in this Agreement" to any person or entity without the approval of, or even notice to, SCB.

57.

Based on Wyndham's conduct, SCB believed (and continues to believe) that La Quinta transferred or assigned (or Wyndham simply assumed) some or all of La Quinta's rights and obligations under the Franchise Agreement to Wyndham.

58.

On June 30, 2019, SCB sent an email to Wyndham's Vice President, Relicensing, Shilpan Patel, asking him to agree to a mutual termination of the Franchise Agreement.  The following day, Mr. Patel responded in part:

> Our goal is to help you not terminate.  If termination is what you seek[,] my experience tells me that waiving any fees associated with a termination is not a path the company will consider.

(See Ex. M.)

59.

On July 1, 2019, SCB asked Shipan Patel to put SCB in contact "with someone who has authority to discuss termination."  In response to this request, Mr. Patel

forwarded SCB's termination request to Glenn Bisbing in Wyndham's Contracts Compliance Department.

60.

On July 9, 2019, Mr. Bisbing provided SCB a letter from Wyndham's Contracts Compliance Department (the "Liquidated Damages Letter") advising SCB that Wyndham calculated the liquidated damages SCB would have to pay if it prematurely terminated the Franchise Agreement to be $507,644.42.

61.

Along with the Liquidated Damages Letter, Mr. Bisbing sent SCB an email in which Mr. Bisbing wrote: "The liquidated damages help to offset the revenue WHR [i.e., Wyndham] will will [sic] lose if you terminate the contract prematurely . . . ." A copy of Mr. Bisbing's July 9, 2019 email is attached hereto as Exhibit N.

62.

Faced with the near-certain failure of the Hotel under Wyndham and Wyndham's unreasonable damages demand, SCB commenced this litigation on July 10, 2019.[9]

---

[9] SCB filed the Complaint in the Superior Court of Cobb County, Georgia, and then-defendants La Quinta and Wyndham Hotels and Resorts, LLC removed to this Court.

63.

Even after SCB filed the Complaint, Wyndham continued to act as the franchisor for the Hotel, supporting SCB's belief that Wyndham has succeeded to at least some of La Quinta's rights and obligations pursuant to the Franchise Agreement.

64.

On August 19, 2019, Wyndham's Contract Compliance Department sent SCB a Notice of Default that identified Wyndham as a party to the Franchise Agreement. (See Ex. O.)

65.

The Wyndham-written Notice of Default identified the parties to the Franchise Agreement as SCB ("you") and "we", "us", or "our".  There is no mention of La Quinta Franchising, LLC anywhere in the notice.

66.

The Notice of Default consistently refers to Wyndham's rights under the Franchise Agreement.  The Notice alleges two (2) defaults: an operational default and a financial default. With respect to the operational default, Wyndham wrote:

> This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notice, if any, ***from us or any of our affiliates*** regarding the Facility.  ***We also reserve the right*** to take any interim steps permitted under the Agreement because

of your default.   Additionally, *we may terminate your right and license* to operate the Facility . . . .

67.

With respect to the financial default, WHR wrote:

We have enclosed an itemized statement detailing the fees past due. Under the Agreement, you have thirty (30) days to pay this amount *to us* in order to cure your default.  If you do not pay this amount within the time permitted, *we reserve all rights under the terms of the Agreement* including but not limited to termination of the Agreement . . . .

68.

On or about August 30, 2019, SCB asked Wyndham's Vice President, Franchise Operations, Steve Clinkenbeard, how to have the Hotel released from the La Quinta brand on systems operated by online travel agencies ("OTAs") such as Expedia and Hotels.com.  Mr. Clinkenbeard advised SCB that Wyndham had to release the brand identification and that La Quinta could not.

**COUNT I – DECLARATORY JUDGMENT**
(Declaration Franchise Agreement is too Vague,
Incomplete, and Incomprehensible to Enforce)

69.

Plaintiff incorporates paragraphs 1 through 68, above, as if set forth fully herein.

70.

A contract must be certain and unequivocal in all its essential terms. A contract cannot be enforced if its terms are incomplete or incomprehensible.

71.

Section 4.06 of the Franchise Agreement concerning Booking Fees and Commissions and Other Charges is too vague, incomplete, and incomprehensible to be enforced.

72.

Pursuant to the Franchise Agreement, "Booking Fees and Commissions" includes, among other things, "other related fees that we may require or that we pay third parties on your behalf in connection with reservations for rooms at your Facility."

73.

Defendants rely on the "Booking Fees and Commissions" provision of the Franchise Agreement to charge SCB "Member Benefits Commissions" of 10% of "commissionable revenue" plus a 1.5% service charge on rooms booked under a member discount program without any indication Defendants incurred any costs or party any third party in connection with such reservations.

74.

SCB did not, and reasonably could not, have anticipated Booking Fees and Commissions would include fees such as Member Benefits Commissions. In fact, no such fees were charged from the January 1, 2016 effective date of the Franchise Agreement until Wyndham imposed the new fee effective June 1, 2019.

75.

As evidenced by Defendants' imposition a fee for guest use of the Wyndham Rewards Program as part of "Booking Fees and Commissions", there was no meeting of the minds as to the scope of such fees, rendering a material contract provision is too vague to be enforced.

76.

Pursuant to the Franchise Agreement, "Other Charges" include all amounts due under the Franchise Agreement (other than certain specified fees), including, among other things, "reimbursements for all costs incurred by us or our affiliates on your behalf for the benefit of y our Facility."

77.

Among the "Other Charges" Defendants require SCB to pay a $60 "Best Rate Guarantee Processing Fee" each time a guest finds a lower publicly available rate than the rate provided by the Hotel.

78.

There is no indication the Best Rate Guarantee Processing is reasonably related to the cost, if any, Defendants incur when a guest finds a lower rate.

79.

Among the "Other Charges" Defendants require SCB to pay is a "Loyalty Program Charge" of 5% of all amounts on which members earn points or other program currency.

80.

SCB is required to pay the Loyalty Program Charge regardless of whether the guest knows he or she is a member of the rewards program and regardless of the guest was a member of the program when he or she stayed at the Hotel.

81.

There is no indication the Loyalty Program Charge is reasonably related to the cost, if any, Defendants occur when a program member stays (or stayed) at the Hotel.

82.

There was no meeting of the minds as to the scope of "Other Fees" and, in particular, that SCB would be required to pay fees such as the "Best Rate Guarantee Processing Fee" or "Loyalty Program Charge" that do not appear directly related to

costs incurred on SCB's behalf, rendering a material contract provision is too vague to be enforced.

83.

SCB is required to contribute to the Brand Marketing Fund.

84.

Section 8.01 of the Franchise Agreement concerning the BMF provides that administration of the Fund, which is intended to "maximize general recognition and patronage of the Marks," is left entirely to Defendants' discretion any may not benefit the Hotel.   Based on the vague outlines of the Fund, there is no way to tell whether Defendants are acting in accordance with its purpose as set forth in the Franchise Agreement, rendering the provision unenforceable.

85.

As a result of the multiple unenforceable terms of the Franchise Agreement, the Franchise Agreement is unenforceable in its entirety.

86.

Notwithstanding the above, Defendants contend the Franchise Agreement is enforceable and that SCB will be liable to Defendants for liquidated damages if it does not continue to perform pursuant to the agreement.

87.

SCB, on the other hand, believes it may cease paying Defendants and cease operating the Hotel as a La Quinta Inn & Suites without paying liquidated damages in any amount because the Franchise Agreement is unenforceable.

88.

There is an actual controversy between SCB and Defendants with respect to the enforceability of the Franchise Agreement and uncertainty as to the parties' rights that can be resolved only by a decree of this Court.

89.

SCB seeks a declaration that the Franchise Agreement is too vague, incomplete, and incomprehensible to enforce.

## COUNT II – DECLARATORY JUDGMENT
(Declaration Franchise Agreement Unconscionable)

90.

Plaintiff incorporates paragraphs 1 through 89, above, as if set forth fully herein.

91.

When the parties entered into the Franchise Agreement, La Quinta was an international hotel brand and chain with approximately 900 owned or franchised hotels.

92.

When the parties entered into the Franchise Agreement, SCB was (and is) a family-owned single-purpose entity whose only significant asset is the Hotel.

93.

La Quinta prepared the Franchise Agreement.  Other than certain Hotel-specific information included in the Basic Terms, the Franchise Agreement is a form agreement that La Quinta used with franchisees.

94.

SCB did not have a meaningful possibility of negotiating the terms of the Franchise Agreement, including the costs and fees and the terms giving La Quinta sole discretion concerning the franchisor's obligations.

95.

The provisions of the Franchise Agreement that allow Defendants to unilaterally establish the amount of costs and fees SCB will have to pay and to establish new fees not specified in the agreement are unreasonable such that no honest person would take advantage of the terms.

96.

The provisions of the Franchise Agreement that do not impose any accountability upon Defendants for their purported undertakings to provide

marketing and system support are unreasonable such that no honest person would take advantage of the terms.

97.

As a result of the circumstances leading to the Franchise Agreement and the multiple unconscionable terms therein, the Franchise Agreement is unenforceable in its entirety.

98.

Notwithstanding the above, Defendants contend the Franchise Agreement is enforceable and that SCB will be liable to Defendants for liquidated damages if it does not continue to perform pursuant to the agreement.

99.

SCB, on the other hand, believes it may cease paying Defendants and cease operating the Hotel as a La Quinta Inn & Suites without paying liquidated damages in any amount because the Franchise Agreement is unenforceable.

100.

There is an actual controversy between SCB and Defendants with respect to the enforceability of the Franchise Agreement and uncertainty as to the parties' rights that can be resolved only by a decree of this Court.

101.

SCB seeks a declaratory judgment that the Franchise Agreement is unenforceable due to unconscionability.

## COUNT III – DECLARATORY JUDGMENT
(Declaration Liquidated Damages Provision is an Unenforceable Penalty)

102.

Plaintiff incorporates paragraphs 1 through 101, above, as if set forth fully herein.

103.

The liquidated damages provision in the Franchise Agreement was premised on losses La Quinta would purportedly incur by granting SCB exclusive rights to operate a La Quinta Hotel within a specified geographic area (the "Restricted Area") if SCB stopped operating the Hotel under the La Quinta brand.

104.

The liquidated damages provision does not prevent Defendants from granting a franchise for any other Wyndham property in the Restricted Area.

105.

Defendants cross-market La Quinta and other Wyndham properties such that lost sales from one hotel may benefit another Wyndham property.

106.

Defendants contend that, based on present calculations, SCB would have to pay $507,644.42 in liquidated damages to terminate the Franchise Agreement

107.

As applied under the current facts, the liquidated damages provision is an unenforceable penalty that does not reflect the actual damages Defendants would incur if SCB terminated the Franchise Agreement.  Thus, even if the rest of the Franchise Agreement is somehow enforceable, the liquidated damages provision is not.

108.

There is an actual controversy between SCB and Defendants with respect to the enforceability of the liquidated damages provision and uncertainty as to the parties' rights that can be resolved only by a decree of this Court.

109.

In the event the Court does not declare the entire Franchise Agreement is unenforceable, then, at the least, SCB seeks a declaration that, as applied to SCB and the relevant facts, the liquidated damages provision that Defendants claim would result in damages of approximately $507,644.42 is an unenforceable penalty.

## COUNT IV – BREACH OF CONTRACT

### 110.

Plaintiff incorporates paragraphs 1 through 68, above, as if set forth fully herein.

### 111.

In the event it is determined that the Franchise Agreement is enforceable, then Defendants breached the agreement by charging fees different than and in excess of the fees contemplated by and authorized by the agreement.

### 112.

By charging excessive fees and promoting other Wyndham brands and properties above the Hotel, Defendants breached the covenant of good faith and fair dealing implied in all contracts.

### 113.

As result of Defendants' breaches of the Franchise Agreement, SCB has been damaged, and continues to be damaged, in an amount to be proven at trial.

## COUNT V – AUDIT OF BRAND MARKETING FUND

### 114.

Plaintiff incorporates paragraphs 1 through 68, above, as if set forth fully herein.

115.

As part of its obligations under the Franchise Agreement, SCB has been contributing to the BMF.

116.

Defendants administer the BMF and have discretion to use the funds for any purpose so long as it is related to sales, marketing or advertising initiatives or other programs to benefit the La Quinta brands and marks.

117.

SCB has been unable to confirm whether Defendants have used the BMF for its intended purpose and requests an audit of the fund to verify its proper use.

## COUNT VI - ALTER EGO

118.

Plaintiff incorporates paragraphs 1 through 117, above, as if set forth fully herein.

119.

If Wyndham is not La Quinta's successor to all of part of La Quinta's interest in the Franchise Agreement, then Wyndham is La Quinta's alter egos for purposes of that Agreement.

120.

Wyndham, not La Quinta, performs the franchisor functions formerly performed by Quinta including, but not limited to: establishing franchise fees; collecting fees; managing the reservation system; and tracking and reporting on Hotel revenue management.

121.

Wyndham has taken over all franchisor communications with SCB; La Quinta no longer communicates with SCB.

122.

Wyndham controls all contract compliance issues related to the Franchise Agreement.

123.

Wyndham controls La Quinta franchisees' relationship with online travel agencies.

124.

Wyndham claims the right to declare defaults and to terminate SCB's rights under the Franchise Agreement.

125.

Wyndham so controls La Quinta that La Quinta operates as a mere instrumentality of Wyndham and not a separate corporate entity.

126.

There is such unity of interest between Wyndham and La Quinta that La Quinta's separate corporate personality no longer exists.  Such unity is evidenced by, among other things, Wyndham's common reservation system; it active cross-marketing; and its control of all contract-related decisions.

127.

To adhere to the doctrine of a separate corporate entity would promote injustice and by, among other things, impeding efficient discovery in this case.

## <u>COUNT VII - ATTORNEYS' FEES AND COSTS OF LITIGATION</u>

128.

Plaintiff incorporates paragraphs 1 through 127, above, as if set forth fully herein.

129.

Defendants' conduct, evidences bad faith and stubborn litigiousness, and is causing Plaintiff to suffer unnecessary trouble and expense such that Plaintiff is entitled to recover the costs and expenses of litigation including attorneys' fees.

WHEREFORE, Plaintiff prays that the Court:

(a)     Declare the Franchise Agreement unenforceable;

(b)     Declare the liquidated damages provision of the Franchise Agreement an unenforceable penalty;

(c)     In the alternative to declaring the Franchising Agreement unenforceable, enter judgment against Defendants on Count IV of Plaintiff's Complaint;

(d)     Order that Defendants shall provide an audit of the BMF;

(e)     Award Plaintiff its attorneys' fees and costs of litigation; and

(f)     Award Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted this __ day of _____ 2019.

/s/ Bryan M. Knight
Bryan M. Knight
Georgia Bar No. 142401
Sherri G. Buda
Georgia Bar No. 093399
**KNIGHT LAW, LLC**
One Midtown Plaza
1360 Peachtree Street, Suite 1201
Atlanta, Georgia 30309
P: (404) 228-4822
F: (404) 228-4821
bknight@lawknight.com
sbuda@lawknight.com
*Attorneys for Plaintiff*