# EXHIBIT "A"




## FRANCHISE AGREEMENT

### BASIC TERMS

A.  Effective Date: **JANUARY 1, 2016** [insert date that Franchisor executes Agreement]

B.  Site Address: 2370 Stephens Center Drive, Duluth, GA 30096
    Number of Guest Rooms: 83
    Facility Type: La Quinta Inn
    Development Method: New Construction (Transfer Agreement)

C.  Franchisee: Sugarloaf Capital Buford, LLC, a Georgia limited liability company
    Franchisee's Address: 2253 Gradyridge Trail, Duluth, GA 30097
    Telephone No.: (770) 495-1574          Facsimile No.: _____
    E-mail Address: spatel@sugarloafcap.com
    Franchisee's Operating Partner: Sonial Patel
    Operating Partner's Address: 2253 Gradyridge Trail, Duluth, GA 30097
    Telephone No.: (770) 495-1574          Facsimile No.: _____
    E-mail Address: spatel@sugarloafcap.com

D.  Franchisor: La Quinta Franchising LLC, a Nevada limited liability company
    Franchisor's Address: 909 Hidden Ridge, Suite 600, Irving, Texas 75038,
    Attn: Franchise Dept.; Telephone No.: (214) 492-6600; Facsimile No.: (214) 492-6740

E.  Term: The time period commencing upon the Effective Date and, unless otherwise
    terminated in accordance with this Agreement, expiring 20 years after Effective Date.

F.  Assigned Area: Commencing at the intersection of Duluth Hwy NW and I-85 traveling
    along the centerline of I-85 two (2) miles north and two (2) miles south, including one
    half (1/2) mile on either side of that same centerline, as shown on the map attached hereto
    as Exhibit B. In the event of any conflict between this written description of the Assigned
    Area and the map, this written description will control. Franchisee acknowledges that the
    Assigned Area may overlap the assigned areas of one or more other franchisees.

G.  Principal Owner(s): See Exhibit A

H.  Transfer Fee: $10,000.00
    Transfer Opening Training Fee: $5,000
    PIP Fee: $1,000.00

I.  Royalty Fee: 4.5% of Gross Room Revenues of your Facility from the Effective Date through the end of the 24th full calendar month after the Effective Date; 5% of Gross Room Revenues beginning with the 25th full calendar month after the Effective Date and continuing through the end of the Term.

J.  Reservations Fee: 2% of Gross Room Revenues.

K.  Marketing Fee: 2½% of Gross Room Revenues.

L.  Opening Date: The definition for Opening Date in Article 2 of the Agreement shall be deleted in the entirety and replaced with the following:

> *"Opening Date" – December 31, 2002*

M.  Sections 4.04, 4.05 and 5.01 of the Agreement are amended to strike the words "Opening Date" in each place they appear and substitute in their place the words "Effective Date".

N.  Section 15.01 of the Agreement shall be deleted in its entirety and replaced with the following:

### 15.01  Reciprocal Right To Terminate Without Cause.

We and, subject to all the provisions of this Section 15.01, you shall each have the right to terminate this Agreement without any reason at all, and without the need to obtain the authorization of any third party or any arbitral, judicial or administrative resolution, without liability to us, and without prejudice to our corresponding collection of damages and/or losses effective on the fifth (5th), tenth (10th) and fifteenth (15th) anniversary of the Effective Date by giving the other party written notice thereof at least twelve (12) months prior to such fifth (5th), tenth (10th) or fifteenth (15th) anniversary of the Effective Date, as applicable. Your right to terminate this Agreement pursuant to this Section 15.01 is conditioned on the following: (i) on the date you give notice and on the applicable anniversary of the Effective Date you and your Principal Owners and Affiliates must be in full compliance with this Agreement and all other agreements that you have entered into with us or any of our Affiliates; (ii) you and your Principal Owners must execute a general release of the Indemnitees in such form as we may prescribe; and (iii) you must have paid us and our Affiliates all outstanding amounts under this Agreement and all other Agreements that you have entered into with us or any of our Affiliates. If then-current applicable law would prohibit us from terminating this Agreement pursuant to this Section 15.01, then you will likewise not have the foregoing right to terminate this Agreement.

In addition to the reciprocal rights granted in the previous paragraph, we shall have the right to terminate this Agreement effective on the second (2nd) anniversary of the Effective Date ("Additional Termination Right") by giving Franchisee written notice thereof at least six (6) months prior to such second (2nd) anniversary of the Effective Date. If the Property Improvement Plan attached hereto as Exhibit D ("PIP") is completed by the PIP Deadline set out in Paragraph R, below, the Additional Termination Right in this paragraph shall be of no further force and effect.

2

O.      Section 15.02(a)(i) is deleted in its entirety and replaced with the following:

        (i)     for any full calendar year (January 1 through December 31) following the second (2nd) anniversary of the Effective Date (each, a "Measurement Period"), (1) your Facility experiences an average monthly occupancy rate of less than fifty percent (50%) of all rentable Guest Rooms and you provide written notification thereof to us within thirty (30) days following the end of any such Measurement Period; and (2) during the calendar year immediately following such Measurement Period (the "Waiting Period"), your Facility again experiences an average monthly occupancy rate of less than fifty percent (50%) of all rentable Guest Rooms; and (3) you provide written notice of termination under this Section 15.02(a)(i) to us within thirty (30) days following the end of any such Waiting Period.  Any such termination shall become effective ninety (90) days following the date of such notice;

P.      Management Company: We will not require you to hire a Management Company as of the Effective Date. However, approximately six months after the Effective Date, we will meet with you to review the Facility's performance, confirm that your General Manager and other personnel have completed the required training, and make recommendations for needed improvements, if any. Approximately one year after the Effective Date, we will review the first year's performance and may at that time require you to secure the services of a third-party Management Company

Q.      Site Control/Landlord Estoppel: You have advised us that you will not acquire fee simple title to the Site and the Facility until on or about March 31, 2016 but in the interim you are leasing the Facility. Thus a Landlord Estoppel and Recognition Agreement ("Landlord Estoppel") is attached hereto as Exhibit F pursuant to Section 5.01 of the Agreement. When you acquire fee simple title and provide us with documentation of that acquisition, the Landlord Estoppel will be of no further force or effect. Documentation must show Franchisee as fee simple owner. You will have until April 30, 2016 to provide us with the required documentation

R.      Deadline to Complete PIP: Franchisee will have a period of two hundred seventy (270) days following the Effective Date of this Agreement ("PIP Deadline") to complete the renovations to the Facility outlined in the PIP.

S.      Condition Precedent: The effectiveness of this Agreement is wholly contingent upon our receipt of a fully executed Mutual Termination and Release Agreement, including all exhibits thereto, by and between La Quinta Franchising LLC and MRL Hospitality, LLC.

T.      FTC Exemption:  The franchise sale is for more than $1,084,900 - excluding the cost of unimproved land and any financing received from the franchisor or an affiliate - and thus is exempted from the Federal Trade Commission's Franchise Rule disclosure requirements, pursuant to 16 CFR 436.8(a)(5)(i). Franchisee acknowledges receiving a copy of Franchisor's Franchise Disclosure Document on or before November 12, 2015, and hereby waives any required waiting periods and the holding period for completed contracts as provided in the Federal Trade Commission's Franchise Rule.

3

Atlanta (Duluth), GA #0264_Rev2_Transfer FA

**TABLE OF CONTENTS**

**TO**

**SUPPLEMENTAL TERMS**

| Section | | Page |
|---|---|---|
| ARTICLE 1: BACKGROUND | | 1 |
| ARTICLE 2: DEFINITIONS | | 1 |
| ARTICLE 3: GRANT OF RIGHTS | | 5 |
| 3.01 | Grant of Franchise. | 5 |
| 3.02 | Territorial Protection. | 6 |
| 3.03 | Reserved Rights. | 6 |
| ARTICLE 4: FEES | | 6 |
| 4.01 | Initial Fee. | 6 |
| 4.02 | Expansion Fee. | 6 |
| 4.03 | Credit Card Interface. | 6 |
| 4.04 | Monthly Fees. | 7 |
| 4.05 | Royalty Fee Rebate. | 7 |
| 4.06 | Booking Fees and Commissions and Other Charges. | 7 |
| 4.07 | Payment of Fees and Other Amounts; Late Payments. | 7 |
| 4.08 | Application of Payments. | 8 |
| ARTICLE 5: DEVELOPMENT AND OPENING OF FACILITY | | 8 |
| 5.01 | Ownership of Facility. | 8 |
| 5.02 | Development of Your Facility. | 8 |
| 5.03 | Construction, Renovation and Opening of Your Facility. | 9 |
| 5.04 | Fixtures, Furniture and Equipment. | 12 |
| 5.05 | Opening Assistance. | 12 |
| 5.06 | Expansion of Facility. | 12 |
| 5.07 | No Subleases, Etc. | 13 |
| ARTICLE 6: TRAINING AND GUIDANCE | | 13 |
| 6.01 | Initial Training Program. | 13 |
| 6.02 | Ongoing Guidance. | 13 |
| 6.03 | System Manual. | 13 |
| 6.04 | Annual La Quinta Convention. | 13 |
| 6.05 | Delegation and Combined Performance of Obligations. | 14 |
| ARTICLE 7: FACILITY OPERATING REQUIREMENTS | | 14 |
| 7.01 | Condition of Facility. | 14 |
| 7.02 | Authorized Products and Services. | 15 |
| 7.03 | Supplies. | 15 |
| 7.04 | Market Research. | 15 |
| 7.05 | Standards. | 16 |
| 7.06 | Compliance With Laws and Good Business Practices. | 16 |
| 7.07 | Personnel. | 16 |
| 7.08 | Insurance. | 17 |
| 7.09 | Rates for Products or Services. | 17 |

i

| 7.10 | Operating Partner. | 18 |
| 7.11 | Use of Management Company. | 18 |
| ARTICLE 8: MARKETING AND RESERVATION SYSTEM | | 19 |
| 8.01 | Brand Marketing Fund. | 19 |
| 8.02 | Reservation System. | 20 |
| 8.03 | Internet Advertising and Reservations. | 20 |
| 8.04 | Cooperative Advertising and Marketing Programs. | 21 |
| 8.05 | Grand Opening Marketing and Advertising. | 21 |
| 8.06 | Your Advertising. | 21 |
| 8.07 | Intranet/Extranet. | 21 |
| ARTICLE 9: RECORDS AND REPORTS | | 21 |
| 9.01 | Records. | 21 |
| 9.02 | Computer Systems. | 22 |
| 9.03 | Periodic Reports. | 22 |
| ARTICLE 10: COMPLIANCE WITH SYSTEM | | 23 |
| 10.01 | Audits. | 23 |
| 10.02 | Inspections. | 23 |
| ARTICLE 11: TRADEMARKS | | 23 |
| 11.01 | Ownership of the Marks. | 23 |
| 11.02 | Use of the Marks. | 24 |
| 11.03 | Discontinuance of Use of Marks. | 24 |
| 11.04 | Notification of Infringements and Claims. | 24 |
| 11.05 | Domain Names. | 24 |
| 11.06 | Indebtedness. | 24 |
| 11.07 | Infringement. | 24 |
| 11.08 | Assignment. | 24 |
| ARTICLE 12: FRANCHISEE'S COVENANTS | | 25 |
| 12.01 | Confidential Information. | 25 |
| 12.02 | System Loyalty. | 25 |
| ARTICLE 13: FRANCHISEE'S REPRESENTATIONS AND WARRANTIES | | 25 |
| 13.01 | General Representations and Warranties. | 25 |
| 13.02 | Anti-Terrorism, Anti-Bribery and Anti-Corruption Laws. | 26 |
| 13.03 | Continuing Representations. | 27 |
| ARTICLE 14: RIGHTS TO TRANSFER | | 27 |
| 14.01 | Franchisee's Transfer; Franchisor's Approval. | 27 |
| 14.02 | Conditions for Approval. | 27 |
| 14.03 | Effect of Approval. | 29 |
| 14.04 | Death or Disability of Franchisee. | 29 |
| 14.05 | Special Transfers. | 29 |
| 14.06 | Securities Offerings. | 30 |
| 14.07 | Our Transfer. | 30 |
| ARTICLE 15: TERMINATION RIGHTS | | 30 |
| 15.01 | Reciprocal Right To Terminate Without Cause. | 30 |
| 15.02 | Your Right To Terminate Based On Occupancy Rates. | 31 |
| 15.03 | Your Right To Terminate Due to Casualty or Condemnation. | 32 |

ARTICLE 16: DEFAULT AND REMEDIES........................................................................32
  16.01   Events of Default. ...................................................................................32
  16.02   Remedies..................................................................................................34
ARTICLE 17: RENEWAL RIGHTS...................................................................................34
  17.01   Your Right To Acquire a Successor Franchise........................................34
  17.02   Renewal Notice.......................................................................................35
  17.03   Successor Franchise Agreements.............................................................35
ARTICLE 18: EFFECT OF TERMINATION OR EXPIRATION ...................................35
  18.01   Payment of Amounts Owed to Us. .........................................................35
  18.02   Discontinue Use of Marks and Confidential Information........................35
  18.03   Liquidated Damages................................................................................36
  18.04   Continuing Obligations...........................................................................36
ARTICLE 19: RELATIONSHIP OF THE PARTIES .......................................................37
  19.01   Independent Contractors..........................................................................37
  19.02   Indemnification of Franchisee.................................................................37
  19.03   Indemnification of Franchisor..................................................................37
  19.04   Taxes. ......................................................................................................39
  19.05   Advisory Council.....................................................................................39
ARTICLE 20: MISCELLANEOUS. ..................................................................................39
  20.01   Governing Law........................................................................................39
  20.02   Mediation. ...............................................................................................39
  20.03   Exclusive Jurisdiction.............................................................................40
  20.04   Acknowledgement. ..................................................................................40
  20.05   Limitations on Legal Rights....................................................................40
  20.06   Injunctive Relief......................................................................................41
  20.07   Costs and Attorneys' Fees. ......................................................................41
  20.09   Waiver of Obligations.............................................................................41
  20.10   Exercise of Rights....................................................................................42
  20.11   Successors and Assigns...........................................................................42
  20.12   Construction............................................................................................42
  20.13   Discretion................................................................................................42
  20.14   Approvals and Consents. .........................................................................43
  20.15   Notices. ...................................................................................................43
  20.16   Franchisor's Obligations.........................................................................43
  20.17   Franchisee Bankruptcy/Foreclosure........................................................43
ARTICLE 21: STATE LAW ADDENDA ..........................................................................44
  21.01   Scope of State Law Addenda...................................................................44
  21.02   Presumption of State Residency and Domicile........................................44
ARTICLE 22: ACKNOWLEDGMENTS ...........................................................................45
  22.01   Domicile..................................................................................................45
  22.02   Receipt of Franchise Disclosure Document and Agreement. ...................45
  22.03   No Inconsistent Representations..............................................................45
  22.04   Business Risks; Independent Investigation...............................................45
  22.05   Independent Counsel...............................................................................45
  22.06   No Guarantee or Assurance. ....................................................................45

**EXHIBITS**

Exhibit A - Franchisee Owner Information
Exhibit B - Map of Assigned Area
Exhibit C - Computer System License and Maintenance Agreement
Exhibit D - Property Improvement Plan
Exhibit E - Insurance Requirements
Exhibit F – Landlord Estoppel and Recognition Agreement

FRANCHISE AGREEMENT

SUPPLEMENTAL TERMS

This Agreement is made as of the Effective Date between Franchisor and Franchisee.

## ARTICLE 1:  BACKGROUND

Worldwide, our Affiliate, as the result of the expenditure of time, skill, effort and money, has developed and owns the System. The System is identified by the Marks, which are owned by Worldwide. We have obtained from Worldwide the right to use and to franchise others to use the System and the Marks. We grant to qualified individuals and Legal Entities the right and franchise to operate a single La Quinta Lodging Facility under the Marks and using the System. You have applied to us for the right to operate a La Quinta Lodging Facility, and we have approved your application based on all of the information and representations made by you and your Principal Owners in your franchise application. You understand and acknowledge the importance of our Standards and the need to operate your Facility fully according to the Standards.

## ARTICLE 2:  DEFINITIONS

Where the context so indicates, capitalized terms will have the meanings ascribed to them below:

"100% LQ Approved Construction Plans" - The completed working drawings and specifications for the total Project (including the completed site plan, architectural drawings and construction drawings), once they have been approved by us pursuant to Section 5.02.

"Action" - Any action, suit, proceeding, claim, demand, governmental investigation or formal or informal governmental inquiry.

"ADA" - The Americans with Disabilities Act.

"Affiliate" - Any person or entity that directly or indirectly owns or Controls the referenced party, that is directly or indirectly owned or Controlled by the referenced party, or that is under common control with the referenced party.

"Affiliated Lodging Facilities" - Lodging facilities owned, operated, franchised or licensed by us or our Affiliates and which are identified by or associated with marks other than the Marks.

"Agreement" - This Franchise Agreement, consisting of the Basic Terms, the Supplemental Terms and each exhibit, rider and addendum attached to this Agreement and listed as "Exhibits" under the Basic Terms as they may be amended from time to time by written agreement of the parties.

"Assigned Area" - The assigned area described in the Basic Terms.

"BMF" – The Brand Marketing Fund administered by us for the creation, development and administration of marketing, advertising and related programs and materials for the purpose of maximizing general recognition and patronage of the Marks in the United States and throughout the world for the benefit of all La Quinta Lodging Facilities of the Facility Type and, at our option, one or more other types of La Quinta Lodging Facilities or Affiliated Lodging Facilities in the United States and elsewhere.

"Booking Fees and Commissions" - The amounts of any travel agency commission, global or electronic distribution systems fees, fees associated with the use of other electronic booking systems by guests or travel agents, DPM fees (as hereinafter defined) and other related fees that we may require or that we pay third parties on your behalf in connection with reservations for rooms at your Facility.

1

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

"Casualty Event" - The occurrence of a fire at or other casualty to your Facility with the result that the undamaged portion of your Facility cannot reasonably be operated as a La Quinta Lodging Facility and your Facility cannot reasonably be repaired or restored within one (1) year of the occurrence of the event.

"Commence Construction" - (a) With respect to new construction, "Commence Construction" means commence pouring of foundations for the Project; (b) with respect to the conversion of an existing premises, "Commence Construction" means starting conversion as outlined in the Property Improvement Plan.

"Computer Systems" - All computer hardware components and software applications, including future enhancements, additions, substitutions, upgrades and modifications, used or required for use in connection with the operation of your Facility.

"Condemnation Event" - Your receipt of notice of a proposed taking of your Facility (or a material part of your Facility) by eminent domain.

"Confidential Information" - Our and our Affiliates' proprietary and confidential information, documentation, procedures, manuals, know-how, techniques, data and other materials, whether in written, electronic, oral or visual form, relating to the development and operation of La Quinta Lodging Facilities, including, but not limited to (1) the Standards, the System and the System Manuals; (2) site selection criteria for La Quinta Lodging Facilities and Standards for the development of La Quinta Lodging Facilities; (3) sales, marketing and advertising programs for, and information pertaining to, La Quinta Lodging Facilities; (4) our and our Affiliates' reservation systems; (5) information on suppliers and Standards for FF&E and supplies; (6) knowledge of operating results and financial performance of La Quinta Lodging Facilities, other than La Quinta Lodging Facilities you own; (7) training programs and all other information relating to the management and operation of La Quinta Lodging Facilities; (8) computer systems and software programs; and (9) all information pertaining to guests of La Quinta Lodging Facilities, including your Facility, and guests of Affiliated Lodging Facilities regardless of whether collected by us, you or third parties, through the Reservation System, on the Internet, at your Facility or otherwise.

"Control" - The possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities or interests, by contract or otherwise, each as reasonably determined by Franchisor.

"Credit Card Interface" - An interface for automated credit card settlements and authorizations.

"DPM" – Digital Performance Marketing as defined in Section 4.06 of this Agreement.

"Effective Date" - The date upon which Franchisor executes this Agreement as indicated below Franchisor's signature on the signature page.

"Facility" or "your Facility" - Your hotel facility, located or to be located at the Site, which you will establish and operate pursuant to this Agreement as a La Quinta Lodging Facility of the Facility Type described in the Basic Terms.

"Facility Type" - The type of La Quinta Lodging Facility identified in the Basic Terms. The Facility Type does not include any Affiliated Lodging Facilities.

"FF&E" - Fixtures, furnishings, equipment, decorations and signs for your Facility.

2

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

"Force Majeure" - Acts of God, strikes, war, riot, epidemic, fire or other natural catastrophe, terrorist acts or government actions resulting from terrorist acts, or other forces beyond your control.

"Franchisee" or "you" or "your" - The party identified as the Franchisee in the Basic Terms.

"Franchisor" or "we" or "us" - The party identified as the Franchisor in the Basic Terms, or its successors or assigns.

"Gross Room Revenues" - All revenues, net of discounts, from the rental, sale, use, or occupancy of Guest Rooms and any meeting rooms at your Facility including cash and credit transactions, whether or not collected by you, including any revenues deemed to have been received by your Facility pursuant to Section 7.01. Gross Room Revenues do not include taxes on the hotel stay required by law or revenues from telephone calls, vending machines, or the Bright Side Market.

"Guest Room" - Each rentable unit consisting of a room or suite of rooms, the entrance to which is controlled by the same key. Adjacent rooms with connecting doors that can be locked and rented as separate units are considered to be separate Guest Rooms.

"Indemnitees" - Us, LQ Management L.L.C., La Quinta Holdings Inc. and their respective Affiliates, and the directors, officers, employees, shareholders, successors and assigns of each.

"Internet" - All communications between computers and between computers and television, telephone, facsimile and similar communications devices, including the World Wide Web, proprietary online services, E-mail, news groups and electronic bulletin boards.

"La Quinta Lodging Facility(ies)" – A La Quinta Inn or La Quinta Inn & Suites lodging facility or lodging facilities identified by or associated with the Marks. A La Quinta Lodging Facility does not include lodging facilities using only the "by La Quinta" tagline in conjunction with a different primary mark.

"Late Fee" - The highest contract interest rate permitted by law, or one and one-half percent (1½%) per month, whichever is lower.

"Legal Entity" - A corporation, partnership, limited liability company, or other legal entity.

"Losses and Expenses" - All losses and expenses, including compensatory, exemplary, and punitive damages; fines and penalties; attorneys' costs and fees at trial or on appeal and in preparation therefor; experts' fees; court costs; costs associated with investigating and defending against claims; settlement amounts; judgments; and all other costs associated with any of the foregoing losses and expenses.

"Management Agreement" - An agreement entered into between you and a Management Company for the management of your Facility.

"Management Company" - An operating company other than Franchisee engaged by you to manage your Facility.

"Marketing Fee" - The amount identified as the Marketing Fee in the Basic Terms.

"Marks" or "La Quinta Marks" - The current and future trademarks, service marks and trade dress used to identify La Quinta Lodging Facilities, including the distinctive bell tower and red tile roof.

"Monthly Fees" – The fees described in Section 4.04.

3

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

"Opening Approval Notice" - Our written notice acknowledging our approval for your Facility to commence operations as a La Quinta Lodging Facility.

"Opening Date" - The date on which you begin to rent Guest Rooms to the public at your Facility using the System and the Marks under this Agreement after being authorized to do so pursuant to an Opening Approval Notice from us.

"Operating Partner" - See Basic Terms and Section 7.10.

"Other Charges" - All amounts due to us or any of our Affiliates under this Agreement or in connection with your Facility (other than the Booking Fees and Commissions and the fees described in Sections 4.01-4.04), including training program fees, conference fees, La Quinta Returns fees, guest assistance charges, computer system hardware and software and installation costs pertaining to your Facility, fees or charges for participation in sales or marketing or other promotional programs, and reimbursements for costs incurred by us or our Affiliates on your behalf or for the benefit of your Facility.

"Ownership Interest" - Any direct or indirect, legal or beneficial ownership interest of any type, including without limitation (a) in relation to a corporation, the ownership of shares in the corporation; (b) in relation to a partnership, the ownership of a general or limited partnership interest; (c) in relation to a limited liability company, the ownership of a membership interest; or (d) in relation to a trust, the ownership of the beneficial interest of such trust.

"Permanently Disabled" - Being subject to any physical, emotional or mental injury, illness or incapacity that prevents an individual from performing his obligations under this Agreement or under any guaranty of Franchisee's obligations hereunder for at least ninety (90) consecutive days, and from which recovery is unlikely within ninety (90) days from the date such person is determined to be Permanently Disabled.

"Preliminary Plans" - A site plan for the Project, preliminary architectural drawings for your Facility, and all other documentation that is required for you to obtain any necessary governmental approvals for the Project.

"Principal Owner" - Each person or entity that has an Ownership Interest of ten percent (10%) or more in Franchisee, if Franchisee is a Legal Entity. See Exhibit A.

"Project" - The new construction or conversion of, or addition of Guest Rooms to, your Facility.

"Property Improvement Plan" - A description, prepared by us and attached as Exhibit D (if applicable), of certain renovations necessary to convert your Facility to a La Quinta Lodging Facility, or in the case of a Transfer, to upgrade your Facility. It also includes any similar document prepared by us during the Term describing necessary renovations to achieve compliance with Sections 7.01 and 7.05.

"Reservations Fee" - See Basic Terms.

"Reservation System" - A telephonic or electronic reservation system or such technological substitutes as we may determine to be appropriate from time to time.

"Royalty Fee" - See Basic Terms.

"Royalty Fee Rebate" - An amount equal to one half percent (0.5%) of the Gross Room Revenues of your Facility.

"SEC" - The U.S. Securities and Exchange Commission.

4

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

"Site" - The location of your Facility identified in the Basic Terms.

"Standards" - The standards, plans, specifications, policies, procedures and techniques that we or our Affiliates have developed relating to the design, construction, development and operation of La Quinta Lodging Facilities, all of which may be changed by us at our option. The Standards include required and recommended business practices; requirements for advertising and sales literature; standards for guest service; sales techniques and procedures; management, operational and accounting procedures; and standards and specifications for quality, design, warranties, appearance, function and performance.

"System" - Worldwide's distinctive system for developing, operating and promoting lodging facilities identified by the Marks. The distinguishing characteristics of the System include business methods, designs, trade dress, decor, color schemes, and arrangements, the Confidential Information, Standards and the System Manual, all of which we may improve, further develop or otherwise modify from time to time.

"System Manual" - Our confidential System Manual, as amended from time to time, in hard copy or electronic form, which may consist of one or more manuals, containing our mandatory and suggested Standards relating to the development and operation of La Quinta Lodging Facilities and other information relating to your obligations under this Agreement. The term "System Manual" also includes alternative or supplemental means of communicating such information by other media including bulletins, e-mails, videotapes, audio tapes, compact discs, computer diskettes, CD ROMs; USB drives, and designated websites.

"Term" - See Basic Terms.

"Transfer" - The voluntary, involuntary, direct or indirect sale, assignment, transfer, merger, license, sublicense, sublease, collateral assignment, grant of a security, collateral or conditional interest, inter vivos transfer, testamentary disposition or other disposition of this Agreement, any interest in or right under this Agreement, or any form of Ownership Interest in Franchisee or interest in the assets (including but not limited to the Site and improvements comprising your Facility), or revenues or income of your Facility, whether or not such disposition constitutes a transfer or assignment under applicable law including: (1) any transfer, redemption or issuance of an Ownership Interest in the capital stock of, or a partnership or membership interest in, Franchisee or of any interest convertible to or exchangeable for capital stock of, or a partnership or membership interest in, Franchisee; (2) any merger or consolidation of Franchisee, whether or not Franchisee is the surviving corporation; (3) any transfer in, or as a result of, a divorce, insolvency, corporate or partnership dissolution proceeding or otherwise by operation of law; (4) any transfer upon the death of Franchisee or any Principal Owner of Franchisee by will, declaration of or transfer in trust or under the laws of intestate succession; (5) any foreclosure upon your Facility or the transfer, surrender or loss by Franchisee of possession, control or management of your Facility; or (6) any disposition of the Facility or any Ownership Interest in you or the Facility as a result of a bankruptcy or similar proceeding.

"Worldwide" - La Quinta Worldwide, LLC, a Nevada limited liability company, and its successors and assigns.

## ARTICLE 3: GRANT OF RIGHTS

### 3.01    Grant of Franchise.

Subject to the terms and conditions of this Agreement, we grant to you the right, and you assume the obligation, to develop and, upon receiving an Opening Approval Notice, to operate your Facility as a Facility Type at the Site in accordance with the Standards, and to use continuously the La Quinta System solely in connection therewith, during the Term.

5

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

**3.02   Territorial Protection.**

Provided you and your Principal Owners are in full compliance with all terms and conditions of this Agreement and all other agreements between you or any of your Affiliates, and us or any of our Affiliates, we will not  (and will not grant to another person the right to) own, operate or manage another La Quinta Lodging Facility, at a location within the Assigned Area, defined below, except for:

(a) La Quinta Lodging Facilities open (or under commitment to open) as of the Effective Date, and

(b) La Quinta Lodging Facilities that are modifications to, replacements for, or relocations of La Quinta Lodging Facilities open (or under commitment to open) within the Assigned Area as of the Effective Date; provided, however that no such modified, replacement or relocated facility shall have more than one hundred twenty-five percent (125%) of the number of Guest Rooms of the existing La Quinta Lodging Facility being modified, replaced or relocated.

**3.03   Reserved Rights.**

All rights not expressly granted to Franchisee are reserved to Franchisor, its Affiliates and their respective successors and assigns (by purchase, merger or otherwise), including but not limited to:

(a)     Subject only to Section 3.02 of this Agreement, the right to conduct any kind of lodging business or other business, anywhere in the world, within or outside the Assigned Area, including the right to own, develop, operate and manage, and grant to others the right to own, operate and manage lodging facilities, (including, but not limited to, extended stay and full service lodging facilities and lodging facilities utilizing the "La Quinta" or "by La Quinta" tagline in association with a different primary mark) utilizing the La Quinta Marks or any other trademarks or service marks, on such terms and conditions, as we or they deem appropriate; and

(b)     The right to offer, sell and advertise any goods and services (including those services offered by La Quinta Lodging Facilities) under any trademarks or service marks (including but not limited to the La Quinta Marks) from, on an through any medium, including the Internet or any Website.

**ARTICLE 4: FEES**

**4.01   Initial Fee.**

You agree to pay us the Initial Fee, or Transfer Fee, as applicable, set forth in the Basic Terms. The Initial Fee or, if applicable, the Transfer Fee is fully earned, non-refundable, and payable no later than the Effective Date.

**4.02   Expansion Fee.**

If you submit an application to expand your Facility in accordance with the provisions of Section 5.06, you shall pay us an Expansion Fee equal to our then-standard per room Initial Fee multiplied by the number of additional Guest Rooms described in your application. The Expansion Fee will be payable with the written application and will be fully earned if and when the application is approved by us.

**4.03   Credit Card Interface.**

If we elect, at our option, to administer, directly or indirectly, a Credit Card Interface, you agree to pay us any costs and expenses we incur to install software and set up your computer hardware to provide a Credit Card Interface. If we do not elect to administer a Credit Card Interface, you must obtain and at all times utilize such Credit Card Interface services as we may designate from time to time from a third party approved, or at our option, designated by, us and purchase or lease all equipment, software and related services necessary therefore.

6

**4.04 Monthly Fees.**

Beginning with the calendar month in which the Opening Date occurs and continuing for each calendar month or portion of a calendar month during the Term, you shall pay us the Royalty Fee, Reservations Fee and Marketing Fee and, if applicable, a monthly Credit Card Interface fee calculated for such calendar month, or portion of a calendar month; provided, however, that your obligation to pay a Credit Card Interface fee shall not commence unless and until we elect, at our option, to install software and set up your computer hardware to provide a Credit Card Interface.

**4.05 Royalty Fee Rebate.**

If, for any full calendar year beginning with the calendar year that commences after the end of the 24th full month after the Opening Date, (a) your Facility achieves superior results, as determined by us in our sole discretion, using a guest satisfaction tracking system selected by us for determining the satisfaction of guests at La Quinta Lodging Facilities, and (b) you, your Principal Owners and your Affiliates are in full compliance with this Agreement and all other agreements with us or any of our Affiliates, then we will remit to you the Royalty Fee Rebate for the calendar year for which you achieve superior results. Any Royalty Fee Rebate will be paid to you within ninety (90) days following the end of the calendar year to which the rebate relates.

**4.06 Booking Fees and Commissions and Other Charges.**

You agree to pay us all Booking Fees and Commissions and Other Charges. You shall comply with all of our rules and regulations (including payment procedures) regarding Booking Fees and Commissions and Other Charges and any modifications that we in our sole discretion make to those rules and regulations. Booking Fees and Commissions and Other Charges may, in the future, be directly invoiced to you by one or more third-party billing clearinghouses. These clearinghouses may require you to pay them an additional administrative or related fee for their services. You agree to participate fully in the billing clearinghouses in which we participate and agree to pay on a timely basis the amounts of invoices that you receive from these clearinghouses, including the administrative or related fees imposed by the clearinghouses.

You must participate in our Digital Performance Marketing Program ("DPM"). DPM markets the La Quinta brand through major Internet search engines, web site portals and other Internet web sites, including call center and mobile websites and applications, using key words, banner display ads and textual links. You must pay a fee for stays at your hotel resulting from DPM marketing. The fee will be no less than ten percent (10%) and no greater than fifteen percent (15%) of Gross Room Revenues from the applicable stay. The current fee is ten percent (10%) of the applicable Gross Room Revenues. We have the right to change the commission percentage in our discretion at any time up to fifteen percent (15%) of applicable Gross Room Revenues. The DPM fee is in addition to all other applicable reservation fees. The fee applies to revenue you receive in respect of no-show, changed and canceled reservations that you receive through DPM. The fee does not apply to certain reservations as described in our DPM policy. We have the right to change the DPM policy in our discretion at any time.

**4.07 Payment of Fees and Other Amounts; Late Payments.**

Unless paid in accordance with an electronic debit/credit transfer of funds program as described below, we will send you an invoice for all fees and other amounts payable to us. All invoices will be payable upon your receipt and past due thirty (30) days after receipt of the invoice. You should pay all invoices by delivering your payment to us at the following address: P.O. Box 612587, Dallas, TX 75261-2587, Attn: Cash Management, or such other address as we may designate from time to time. We may require that all fees and any other amounts be paid, at your cost, through electronic debit/credit transfer of funds programs that we specify from time to time, and you agree to sign such documents (including independent transfer authorizations), pay such fees and costs and do such things as we deem necessary to facilitate electronic transfers of funds. You agree to maintain sufficient funds in the appropriate accounts

7

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

for such withdrawals. In addition to any remedies available to us, you shall pay to us the Late Fee for all amounts which you owe us or any of our Affiliates beyond their due date. We will have the right from time to time to designate alternative payment terms and procedures (including, without limitation, requiring payment by electronic debit/credit transfer, wire, cashier's check or check) so long as they are consistent with the payment terms and procedures we have designated for franchisees of other La Quinta Lodging Facilities. You agree to comply with those alternative payment terms and procedures.

**4.08   Application of Payments.**

We may, at our option, apply any payments that we receive from you or from any third party on your behalf (including, but not limited to, payments from national account customers) to any of your past due indebtedness for fees, purchases of products or supplies or any other past due indebtedness to us or any of our Affiliates, notwithstanding any contrary designation by you or the applicable third party. You agree that all payments hereunder shall be made as and when due without any setoff, deduction or prior demand therefore. No restrictive endorsement on any check or in any letter or other communication accompanying any payment shall bind us, and our acceptance of any such payment shall not constitute an accord or satisfaction.

**ARTICLE 5: DEVELOPMENT AND OPENING OF FACILITY**

**5.01   Ownership of Facility.**

If you do not own fee simple title to the real property and improvements which comprise your Facility, but instead have a leasehold interest, then within thirty (30) days after the Effective Date and in any event prior to the Opening Date, you will cause the fee simple owner (or another third party acceptable to us) to execute an estoppel and recognition agreement, in form and substance acceptable to us, which, among other things, recognizes our rights in and to the Marks and our rights described in Section 18.02.

**5.02   Development of Your Facility.**

(a)      You shall retain the services of a qualified architect for the development or renovation of your facility. Your selection of an architect is subject to our approval.

(b)      You shall arrange for your architect to develop Preliminary Plans. We may, but shall not be obligated to, provide you with a prototypical set of our standard plans and specifications. Such prototypical plans will not contain the requirements of any federal, state or local law, code or regulation, including the ADA or similar rules governing accommodations for persons with disabilities, nor will such plans contain the requirements of, or be used for, construction drawings or other documentation necessary to obtain permits or authorizations to build a specific La Quinta Lodging Facility.

(c)      You shall submit the Preliminary Plans to us for our review and approval. In addition, construction drawings and specifications shall be submitted to us for our review and approval when each are thirty to fifty percent (30% to 50%) complete and again when each is one hundred percent (100%) complete. Our review and approval of Preliminary Plans and construction drawings and specifications shall be limited to assessing compliance with our Standards. If we do not approve the Preliminary Plans or any set of construction drawings or specifications, we will provide to you and your architect reasonable recommendations that you and your architect shall incorporate into the Preliminary Plans, construction drawings and specifications, as applicable. You shall then have your architect prepare for our review and approval two sets of completed working drawings and specifications for the total Project that incorporate our recommendations, which, when approved by us, shall constitute the "100% LQ Approved Construction Plans." Once we have approved your 100% LQ Approved Construction Plans you must submit the 100% LQ Approved Construction Plans to us in electronic (PDF) and hard copy format. We will stamp our approval on the 100% LQ Approved Construction Plans and return them to you. A copy of the stamped 100% LQ Approved Construction Plans must remain on your construction site at all times during construction.

8

(d)     Following your receipt of the 100% LQ Approved Construction Plans stamped by us, you shall obtain, at your sole cost and expense, all governmental licenses and permits that are required for completion of the Project in accordance with the 100% LQ Approved Construction Plans, including any required building, occupancy, sewer and utility permits. We are not responsible for, and shall have no liability for, the architecture, design, engineering or construction of your Facility, for your Facility's compliance with any federal, state or local law (including the ADA and any other federal, state or local law or ordinance regulating standards for access to, use of the, or modification of buildings for and by persons who are protected by law by virtue of such disability or whose disabilities are otherwise recognized by law), for any errors, omissions or discrepancies of any nature in any drawings or specifications with respect to your Facility, or for any other matter relating to the development, use or operation of your Facility.

**5.03    Construction, Renovation and Opening of Your Facility**.

(a)     No construction, conversion or renovation may commence until your 100% LQ Approved Construction Plans have been approved by us, and you have obtained building permits and otherwise complied with all applicable codes and regulations. You shall undertake, conduct and construct the Project in full compliance with the approved 100% LQ Approved Construction Plans, and no material and/or design changes may be made to the 100% LQ Approved Construction Plans without our prior written consent. Requests for material and/or design changes must be made in writing by you and, if not approved by us in writing, will be considered rejected.

(b)     If your Facility is to be newly constructed, you shall Commence Construction within twelve (12) months after the Effective Date. Construction shall be completed, and your Facility shall open for business as a La Quinta Lodging Facility, within twelve (12) months after the date you Commence Construction; provided however that in no event shall you open your Facility without an Opening Approval Notice as described in Section 5.03(j). Unless otherwise provided in the Basic Terms or agreed by us in writing, the following deadlines apply:

(i)     no later than ninety (90) days following the Effective Date, you must obtain ownership or leasehold rights to the Site and provide us with documentation thereof and submit a copy of your agreement with your architect;

(ii)     no later than one hundred eighty (180) days following the Effective Date, you must submit Preliminary Plans and a copy of your agreement with your selected FF&E vendor and/or interior design company;

(iii)     no later than two hundred seventy (270) days following the Effective Date, you must obtain our approval for your 100% plans, submit the 100% LQ Approved Construction Plans to applicable governmental authorities for permitting, and submit to us a copy of your agreement with your general contractor; and

(iv)     no later than three hundred sixty-five (365) days following the Effective Date, you must pour your foundation and provide photos of poured foundation to us.

(c)     If your Facility is an existing lodging facility to be converted to a La Quinta Lodging Facility, you shall commence construction of conversion renovations within three (3) months after the Effective Date. Conversion renovations and all work described in your Property Improvement Plan shall be completed, and your Facility shall open for business as a La Quinta Lodging Facility, within six (6) months after the date that construction commences; provided however that in no event shall you open your Facility without an Opening Approval Notice as described in Section 5.03(j).

(d)     If you are renovating an existing La Quinta Lodging Facility as a result of a Transfer, you shall commence and complete the required renovations on the schedule outlined in the Property Improvement Plan ("PIP")

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

(e)    If, after opening your Facility, you have obtained our approval to expand your Facility, you shall commence construction within five (5) months after we approve your application in accordance with Section 5.06. New room additions shall be completed and shall be open for business within eight (8) months after the date that construction commences; provided, however, that in no event shall you open your new room additions without an Opening Approval Notice as described in Section 5.03(j) with respect to such additional rooms.

(f)    During the construction, conversion or renovation period, we have the right to visit the Project site at any time to inspect the work. If we believe that the construction, conversion or renovation does not fully comply with the approved 100% LQ Approved Construction Plans or has not been performed in a workmanlike manner, we may bring these deficiencies to your attention, and you shall correct them promptly. You will not be issued an Opening Approval Notice pursuant to Section 5.03(j), below, until such time as all deficiencies are corrected.

(g)    Not later than the 10th day of each calendar month during the construction and/or conversion period, you shall provide to us progress reports, in such form and manner as we may specify in the System Manual or otherwise in writing. Such progress reports may include, among other things, digital photographs.

(h)    Before acquiring or installing any FF&E or interior design elements or packages for your Facility which are not part of our standard interior design packages or have not otherwise previously been approved by us as meeting our Standards, you shall submit your proposed FF&E and interior design elements and packages to us for our review and approval. You shall not acquire or install any of these non-standard FF&E or interior design elements or packages without our prior written approval. If you use a non-standard interior design package or individual item that we have not approved, we may require you to replace at your sole cost and expense any items that do not meet our Standards and you may be charged a re-inspection fee for us or our consultant to review and approve it.

(i)    Although it is important to us that you timely perform your obligations, upon your written request, we may, in our sole discretion, grant you a written extension to commence construction, complete construction, finish conversion renovations or open your La Quinta Lodging Facility for business. The length of the extension, if granted, will be determined by us in our sole discretion, and will be based on a number of factors. You may be required to pay an extension fee for each month that a particular deadline is extended in accordance with our then-current policy, provided, that you will not be required to pay an extension fee if you are delayed due to Force Majeure or you fail to obtain required governmental approvals, provided that you have exercised diligent efforts to obtain such governmental approvals.

(j)    Upon completion of construction, conversion, renovations or any expansion, you shall notify us that your Facility (or the expanded portion of your Facility, as applicable) is ready for a pre-opening inspection. We will then conduct a pre-opening inspection to determine if your Facility (or the expanded portion of your Facility, as applicable) is completed and ready to provide lodging services to guests on a fully operational basis. We shall conduct one (1) inspection without additional charge to you. If we determine, in our sole discretion, that additional inspections are required, you shall reimburse us for all costs and expenses thereof, including a re-inspection fee, travel, lodging and meals. You shall take all measures necessary to promptly remedy any deficiencies indicated by such inspection. Any conditional approval may be rescinded if you fail to satisfactorily remedy your identified deficiencies. We will issue an Opening Approval Notice, which must be countersigned by you and returned to us, signifying that your Facility (or the expanded portion of your Facility, as applicable) may be opened for business as a La Quinta Lodging Facility and establishing the Opening Date if, upon completion of the pre-opening inspection, all of our conditions have been met to our satisfaction, including:

(i)    your Facility or the expanded portion of your Facility, as applicable (including all public areas, work areas and Guest Rooms) is completed (including the completion of work described in

10

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

your Property Improvement Plan, if applicable); contains the number of Guest Rooms set forth in the Basic Terms (or your approved expansion application) and is ready to provide lodging services to guests on a fully operational basis;

(ii)     the governmental authorities under whose jurisdiction your Facility was constructed have issued a permanent certificate of occupancy, if required by applicable law;

(iii)     all other licenses, permits and other consents required for the occupancy and operation of your Facility have been obtained; and

(iv)     all deficiencies revealed in the pre-opening inspection have been corrected and your Facility complies with all of our Standards.

In no event shall your Facility or the expanded portion of your Facility, as applicable, open for business as a La Quinta Lodging Facility prior to our issuance of an Opening Approval Notice. You acknowledge and agree that the opening of the Facility prior to our issuance of an Opening Approval Notice is a breach of this Agreement and will damage the System and the Marks. Accordingly, in the event you open the Facility to the public prior to our issuance of an Opening Approval Notice in addition to and not in lieu of all other remedies available to us hereunder, you shall pay us, upon our demand, as liquidated damages (to compensate us for damages to the System and the Marks in an amount difficult to ascertain, and not as a penalty) an amount equal to $1,000/day for each day the Facility is open to the public without an Opening Approval Notice, plus our costs to enforce our rights under this Section 5.03.

(k)     If your Facility is an existing lodging facility to be converted to a La Quinta Lodging Facility, and the Facility is currently subject to a franchise agreement with a brand other than La Quinta ("Existing Agreement"), you represent, warrant and agree as follows:

(i)     the Existing Agreement will be terminated prior to the date the Facility is scheduled to Open as a La Quinta Lodging Facility;

(ii)     you will not be permitted to open, brand, operate, or market the Facility as a La Quinta Lodging Facility until you provide us with a copy of a duly executed mutual termination agreement or other release of the Existing Agreement, or other confirmation of the termination of the Existing Agreement, in form reasonably satisfactory to us, and such other documentation related to confirming the expiration or lawful and appropriate termination of the Existing Agreement as we may reasonably request (collectively, the "Evidence of Termination").

(iii)     once you provide the Evidence of Termination to us, we will confirm in writing that the condition in this Section 5.03(k) has been satisfied;

(iv)     if you do not deliver the Evidence of Termination by the time the renovations are completed and the Facility is ready to Open as a La Quinta Lodging Facility, then we will have the right to terminate this Agreement by delivering written notice thereof to you, to retain all fees paid by you pursuant to this Agreement, and to collect from you pre-opening Liquidated Damages pursuant to Section 18.03;

(v)     you understand that we are entering into this Agreement based upon your prior acknowledgement that you approached La Quinta about this franchise opportunity and your representations that this Agreement will not conflict with or result in a breach of the Existing Agreement or other agreement to which you or your Facility may be bound which might subject us to liability. In the event of any claim or dispute arising out of the Existing Agreement, then in addition to any other indemnities described in Section 19.03, you agree to indemnify and defend the Indemnitees against and hold them harmless from any and all Actions and Losses and Expenses that may be instituted or threatened against us or that we or they may incur arising out of any claim related to the Existing Agreement or any alleged interference with it. The provisions of this paragraph shall survive any termination of the Agreement.

11

(l)     You represent and warrant that all permits, licenses and approvals required for the La Quinta Lodging Facility have been lawfully issued or will be lawfully issued when required by law and the development and operation of the Facility is and will be in compliance with such permits, licenses, approvals, and other laws, including, but not limited to, those laws referred to in Section 13.02.

(m)     **Neither our approval of the Site nor any assistance we may give you in identifying the Site, constitutes any acknowledgement, warranty or representation of any kind, express or implied, including, without limitation, any warranty or representation as to the potential access, visibility or profitability of a La Quinta Lodging Facility at the Site. Our approval of the Site merely signifies that we are willing to grant a franchise for a La Quinta Lodging Facility at that location. Your decision to develop and operate your Facility at the Site is based solely on your own independent investigation of the suitability of the Site for a La Quinta Lodging Facility. Our exercise of our right to approve the Site layout, to approve any plans, to inspect the construction or conversion of your Facility and to issue the Opening Approval Notice shall be solely for the purpose of assuring compliance with our Standards and shall not be construed as any express or implied representation or warranty that your Facility complies with any applicable laws, codes or regulations (including the ADA or any other federal, state, or local law or ordinance regulating standards for the access to, use of, or modification of buildings for and by persons whose disabilities are protected by law) or that the construction thereof is sound or free from defects. Our criteria for approval or disapproval do not encompass technical, architectural or engineering considerations. We shall have no liability or obligation with respect to the construction or conversion of your Facility.**

### 5.04     Fixtures, Furniture and Equipment.

You agree to purchase or lease all required FF&E. You agree to purchase or lease only such types, brands and models of FF&E which we approve as meeting our Standards. You may purchase or lease approved types, brands or models of FF&E only from suppliers approved by us, which may include us and any of our Affiliates. We have the right to profit from the sale of such items to you and to receive fees from third party suppliers. From time to time, we may modify the list of approved types, brands, models and/or suppliers, and you may not, after receipt of notice of such modification, reorder any type, brand or model, or from any supplier, which is no longer approved by us. If you propose to purchase any FF&E of a type, brand or model, or from a supplier, that we have not previously approved, you shall notify us and submit to us such information as we may request to evaluate your proposal. We have the right to charge reasonable fees to cover our costs to evaluate the proposed brand or supplier. We will notify you of our decision within a reasonable period of time. We may prescribe procedures for the submission of requests for approval and impose obligations on suppliers, which we may require to be incorporated in a written agreement. We may impose limits on the number of suppliers and/or brands for any of the foregoing items.

### 5.05     Opening Assistance.

We will provide you with such opening assistance as we deem appropriate to assist you in starting operations at your Facility, including on-site opening assistance for not more than seven (7) days, starting three (3) days before and ending four (4) days after opening. You agree to reimburse us for the travel, lodging and meal expenses of our personnel providing such assistance.

### 5.06     Expansion of Facility.

If at any time you desire to expand your Facility or otherwise increase the number of Guest Rooms above the number set forth in the Basic Terms, you shall first obtain our approval (which will not be unreasonably withheld) by submitting to us our standard form of application, along with the Expansion Fee pursuant to Section 4.02. As a condition to our approval, we may require that your Facility be upgraded to our then-current standards. The development and construction of any expansion to your Facility shall be subject to all of the provisions of Sections 5.02 and 5.03.

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

**5.07    No Subleases, Etc.**

You shall not lease or sublease any portion of the Facility to a third party, grant any concession to operate any facility at the site, or subcontract any of your rights or duties hereunder, except with our prior written consent which we may withhold in our sole discretion.

### ARTICLE 6: TRAINING AND GUIDANCE

**6.01    Initial Training Program.**

Prior to opening your Facility, you (or, if applicable, your Operating Partner), all of your managers, all front office personnel and certain other designated personnel for your Facility shall attend and successfully complete initial training programs on the operation of a La Quinta Lodging Facility at such time(s) and place(s) as we designate. We may require your Operating Partner, managers and front office personnel for your Facility to attend and successfully complete periodic or additional training programs, and we may also offer optional training programs. We have the right to charge reasonable fees for providing any such initial, periodic or additional training programs. You will be responsible for all compensation and expenses (including travel, meals and lodging) incurred by you (or, if applicable, your Operating Partner) and your personnel in attending any training programs. You shall immediately replace any manager or front office personnel who fail to successfully complete any mandatory training program.

**6.02    Ongoing Guidance.**

We will furnish you periodic guidance with respect to the System, including improvements and changes to the System. Such guidance, at our discretion, will be furnished in the form of the System Manual, bulletins and other written materials, consultations by telephone or in person at our offices or at your Facility, or by any other means of communications. At your request, we may provide special assistance for which you will be required to pay the fees and charges we may establish from time to time.

**6.03    System Manual.**

Within a reasonable time after the Effective Date, we will permit you to use one copy of the System Manual, the terms of which shall supplement this Agreement. You shall operate your Facility in accordance with the System Manual. The System Manual at all times will remain our property. You shall keep it in a secure place at your Facility, and shall return it to us immediately upon request, upon termination or expiration of this Agreement or upon any Transfer. We may periodically revise the contents of the System Manual, or any Standards, based upon the needs of the System, in our sole business judgment. You shall comply with each new or changed System Manual provision or Standard. You shall keep the System Manual current and up-to-date. If any dispute arises as to the contents of the System Manual, the terms of the master copy of the System Manual maintained by us at our corporate headquarters will control. If you lose or misplace the System Manual we may impose a replacement fee which will not exceed $2,500. The System Manual contains Confidential Information, and you agree not to copy any part of the System Manual or use any part of it for any purpose other than the operation of your Facility.

**6.04    Annual La Quinta Convention.**

You or, if applicable, your Operating Partner or other manager of your Facility, shall attend our annual La Quinta conventions. We may, in our sole discretion, also require the managers of your Facility to attend conventions. We may charge your Facility a reasonable fee to cover a proportionate share of the cost of our convention and your representative's attendance (even if you or your representatives fail to attend). You shall be responsible for all compensation and expenses (including travel, meals and lodging) incurred by you and your representatives in attending conventions.

13

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

**6.05     Delegation and Combined Performance of Obligations**.

We shall have the right to delegate our performance of any obligation under this Agreement (including, without limitation, the provision of any service and the operation of any program, such as the BMF described in Section 8.01 hereof and the Reservation System described in Section 8.02 hereof), to an Affiliate or a third party (collectively and individually, a "Delegate"). You agree and acknowledge that we or such Delegate may simultaneously perform the same, similar or different duties for or on behalf of our or such Delegate's company-owned, company-operated or licensed businesses or for or on behalf of businesses owned or operated by third parties, which businesses may be competitive with your Facility and the System and which may be located in the Assigned Area. We and our Delegates shall have the right to perform any such obligations on a combined basis (including, without limitation, utilizing the same or shared personnel) or in conjunction with the performance of the same, similar or different services for or on behalf of our or such Delegate's company-owned, company-operated or licensed businesses or for or on behalf of businesses owned or operated by third parties, which businesses may be competitive with your Facility and the System and which may be located in the Assigned Area. We shall have the right, in our sole discretion, to allocate costs, personnel and other resources among any combined programs.

## ARTICLE 7: FACILITY OPERATING REQUIREMENTS

**7.01     Condition of Facility**.

You shall maintain your Facility's condition and appearance so that it is attractive, clean and efficiently operated. You must maintain your Facility's condition and appearance and make such modifications and additions as we require from time to time, including replacement of worn-out or obsolete FF&E, repair of the interior and exterior and parking areas and periodic cleaning and redecorating. If at any time the general state of repair, appearance or cleanliness of your Facility or its FF&E, does not meet our Standards, we may notify you and specify the action you shall take to correct such deficiency.

You shall periodically upgrade and/or remodel your Facility at your sole cost and expense to conform to the building decor and trade dress and FF&E required under our then-current Standards for La Quinta Lodging Facilities, including such FF&E replacements, remodeling, redecoration and modifications to existing improvements as may be necessary to do so. You shall complete any required upgrading and remodeling of your Facility within the time specified by us, and you acknowledge that your failure to perform such upgrades, except for delays caused by Force Majeure, shall constitute a material default of this Agreement. We will not require substantial upgrading or remodeling more often than every five (5) years during the Term, unless we consider such action to be reasonably necessary. All "soft goods," including carpets, draperies, and bedspreads, and all "case goods," including credenzas, headboards, tables and chairs, shall be maintained in a clean and attractive condition and full working order. You shall replace all "soft goods" at your expense at least once every five (5) years during the Term and all "case goods" at your expense at least once every seven (7) years during the Term, unless we extend these time periods for items that are in good repair and consistent with then-current Standards.

Subject to your right to terminate contained in Section 15.03, if your Facility is damaged or destroyed by fire or other casualty, you shall initiate within ninety (90) days (and continue until completion) all repairs or reconstruction to restore your Facility to its condition immediately prior to such casualty. If, in our reasonable judgment, the damage or destruction is of such a nature that it is feasible, without incurring substantial additional costs, to repair or reconstruct your Facility in accordance with the then-current standard La Quinta Lodging Facility layout and specifications, we may require you to repair or reconstruct your Facility in accordance with those specifications. If as a result of any casualty the monthly Gross Room Revenues for your Facility shall decrease to more than twenty-five percent (25%) below the average monthly Gross Room Revenues for the twelve (12) month period ending the last day of the calendar month prior to the casualty (the "Pre-Casualty Average GRR") and same shall continue for more than one (1) calendar month, then for purposes of calculating the Royalty Fee, Reservations Fee and

14

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

Marketing Fee due us under this Agreement, starting after such calendar month and until the damage caused by such casualty is fully repaired, (a) we will multiply the applicable percentage by the actual Gross Room Revenues received during such month, and (b) add to it the amount of any payment on an insurance policy applicable to the Facility which is designated as remuneration for fees payable under Sections 4.04 or 4.06 of this Agreement during the period of loss or, if that amount is not available, we will multiply the applicable percentage by the amount of lost Gross Room Revenues used by the insurance company to calculate the benefit payable to you for the period of loss and add that to the amount calculated under (a). In the event payment on any insurance policy does not clearly identify either what portion of such payment is attributable to fees owed by the you under Sections 4.04 or 4.06 of this Agreement or the lost Gross Room Revenues for the period of loss, we shall have the right to determine, in our reasonable judgment, the amounts owed by you under Sections 4.04 or 4.06, based upon our historical records of Gross Room Revenues and values you have submitted in proofs of loss, after consultation with you and considering payments received under your property insurance policy. The resulting total due shall be payable by you upon demand.

You may not make any material alterations to your Facility, nor any replacements, relocations or alterations of FF&E, without our prior written approval. We have the right at your expense to correct any replacements, relocations or alterations not previously approved by us.

### 7.02    Authorized Products and Services.

The Facility must offer all products and services, including guest service programs, products we and/or our Affiliates sell or endorse, customer loyalty programs, promotional items and frequent traveler programs and other programs and activities as we deem appropriate from time to time. You agree that your Facility will not, without our prior written approval, offer any products or services (including promotional items) not then authorized by us. Your Facility may not be used for any purpose other than the operation of a La Quinta Lodging Facility in compliance with this Agreement. You agree that your Facility will offer courteous and efficient service and a pleasant ambiance.

### 7.03    Supplies.

You agree that your Facility will use and/or offer for sale only supplies, uniforms, forms, labels and other products and services that conform to our Standards, are of brands and/or are purchased from suppliers (which may include us and/or any of our Affiliates) that we approve. We may modify the Standards and the list of approved brands and/or suppliers or we may change the number of approved suppliers at any time, including designating ourselves, an Affiliate, or a third party as the exclusive source for any particular item. We may also profit from your purchases from approved suppliers, and we and/or our affiliates may receive payments, fees, commissions or reimbursements from approved suppliers in respect of your purchases. After notice of any modification of the list of approved brands or suppliers, you may not reorder any brand or from any supplier which is no longer approved.

If you propose to use any brand and/or supplier which is not then approved by us, you shall first notify us and submit such information, specifications and samples concerning such brand and/or supplier as we may request, so that we can decide whether such brand complies with our Standards and/or such supplier meets our approved supplier criteria. We have the right to charge reasonable fees to cover our costs to evaluate your proposed brand or supplier. We will notify you of our decision within a reasonable period of time. We may prescribe procedures for the submission of requests for approval and impose obligations on suppliers, which we may require to be incorporated in a written agreement. We may impose limits on the number of suppliers and/or brands for any of the foregoing items.

### 7.04    Market Research.

Upon our request, you shall, at your expense, test market new products and services in your Facility in such manner as we may prescribe from time to time and provide us timely reports and other relevant

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

information regarding such market research. You shall purchase a reasonable quantity of such test products and make a reasonable effort to use or sell them, as applicable.

**7.05**     **Standards**.

You acknowledge that each and every aspect of the interior and exterior appearance, layout, decor, services and operation of your Facility is important to us and is subject to our Standards. You agree to comply with all Standards as modified from time to time (whether contained in the System Manual or any other communication) relating to the appearance, function, cleanliness or operation of a La Quinta Lodging Facility, including: (a) advertising and promotional programs; (b) reservation systems; (c) appearance and dress of employees; (d) services and products offered to guests; (e) safety, maintenance, appearance, cleanliness, sanitation, standards of service and operation of your Facility; (f) days and hours of operation; and (g) bookkeeping, accounting and record keeping systems and forms.

**7.06**     **Compliance With Laws and Good Business Practices**.

You shall obtain and maintain in your name and in full force and effect all required licenses, permits, certificates and other authorizations relating to the design, construction, renovation and/or operation of your Facility. You shall design, construct, renovate, operate and maintain your Facility in full compliance with all applicable laws, ordinances and regulations, including all laws relating to the safety and security of the guests of your Facility, and agree not to discriminate, directly or indirectly, against any guests or potential guests due to their race, color, religion, sex, national origin or other legally protected classification. You shall notify us in writing within five (5) days after: (a) the commencement of any legal or administrative action, or the issuance of any order of any court, agency or other governmental instrumentality, which may adversely affect the development, construction, renovation, occupancy or operation of your Facility or your financial condition; or (b) the delivery of any notice of violation or alleged violation of any law, ordinance or regulation, including those relating to safety, health or sanitation at your Facility.

You agree to maintain an atmosphere of high moral and ethical standards at your Facility and to maintain the premises in a clean, safe, and orderly manner. You agree to pay when due all amounts that you owe us or others for items and services used in or by your Facility and all amounts owed under leases and license agreements, recognizing that your failure or repeated delay in making prompt payment for purchases and services may result in your loss of credit rating or standing, which also may be detrimental to us and to other La Quinta Lodging Facility franchisees.

Your advertising and promotion shall not be false or misleading and shall conform to the highest standards of ethical advertising. In all dealings with us, as well as your customers, suppliers, lessors and the public, you shall adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which may be injurious to our business, to the business of other La Quinta Lodging Facilities or to the goodwill associated with the Marks.

You must comply with payment card industry (PCI) standards as we may require.

**7.07**     **Personnel**.

You (or, if applicable, your Operating Partner) shall actively participate in the management and supervision of your Facility. Your Facility shall at all times be under the direct, on-premises supervision of a general manager who has completed our training program to our satisfaction and be staffed by a sufficient number of competent and properly trained employees. You shall notify us, in writing, within three (3) days following the death, permanent disability or termination of employment (for any reason) of your general manager and shall designate a replacement general manager not later than seven (7) days following such death, permanent disability or termination of employment. You are solely responsible for all employment decisions for your Facility, including staffing levels, work schedules, pay rates, hiring, firing, personnel policies, training, benefits, safety, security, supervision and discipline, regardless of whether you received advice from us on any of these subjects. You shall establish at your Facility an

16

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

employee-training program meeting our Standards. You may not recruit or hire any person who is an employee of ours, our Affiliates or of any La Quinta Lodging Facility or Affiliated Lodging Facility operated by us, our Affiliates or another franchisee of ours without obtaining the employer's consent, which consent may be withheld for any reason or no reason.

**7.08    Insurance.**

     a.    Required Coverage.

You shall procure and maintain in force and effect, during the Term of this Agreement and at your expense, such insurance coverage as we may specify from time to time in the Standards. All insurance policies shall be issued by carriers approved by us, shall contain such types and minimum amounts of coverage as we may specify, with such requirements, endorsements and notice as we may specify, and shall name as additional insureds us, and any of our affiliates or related companies or other persons as we specify from time to time in the Standards (collectively these are the "Insurance Requirements"). The initial Insurance Requirements are contained in Exhibit E to this Agreement. We may modify the Insurance Requirements at any time by changing the Standards and publishing them in the System Manual

Your obligation to procure and maintain insurance coverage as provided herein shall not relieve you of your obligations under Section 19.03 of this Agreement.

If you fail or refuse to obtain and maintain any required insurance coverage, or to furnish satisfactory evidence of such insurance coverage and payment of premiums, we shall have the right and authority (without the obligation to do so) and in addition to our other rights and remedies under this Agreement, to obtain such insurance coverage on your behalf. If we do so, you shall fully cooperate with us in its effort to obtain such insurance policies and shall immediately pay any costs, premiums or other charges, together with a reasonable fee for our expenses in so acting, upon demand.

     b.    Requirements in the event of a Claim or Loss:

In the event of a claim against us or any of our Affiliates, you will cooperate with us in the provision of notice and the pursuit of coverage under any applicable liability insurance policy(ies) required by this Agreement.

In the event of covered loss or damage to the Facility resulting in the interruption of your business operations, you shall, in consultation with us, include in your claim a claim for full recovery of the net profits and continuing expenses of the Facility. Continuing expenses must specifically include the Monthly Fees and other fees payable to us as determined under Sections 4.04 and 4.06 of this Agreement, including but not limited to those fees that are calculated as a percentage of Gross Room Revenues and must be submitted with any proof of loss under the applicable property insurance policy. You shall reasonably cooperate with us in the submission of claims for business interruption and keep us informed during the claims process.

In the event that a payment made under any property insurance policy does not identify that portion of the payment corresponding to fees owed by you under Sections 4.04 or 4.06 of this Agreement, we and you shall exercise our best efforts to determine that portion of any payment received under a property insurance policy attributable to fees owed by you under Sections 4.04 and 4.06 of this Agreement. If no agreement can be reached, we shall have the right to determine the amounts owed by you based upon payments received under a property insurance policy, which amounts shall be payable by you to us upon our demand.

**7.09    Rates for Products or Services.**

You have the right, responsibility, and discretion to set room rates as well as pricing for your other products and services, subject to applicable law. However, you agree to honor the terms of any corporate account, discount, national, regional or promotional program that we or our Affiliates establish from time

to time or generally offer to the public. When establishing such promotional or regional/national/corporate account rates and pricing, we will establish rates and prices that are necessary or appropriate in our reasonable judgment to protect and promote the brand, the Marks, and effective competition in the markets in which the particular rate and pricing requirements apply. If we do so, they will apply to all similarly-situated Facilities in those markets.

You agree not to enter into any agreement or arrangement or engage in any concerted practice with other La Quinta Lodging Facilities, any Affiliated Lodging Facilities or others relating to the prices at your Facility or other La Quinta Lodging Facilities.

**7.10    Operating Partner**.

If you are, or at any time become, a Legal Entity, you shall designate an Operating Partner. Your Operating Partner shall be an individual approved by us who shall: (a) hold or have the right to hold (subject to conditions reasonably acceptable to us), not less than ten percent (10%) of the Ownership Interest in you or be an officer, managing partner, managing member, or non-member manager ; (b) have the authority to bind you regarding all operational decisions with respect to your Facility, and (c) have completed our training program for Operating Partners to our satisfaction. Your initial Operating Partner, if applicable, is designated in the Basic Terms.

**7.11    Use of Management Company**.

We reserve the right to require that you engage a third-party professional Management Company to manage your Hotel in compliance with the Franchise Agreement and the Standards. We may require that you engage a Management Company if we determine that you otherwise qualify to be a La Quinta franchisee but do not have sufficient experience managing hotels going into the relationship or if you demonstrate during the term of this Agreement that you cannot sufficiently perform to La Quinta Standards on your own. You may also engage a Management Company voluntarily. In either case, the Management Company will be engaged by you and manage the Facility for you on your behalf. You will select the Management Company, subject only to our written approval. As long as the hotel Management Company selected has sufficient experience and success in the hotel industry and otherwise qualifies, we will not unreasonably withhold our approval. We have identified some Management Companies as "pre-approved" because of their experience managing La Quinta Lodging Facilities and we will share that list with you upon your request, but we do not mandate any particular Management Company. You represent, warrant and covenant to us that the following provisions apply or will apply to your engagement of a Management Company:

(a)    Pursuant to the Management Agreement, you have granted or will grant the Management Company the right to manage your Facility on your behalf, fully in accordance with the terms and conditions of this Agreement.

(b)    The terms of the Management Agreement do or will:

(i)    require the Management Company to manage your Facility fully in accordance with the terms and conditions of this Agreement, the System, and the Standards, including, but not limited to, the requirements of this Agreement related to Confidential Information and the provisions of Section 13.02;

(ii)    permit us to communicate directly with the Management Company on day-to-day matters concerning the management and operation of your Facility;

(iii)    provide that if there is a conflict between the terms of this Agreement and the Management Agreement, the terms of this Agreement will control; and

(iv)    provide that a default under this Agreement caused by Management Company will result in a default under the Management Agreement.

18

(c)     You continue to be responsible to us for performance of all obligations under this Agreement and shall ensure that Management Company will manage your Facility fully in accordance with the terms and conditions of this Agreement and all other agreements between you and us or our Affiliates pertaining to your Facility.

## ARTICLE 8: MARKETING AND RESERVATION SYSTEM

### 8.01    Brand Marketing Fund.

We, or our designee, will administer the BMF. We may use BMF contributions in our sole discretion for any purpose relating to sales, marketing or advertising initiatives or programs that we may adopt from time to time, including preparing or procuring market studies, providing or obtaining marketing services (including, without limitation, conducting client satisfaction surveys, customer relations, customer retention and customer research surveys, focus groups, and interviews), developing, producing, distributing, and placing advertising, engaging in telemarketing activities, establishing, maintaining, updating and upgrading one or more Web sites, obtaining sponsorships and endorsements, preparing and conducting sweepstakes and other promotions, providing and procuring public relations services, conducting public relations activities and obtaining vinyl for use on billboards, and development, registration, maintenance, promotion and protection of the Marks, including any associated legal costs. We may, at our option, elect to administer the BMF for the combined benefit of one or more types of La Quinta Lodging Facilities. The BMF will not be used to defray any of our general operating expenses, except for reasonable salaries, administrative costs and overhead we may incur in activities related to the administration of the BMF and its programs, including conducting market research, national account sales efforts, preparing advertising and marketing materials, collecting and accounting for contributions to the BMF, and developing, registering, maintaining and protecting the Marks.

We will have sole control over the creative concepts, content, form, and media placement of all advertising and promotional materials developed with BMF contributions, and the allocation of BMF monies to production, placement, or other costs and may, among other things, in our sole discretion create and allocate funds for conducting advertising and marketing programs on a national, regional or local basis. We may use BMF contributions for creating or placing advertisements that are principally for the solicitation for new franchisees. Additionally, we may include in all advertising prepared from BMF contributions (including Internet advertising) information concerning franchise opportunities, and a portion of BMF contributions may be used to create and maintain one or more Web sites or interior pages on Web sites devoted to advertising franchise opportunities and identifying and screening inquiries and applications submitted by franchise candidates.

Although one of the goals of the BMF is to maximize general recognition and patronage of the Marks for the benefit of all Facility Types and, at our option, all La Quinta Lodging Facilities of one or more other facility types, we cannot assure you that any particular La Quinta Lodging Facility will benefit directly or pro rata from the placement of advertising.

Marketing Fees payable pursuant to this Agreement will be contributed to the BMF. The BMF will be accounted for separately from our other funds, but its funds may be deposited in any of our general accounts and commingled with our other funds, including advertising funds of Affiliated Lodging Facilities. We shall not be obligated to credit the BMF with interest. We may spend in any fiscal year an amount greater or less than the aggregate contributions of all La Quinta Lodging Facilities to the BMF in that year. The BMF may borrow from us or other lenders to cover deficits in the BMF. The BMF may invest any surplus for future use by the BMF or use BMF funds to repay loans made to the BMF by us or other lenders. We will prepare annually a statement of monies collected and costs incurred by the BMF and furnish you with a copy upon your written request. Except as otherwise expressly provided in this Section 8.01, we assume no direct or indirect liability or obligation with respect to the maintenance, direction or administration of the BMF. We do not act as trustee or in any other fiduciary capacity with respect to the BMF.

**8.02    Reservation System**.

We agree to administer (either directly or through an Affiliate or third party) the Reservation System. The Reservation System may provide reservation services to lodging facilities other than La Quinta Lodging Facilities, including Affiliated Lodging Facilities. You shall participate in the Reservation System in such manner as we may prescribe from time to time in the System Manual or otherwise in writing, and shall purchase (or lease), install, use and maintain such Computer Systems and communications systems as we may designate and require from time to time in order to participate in the Reservation System. You shall execute such license agreements as may be necessary in connection therewith and comply with all of our policies and procedures relating to the Reservation System. All information collected by and through the Reservation System, regardless of whether collected by you or your Facility, shall become our sole property. You will not establish your own reservation system for your Facility without our consent.

**8.03    Internet Advertising and Reservations**.

(a)    You agree not to promote your Facility or offer reservations through the Internet without our prior written consent, which we may withhold in our sole discretion. In connection with any such consent, we may establish such requirements as we deem appropriate, including, without limitation: (i) obtaining our prior approval of any Internet domain name and home page addresses; (ii) submission for our approval of all Web site pages, advertising, materials and content; (iii) submission for our approval of all metatags, hyperlinks and other links; (iv) restrictions on use of any materials (including text, video clips, photographs, images and sound bites) in which any third party has any interest; (v) obtaining our prior approval of any modifications; and (vi) you consenting in advance to our removal of any Web site pages, materials, advertising and content as we deem desirable, in our sole discretion, to maintain and enhance the goodwill associated with the Marks.

(b)    We may, at our option, market and advertise La Quinta Lodging Facilities, and offer reservation services for La Quinta Lodging Facilities, through the Internet. Such programs and services may, at our option, be paid for partially or wholly by the BMF.

(c)    The following provisions shall apply with respect to any such Internet Web site developed by us or our Affiliates:

(i)    We will have sole discretion and control over the Web site's design and content. We may create a single Web site for the System and Affiliated Lodging Facilities, may link the Web site to a Web site for Affiliated Lodging Facilities, and may otherwise combine, connect and integrate the Web site with Affiliated Lodging Facilities. We will not be obligated to maintain the Web site indefinitely, and may discontinue it at any time without being liable to you. You understand that we have no control over the stability or maintenance of the Internet generally and agree that we are not responsible for damage or loss caused by errors of the Internet. We are not liable for any direct, indirect, special, incidental, exemplary or consequential damages (including loss of profits, goodwill, damage to or replacement of programs, data or other information) resulting from any failure of the Internet or the Web site, regardless of the cause of the failure.

(ii)    We may, but are not obligated to, create and incorporate into our Web site one or a series of interior pages which may include information about your Facility. If we create such interior pages or sites specific to your Facility, we may require you to utilize such pages or sites on such terms as we specify in the Standards, including paying to us or our designee all fees relating to the development of the interior page or site and any fees (which may be assessed on a *pro rata* basis) relating to hosting the Web site.

(iii)    If we permit or require you to advertise your Facility on an interior page or site, we may establish and enforce reasonable rules and regulations, and impose reasonable fees, relating to your advertising, which we may periodically amend in our discretion. The rules and regulations may relate to, among other things, content, creation, customer service, privacy, and access. We also may

20

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

require you to execute or assent to a terms of use agreement relating to the Web site in a form substantially similar to the form of terms of use agreement described in Section 8.07.

**8.04    Cooperative Advertising and Marketing Programs**.

We may establish and coordinate cooperative advertising, marketing and sales programs, guest services programs, guest loyalty programs, frequent traveler programs, and other similar programs or activities as we deem appropriate. These programs or activities may be on a local, regional or national basis or based on the market orientation of La Quinta Lodging Facilities, and they may include participation by lodging facilities other than La Quinta Lodging Facilities, including Affiliated Lodging Facilities. You shall participate in such programs and activities as we may prescribe. Such programs and activities may require you to incur expenses and to pay reasonable fees to us.

**8.05    Grand Opening Marketing and Advertising**.

You must expend an appropriate amount prior to the Opening Date and for the 8 weeks following the commencement of operations of the Facility for an initial opening advertising and promotion program to be conducted in accordance with our Standards. If we request it, you must submit the grand opening marketing and advertising plan and budget to us for approval. Amounts spent on your grand opening marketing, advertising and promotion program shall be paid directly to the applicable service providers and not to us. You must submit documentation of completion of your grand opening promotion program upon our request.

**8.06    Your Advertising**.

You shall submit to us for our prior approval samples of all advertising and promotional materials not prepared or previously approved by us and which vary from our standard advertising and promotional materials. You may not use any advertising or promotional materials or methods until they have received our approval and must immediately discontinue the use of any previously approved advertising or promotional materials or methods which we subsequently disapprove. You may not solicit or direct any advertising or promotional materials or other communications to any current, former or potential future guest of a La Quinta Lodging Facility or an Affiliated Lodging Facility unless you do so in accordance with our Standards.

**8.07    Intranet/Extranet**.

At our request, you shall participate in any intranet or extranet system developed for use in connection with the System. Such intranet or extranet system may be combined with that of Affiliated Lodging Facilities. You shall also sign such terms of use agreements concerning the use of such intranet or extranet system as we may prescribe, which agreements may contain, among other things: (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system. You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

## ARTICLE 9: RECORDS AND REPORTS

**9.01    Records**.

You agree to prepare and to maintain for five (5) years complete and accurate books, records and accounts (using our standard chart of accounts, if we designate one) for your Facility, copies of your sales, occupancy and use tax returns and such portions of your state and federal income tax returns as relate to your Facility. All such books and records shall be kept at the Site or such other place as you regularly maintain your business records, unless we otherwise approve.

21

**9.02   Computer Systems.**

(a)     You shall acquire, install and use such Computer Systems as we may require from time to time (including front-desk and back-office systems) which are fully compatible with our computer systems and which include an information interface capability to communicate electronically with our computer systems. You agree to use such communications systems as we may require from time to time to facilitate communications between your Computer Systems and our computer systems, including the electronic transmission of information required pursuant to Section 9.03, and to provide communications services, including Internet access and other communications, to guests consistent with our Standards. Contemporaneously with the execution of this Agreement, you shall execute the Computer Systems License and Maintenance Agreement attached as Exhibit C, and shall at all times thereafter comply with such agreement.

(b)     You must purchase (or at our option, lease) the Computer Systems we designate from us or our Affiliates unless we allow you to purchase or lease your Computer Systems from a supplier approved or designated by us. If we allow you to purchase any Computer Systems from a supplier approved by us, you shall be responsible for procuring and shipping the Computer Systems we designate to us or to such place as we designate so that we may arrange for the installation of any required software described in Exhibit C. You shall be responsible for determining and meeting, in a timely manner, all site preparation requirements for computer hardware operation, including environmental controls, phone service, electrical service and cable installation. If we require you to use any additional or alternative proprietary software, you agree to execute and comply with such software license agreements as we deem necessary to protect our interests, and you agree to pay such license, training and maintenance fees as we deem reasonably appropriate.

(c)     You agree to provide such assistance as may be required to connect your Computer Systems with our computer system. Subject to applicable law, we have the right from time to time and at any time to retrieve such data and information from your Computer Systems as we, in our sole discretion, deem necessary or desirable, with the cost of such electronic retrieval to be borne by you. In view of the importance of the contemplated interconnection of computer systems and the necessity that such systems be compatible with each other, you agree to strictly comply with our Standards for all items associated with your Computer Systems.

(d)     To ensure full operational efficiency and optimum communication capability between and among computer systems, you agree, at your expense, to keep your Computer Systems and communications systems in good condition and free from viruses and other defects or impairments, and to promptly install such additions, changes, modifications, substitutions or replacements to hardware, software and other related facilities, as we direct.

**9.03   Periodic Reports.**

(a)     You shall make available to us: (i) daily, information (in such format and detail as we may require from time to time) on occupancy, average daily room rate, rooms sold, and Gross Room Revenue and such other information as we may require; and (ii) within ten (10) days after the end of each month, a report on Gross Room Revenues for the immediately preceding month. As long as occupancy, average daily room rate, rooms sold, Gross Room Revenues and related information is available to us through the Computer Systems, we will not require you to make a separate submission of this information. You agree to submit it upon our request, in a form we specify.

(b)     If we request it, you will provide us, in a form we specify, with: (i) monthly and year-to-date income statements for such preceding month and a balance sheet as of the end of such month; (ii) within ninety (90) days after the end of each calendar year, a year-end balance sheet and income statement and statement of cash flow of your Facility for such year, reflecting all year-end adjustments and accruals; and (iii) such other information as we may require from time to time, including sales, and income tax statements.

22

(c)     You shall verify that the information in each report and financial statement you submit is complete and accurate and sign it. We have the right to disclose data from such reports and statements or available to us from through the Computer Systems, if we consider disclosure advisable. We reserve the right to require that your annual financial statements be audited, at your expense, by an independent certified public accountant approved by us.

(d)     At our request, you agree to transmit any of the foregoing information to us electronically or by any other means we designate in accordance with such policies and procedures as we may establish from time to time. In connection with any such electronic communications, you agree that (i) such electronic reports shall be deemed to be a "writing," and such reports shall be deemed for all purposes to have been signed and to constitute an original when printed from electronic files or records established and maintained by us in the normal course of business; and (ii) you will not contest the validity, enforceability or admissibility of any such reports, if introduced as evidence on paper in any judicial or arbitration proceedings.

## ARTICLE 10: COMPLIANCE WITH SYSTEM

### 10.01   Audits.

We have the right at any time during business hours, and without prior notice to you, to inspect, photocopy and audit the hard copy and electronic books, records, tax returns and documents relating to the development, ownership, lease, occupancy or operation of your Facility, or compliance with this Agreement. You shall cooperate fully with our representatives and independent accountants conducting such audits. If any inspection or audit discloses an understatement of Gross Room Revenues, you shall pay us, within seven (7) days after receipt of the audit report, all fees, including Royalty Fees, Marketing Fees and Reservations Fees, due on the amount of such understatement, plus interest (as provided in Section 4.07) from the date originally due until the date of payment. Further, if such inspection or audit is made necessary by your failure to furnish reports, records or information on a timely basis, or if we determine an understatement of Gross Room Revenues for the period of any audit to be greater than three percent (3%) of the amount due for such period, you shall reimburse us for the cost of such audit or inspection, including the charges of any attorneys and independent accountants and the travel expenses, room and board and compensation of our employees investigating such matters.

### 10.02   Inspections.

In order to determine your compliance with this Agreement and the System, we and our designated agents have the right from time to time during business hours, and without prior notice, to inspect your Facility. In connection therewith, we may use cameras, audiotape recorders and/or videotape recorders and interview personnel and guests of your Facility. You agree to cooperate fully with any such inspection activities. You will be charged a reasonable fee plus the travel expenses, room and board and compensation of our employees in connection with any re-inspection of your Facility that occurs as a result of your Facility failing any previous quality assurance inspection, failing to achieve a satisfactory satisfied intent to return score, failing to comply with any Standards or this Agreement or failing to complete PIP requirements by the specified deadlines.

## ARTICLE 11: TRADEMARKS

### 11.01   Ownership of the Marks.

You acknowledge that our affiliate, Worldwide, owns the Marks. Your right to use the Marks is derived solely from this Agreement and is limited to conducting business pursuant to and in compliance with this Agreement. Your unauthorized use of any of the Marks constitutes a breach of this Agreement and an infringement of Worldwide's rights to the Marks. This Agreement does not confer on you any goodwill or other interests in the Marks. Your use of the Marks and any goodwill established thereby inures to the exclusive benefit of Worldwide. All provisions of this Agreement applicable to the Marks apply to any additional or substitute trademarks, service marks and trade dress we authorize or require you to use. You

23

may not at any time during or after the Term contest, or assist any other person in contesting, the validity or ownership of any of the Marks.

## 11.02 Use of the Marks.

You shall use the Marks as the sole identification of your Facility, provided you identify yourself as the independent owner of your Facility in the manner we prescribe. You shall use the Marks as we prescribe in connection with the sale of lodging services and related products and services. You may not use any Mark (or any abbreviation, modification or colorable imitation) as part of or in association with any entity or business name or in any other manner not expressly authorized by us in writing (including as an electronic media identifier, such as a Web site, Web page or domain name).

## 11.03 Discontinuance of Use of Marks.

If we determine in our sole discretion that it becomes advisable at any time for us and/or you to modify or discontinue use of any Mark and/or use one or more additional or substitute trademarks, service marks or trade dress, you agree to comply with our directions within a reasonable time after notice. Neither we nor Worldwide shall have any liability or obligation whatsoever with respect to any such required modification or discontinuance of any Mark or the promotion of a substitute trademark, service mark or trade dress.

## 11.04 Notification of Infringements and Claims.

You shall notify us immediately of any apparent infringement of or challenge to your use of any Mark, or any claim by another person of any rights in any Mark. You may not communicate with any person, other than your legal counsel, us, Worldwide and its legal counsel, in connection with any such infringement, challenge or claim. Worldwide will have sole discretion to take such action as it deems appropriate and will have the right to control exclusively any litigation or U.S. Patent and Trademark Office proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark. You shall sign any and all documents, render such assistance and do such things as may be advisable in the opinion of Worldwide's legal counsel to protect its interests in any litigation or U.S. Patent and Trademark Office proceeding or otherwise to protect its interests in the Marks.

## 11.05 Domain Names.

You may not register the Marks as part of any Internet domain name or URL, and may neither display nor use any of the Marks or other of our or our Affiliates' intellectual property in connection with, or associate the System with (through a link or otherwise) any Web site advertising, address or listing on the World Wide Web or any other portion of the Internet without our prior written consent.

## 11.06 Indebtedness.

You may not use the Marks to incur any obligation or indebtedness on behalf of us or our Affiliates.

## 11.07 Infringement.

You acknowledge that your unauthorized use of any of the Marks will constitute infringement of our or Worldwide's rights therein, which will entitle us or Worldwide to obtain an injunction in any court of competent jurisdiction, under applicable equity rules, to restrain such infringement.

## 11.08 Assignment.

You hereby assign to us all tangible media of expression derived from any of the Marks, and agree to execute such further assignments as we may request. You shall take all actions and sign all documents necessary to give effect to the purpose and intent of this Section 11.08. You irrevocably appoint us as the true and lawful attorney-in-fact for you and authorize us to take such actions and to execute, acknowledge and deliver all such documents as may from time to time be necessary to convey to us all rights granted by this Agreement.

24

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

## ARTICLE 12: FRANCHISEE'S COVENANTS

### 12.01   Confidential Information.

We will disclose parts of the Confidential Information to you solely for your use in the operation of your Facility. The Confidential Information is proprietary and includes our trade secrets. During the Term and thereafter: (a) neither you or your Principal Owners may use the Confidential Information in any other business or capacity (you acknowledge such use is an unfair method of competition); (b) you shall exert your best efforts to maintain the confidentiality of the Confidential Information; (c) neither you nor your Principal Owners may make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form; and (d) you shall implement all reasonable procedures we prescribe from time to time pertaining to the proper use of, and to prevent unauthorized use or disclosure of, the Confidential Information, including the use of nondisclosure agreements with your officers, directors, managers and assistant managers and the delivery of such agreements to us.

### 12.02   System Loyalty.

You shall use every reasonable means necessary to encourage and promote the use of La Quinta Lodging Facilities by the traveling public and never divert or attempt to divert any business or customer of your Facility or any other La Quinta Lodging Facility or Affiliated Lodging Facility to any competitor or do anything injurious or prejudicial to the goodwill associated with the Marks or the System. You agree to refer all requests for room accommodations to a La Quinta Lodging Facility or an Affiliated Lodging Facility, if one exists in the vicinity of the desired location.

## ARTICLE 13: FRANCHISEE'S REPRESENTATIONS AND WARRANTIES

### 13.01   General Representations and Warranties.

You represent and warrant to us that:

(a)      Neither you nor any of your Principal Owners has made any untrue statement of any material fact or has omitted to state any material fact in obtaining the rights granted hereunder.

(b)      If you are, or at any time become, a Legal Entity:

(i)      you are duly organized and validly existing under the laws of the state of your organization, and you are duly qualified to transact business in the state in which your Facility is located.

(ii)      your execution and delivery of this Agreement have been duly and validly authorized by all necessary action, and no other proceedings on your part are necessary for you to authorize this Agreement.

(iii)      true and complete copies of your articles of incorporation, bylaws, partnership agreement, operating agreement, regulations (as applicable), and all other documents relating to your ownership, organization, capitalization, management and control have been delivered to us, and all amendments thereto shall be promptly delivered to us; and

(iv)      Exhibit A is a current, complete and accurate list of all of your Principal Owners. You agree to furnish promptly to us during the term an updated Exhibit A, so that Exhibit A is at all times current, complete and accurate.

(c)      You have the authority to execute and deliver this Agreement and to perform your obligations hereunder.

(d)      This Agreement has been duly executed and delivered by you and, assuming the due authorization, execution and delivery by us, constitutes a legal, valid and binding obligation of yours, enforceable in accordance with its terms.

25

(e)     Your execution and delivery of this Agreement does not, and your performance of your obligations under this Agreement will not, with or without the giving of notice or the lapse of time or both, (i) conflict with or violate your organizational documents, if applicable, (ii) conflict with or violate any law, statute, ordinance, rule, regulation, order, judgment or decree applicable to you, or (iii) conflict with, result in any breach of, or constitute a default under, any contract, agreement, lease, license, permit, franchise or other instrument or obligation to which you are a party or by which you are bound.

(f)     You own fee simple title to the real property and improvements which comprise your Facility or, you instead hold a leasehold interest in the same with a lease term (plus renewal options) extending at least to the end of the Term and you have provided or will provide to us an estoppel and recognition agreement in accordance with Section 5.01.

**13.02    Anti-Terrorism, Anti-Bribery and Anti-Corruption Laws**.

(a)     You and your Principal Owners represent and warrant to us and agree that:

(i)     Neither you nor any Principal Owner, nor any officer, director, shareholder (or member or partner) having a controlling interest in you, or member of senior management of you or any Principal Owner, nor any owner of the Facility or the Site, is a Restricted Person. A "Restricted Person" for purposes of this Agreement is (a) the government of any country that is subject to an embargo or other sanctions imposed by the government of the United States (an "Embargo"); (b) an individual or entity located in or organized under the laws of any country subject to an Embargo; (c) a person ordinarily resident in any country subject to an Embargo; and (d) a person identified from time to time by any government or legal authority as a person with whom we are or our Affiliates are prohibited or restricted from doing business, including, but not limited to, persons identified, either by name or an alias, pseudonym or nickname, on the lists of "Specially Designated Nationals" or "Other Blocked Persons" maintained by the U.S. Treasury Department's Office of Foreign Assets Control (texts currently available at http://www.ustreas.gov/offices/enforcement/ofac/) and similar listings of restricted parties, including applicable lists maintained by other governments.

(ii)     You, your Principal Owners, any officer, director, shareholder (or member or partner) having a controlling interest in you, or member of senior management of you or any Principal Owner, and any owner of the Facility or the Site, have complied and will comply in all material respects with applicable anti-bribery, export control, anti-money laundering, anti-terrorism and economic sanctions laws, including acts prohibited by the U.S. Patriot Act, U.S. Executive Order 13244, the US. Foreign Corrupt Practices Act ("FCPA"), the U.K. Bribery Act, U.S. Anti-Money-Laundering laws, and/or similar laws.

(iii)     Neither you, nor any of your Principal Owners, nor any officer, director, shareholder (or member or partner) having a controlling interest in you, nor any member of senior management of you or of any Principal Owner, nor any owner of the Site (a) has made or will make, has offered or will offer to make or authorized or will authorize any payment or provided or will provide any gift, property or service that is not permitted by the FCPA or any other applicable laws; or (b) has, with the corrupt intent to obtain or retain business, directly or indirectly offered, paid or promised to pay, or authorized the payment of, or will directly or indirectly offer, pay, or promise to pay any money or provide any property, service or other thing of value (including any fee, gift, sample, travel expense or entertainment with a value in excess of US $100 in the aggregate to any one individual in any year) or any commission payment to: (A) any person who is an official, officer, agent, employee or representative of any governmental entity; (B) any political party or official thereof; or (C) any candidate for political or political party office in violation of applicable laws (including applicable anti-bribery laws).

(iv)     Any funds received or paid in connection with entry into or performance of this Agreement have not been and will not be derived from or commingled with proceeds of any activities that are proscribed by the laws described in this Section 13.02.

26

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

(v)      You have not and will not obtain, receive, transfer or provide any funds, property, debt, equity or other financing related to this Agreement to or from a person that qualifies as a Restricted Person or, to your actual or constructive knowledge, is otherwise the target of any applicable trade restriction.

(b)      In conducting your business under this Agreement, you agree to comply with all laws described in this Section 13.02, to make reasonable efforts to assure that your employees, agents and contractors comply in all material respects with the representations, warranties and agreements in this Section 13.02 and are aware of their legal responsibility to do so and to place into effect and maintain a compliance policy and procedure designed to prevent and detect violations of these laws in your business dealings with us or with third parties.

(c)      You agree to notify us in writing immediately if you or any of your Principal Owners or any other person described in this Section 13.02 become Restricted Persons or come under investigation for or are found guilty of any of the offenses described in this Section 13.02 and, when requested to do so by us from time to time to certify in writing the continuing accuracy of the representations and warranties contained in this Section 13.02.

**13.03   Continuing Representations.**

The foregoing constitute continuing representations and warranties, and you and your Principal Owners shall notify us immediately in writing of the occurrence of any event or the development of any circumstance that might render any of the foregoing representations and warranties false, inaccurate or misleading.

## ARTICLE 14: RIGHTS TO TRANSFER

**14.01   Franchisee's Transfer; Franchisor's Approval.**

The rights and duties created by this Agreement are personal to you. Accordingly, no Transfer shall occur without our approval and without complying with all of the provisions of Article 14. Any Transfer without such approval or compliance shall constitute a breach of this Agreement and shall be void and of no force or effect.

**14.02   Conditions for Approval.**

We will not unreasonably withhold our approval of a Transfer that meets all of the restrictions, requirements and conditions we impose on the Transfer, the transferor(s) and/or the transferee(s), including the following:

(a)      you have fully completed the development, renovation or expansion of your Facility, as applicable, and are operating your Facility in accordance with this Agreement;

(b)      you and your Principal Owners and Affiliates are in full compliance with the provisions of this Agreement and all other agreements with us and any of our Affiliates;

(c)      the proposed transferee shall provide us on a timely basis with all information we request about it and its Principal Owners, including, but not limited to, submitting our then-current Franchise Application along with a non-refundable Application Fee of $5,000, and shall be individuals who are of good character and reputation who have sufficient business experience, aptitude and financial resources to operate your Facility, and who otherwise meet our approval;

(d)      the transferee (or, if applicable, its operating partner) and all managers and front office personnel shall have completed our initial training programs to our satisfaction or agrees to do so as part of a new Franchise Agreement;

(e)      the transferee shall agree to be bound by all of the provisions of this Agreement for the remainder of the Term or, at our option, execute our then current standard form of franchise agreement

27

and related documents used in the state in which your Facility is located (which may provide for different royalties, marketing fees, reservation fees, duration and other rights and obligations than those provided in this Agreement); and such of the transferee's owners as we designate shall execute a guaranty or other agreement in such form as we prescribe, undertaking to guaranty the payment and performance of each of your obligations under this Agreement;

(f) you or the transferee shall pay to us an amount up to $2,500, plus our associated travel costs, to conduct one (1) inspection of the Facility and develop a property improvement plan. Should we determine, in our sole discretion, that additional inspections are required, you shall pay to us our costs and expenses thereof, including an additional re-inspection fee and costs of travel, lodging, and meals;

(g) the transferee shall agree, pursuant to an agreement in form and substance satisfactory to us, to upgrade and/or remodel your Facility to conform to the building decor and trade dress and FF&E required under our then-current Standards for La Quinta Lodging Facilities;

(h) you or the transferee shall pay us a Transfer Fee equal to the then-current Initial Fee (which shall be waived if the Transfer is a reorganization or recapitalization of Franchisee in which the Principal Owners remain the same, or the contribution of your Facility and the Site to a Legal Entity in which you shall have a majority Ownership Interest and Control), against which shall be credited an amount equal to the non-refundable Application Fee actually paid to us pursuant to Section 14.02(c) above;

(i) you and your Principal Owners and Affiliates shall, except to the extent limited or prohibited by applicable law, execute a general release, in form and substance satisfactory to us, of any and all claims against us and our Affiliates, and their respective stockholders, officers, directors, employees, agents, successors and assigns;

(j) if you (or any of your Principal Owners or Affiliates) finance any part of the sale price of the transferred interest, you and/or your Principal Owners or Affiliates shall agree that all obligations of the transferee, and security interests reserved by you or any of your Principal Owners or Affiliates in the assets of your Facility, will be subordinate to the transferee's obligations to pay all amounts due us and our Affiliates and to otherwise comply with this Agreement or the new franchise agreement executed by the transferee;

(k) you and your Principal Owners and Affiliates shall execute such other documents and do such other things as we may reasonably require to protect our rights and interests under this Agreement and under any other agreements entered into with us or any of our Affiliates; and

(l) you or the transferee shall pay to us an amount up to $5,000, plus associated travel lodging, and meal expenses, to cover costs and expenses associated with the Initial Training Program for the transferee's staff.

We shall have the right, in our sole discretion, to increase or otherwise modify the amount of the fees described in Sections 14.02(f) and (l) to reflect (i) increases or decreases in our cost of inspecting the Facility and developing a property improvement plan, or reviewing and evaluating the Transfer, as applicable, or (ii) any change in the fees associated with Initial Training, all as reflected in the Standards applicable from time to time.

You may elect as part of a Transfer agreement with your transferee to allocate to the transferee responsibility for payment of all or a portion of the fees outlined in this Section; however, if the transferee fails to make such payments allocated to it, we will not approve the Transfer. Upon completion of a Transfer that results in a termination of this Agreement, we will include the releases required by Section 14.02(i) in a mutual termination agreement, on our then-current form, by which we will release you from liability for fees resulting from operation of the Facility after the termination date.

28

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

**14.03   Effect of Approval.**

Our approval of a Transfer does not constitute: (a) a representation as to the fairness of the terms of any agreement or arrangement between you or your Principal Owners and the transferee or as to the prospects of success of your Facility by the transferee; or (b) a release of you and your Principal Owners, a waiver of any claims against you or your Principal Owners, or a waiver of our right to demand the transferee's exact compliance with this Agreement. Any approval shall apply only to the specific Transfer being proposed and shall not constitute an approval of, or have any bearing on, any other Transfer.

**14.04   Death or Disability of Franchisee.**

Upon the death or Permanent Disability of an individual Franchisee, or the death or Permanent Disability of a Principal Owner of a Franchisee that is a Legal Entity, the executor, administrator or other personal representative of such person shall Transfer the affected Ownership Interest in Franchisee to another Principal Owner or other third party approved by us in accordance with all of the applicable provisions of Article 14 within a reasonable period of time, not to exceed nine (9) months from the date of death or Permanent Disability. If the parties disagree as to whether a person is "permanently disabled," the determination will be made by a licensed practicing physician, selected by us, upon examination of the person; or, if the person refuses to submit to an examination, then for purposes of this Section, the person automatically will be considered permanently disabled as of the date of refusal. We will pay the costs of any examination required by this Section.

**14.05   Special Transfers.**

Notwithstanding anything to the contrary contained in Article 14, the prior approval of Franchisor shall not be required with respect to the following transactions: (a) the issuance, sale or other Transfer in one or more related or unrelated transactions resulting in the aggregate of less than fifty percent (50%) of the beneficial Ownership Interest in Franchisee (if Franchisee is Legal Entity) being issued or Transferred to one or more persons who are not Principal Owners, or (b) the public issuance or sale (i.e., a sale of shares pursuant to the registration provisions of the Securities Act of 1933, as a result of which a public market is created in the shares of stock of Franchisee on an internationally recognized stock exchange or on the over-the-counter market administered by the National Association of Securities Dealers) from time to time of fifty percent (50%) or more of the beneficial Ownership Interest in Franchisee for so long as there does not occur any "Change in Control," as defined below; provided, however, that in no event shall any Transfer be made to an individual or Legal Entity identified as a "Restricted Person", "Specially Designated National" or "Other Blocked Person" on the lists described in Section 13.02.

For purposes of this Section 14.05, a "Change in Control" of Franchisee shall mean a change in possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of Franchisee, whether through ownership of voting shares, by contract or otherwise, and shall be deemed to take place if: (a) any person (other than a Principal Owner) becomes the beneficial owner of twenty five percent (25%) or more of the total number of voting shares of Franchisee; (b) any person (other than the persons named as proxies solicited on behalf of the Board of Directors of Franchisee) holds revocable or irrevocable proxies, as to the election or removal of two (2) or more directors of Franchisee; (c) any person (other than any Principal Owner) has commenced a tender or exchange offer, or entered into an agreement or received an option, to acquire an Ownership Interest of twenty five percent (25%) or more of the total number of voting shares of Franchisee; or (d) as the result of, or in connection with, any cash tender or exchange offer, merger, or other business combination, sale of assets or contested election, or any combination of the foregoing transactions, the persons who were directors of Franchisee before such transaction shall cease to constitute at least two-thirds of the Board of Directors of Franchisee or any successor entity. For purposes of this Section 14.05, a "person" includes an individual, corporation, partnership, trust, association, joint venture, pool, syndicate, unincorporated organization, joint-stock company or similar organization or group acting in concert. A person for these purposes shall

29

be deemed to be a beneficial owner as that term is used in Rule 13d-3 under the Securities Exchange Act of 1934, as amended.

### 14.06   Securities Offerings.

In connection with any offerings of debt or equity securities of Franchisee, and in addition to the requirements and restrictions set forth in other sections of Article 14, you agree to comply with all of our requirements with respect to such offerings, including the following: provide written notice to us of any proposed securities offering (which notice shall be no later than the time when a proposed letter of intent, memorandum of understanding or similar document is exchanged with any person respecting the underwriting or placement of securities of Franchisee); submission to us, before or simultaneously with submission to the SEC or any other governmental agency, of registration statements and/or prospectuses for our review pertaining to trademark usage and the description of your rights and obligations with respect to the System, the Marks and this Agreement and your relationship with us; the execution by the Principal Owners and by underwriters, if any, of certificates required by us; your execution of an indemnity of the Indemnitees against any liability arising from or in connection with the offering; and your payment of a reasonable fee to us for our costs and expenses associated therewith. Within ten (10) business days after our receipt of a copy of a registration statement filed with the SEC or other governmental agency and which we wish to review, we will furnish you with our comments, if any, on the prospectus; provided that our failure to comment shall not relieve you of your obligations to include in every prospectus such disclaimers as are required by us and your obligation to comply with applicable law. You agree to simultaneously deliver to us all reports and other documents that you or any of your Affiliates may be required to file with the SEC pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, or with any governmental agency pursuant to the laws and regulations of any other jurisdiction in which securities are offered, as and when due.

### 14.07   Our Transfer.

We may freely transfer or assign this Agreement, and any addendum to this Agreement, and all or any part of our rights or obligations in this Agreement to any person or Legal Entity, including a person or Legal Entity who operates one or more businesses that are similar to or competitive with the System. We also may sell our assets, any Ownership Interest in us or in any of our Affiliates, our rights in the Marks or other intellectual property, or the System to any person or entity; may offer our securities privately or publicly; may merge, spin-off, acquire other companies or be acquired; may undertake a refinancing, recapitalization, leveraged buy-out or other economic or financial restructuring; and with regard to any or all of the above sales, assignments and dispositions, you expressly and specifically waive any claims, demands, or damages against us arising from or related to the transfer. Upon any such transfer, the transferee shall be solely responsible for all obligations and duties arising subsequent to such transfer, such transfer will constitute a novation, and we will have no further obligation to you.

### ARTICLE 15: TERMINATION RIGHTS

### 15.01   Reciprocal Right To Terminate Without Cause.

We and, subject to all the provisions of this Section 15.01, you shall each have the right to terminate this Agreement without any reason at all, and without the need to obtain the authorization of any third party or any arbitral, judicial or administrative resolution, without liability to us, and without prejudice to our corresponding collection of damages and/or losses effective on the tenth (10th) and fifteenth (15th) anniversary of the Opening Date (and, if immediately prior to the Effective Date your Facility was an existing lodging facility to be converted to a La Quinta Lodging Facility, then also on the fifth (5th) anniversary of the Opening Date) by giving the other party written notice thereof at least twelve (12) months prior to such fifth (5th), tenth (10th) or fifteenth (15th) anniversary of the Opening Date, as applicable. Your right to terminate this Agreement pursuant to this Section 15.01 is conditioned on the following: (i) on the date you give notice and on the applicable anniversary of the Opening Date you and your Principal Owners and Affiliates must be in full compliance with this Agreement and all other

30
Atlanta (Duluth), GA #0264_Rev1_Transfer FA

agreements that you have entered into with us or any of our Affiliates; (ii) you and your Principal Owners must execute a general release of the Indemnitees in such form as we may prescribe; and (iii) you must have paid us and our Affiliates all outstanding amounts under this Agreement and all other Agreements that you have entered into with us or any of our Affiliates. If then-current applicable law would prohibit us from terminating this Agreement pursuant to this Section 15.01, then you will likewise not have the foregoing right to terminate this Agreement.

## 15.02   Your Right To Terminate Based On Occupancy Rates.

(a)     Provided you and your Principal Owners and Affiliates are in full compliance with this Agreement and all other agreements entered into with us or any of our Affiliates, you will have the right, to terminate this Agreement, subject to Section 15.02(b), if:

(i)     for any full calendar year (January 1 through December 31) following the second (2nd) anniversary of the Opening Date (each, a "Measurement Period"), (1) your Facility experiences an average monthly occupancy rate of less than fifty percent (50%) of all rentable Guest Rooms and you provide written notification thereof to us within thirty (30) days following the end of any such Measurement Period; and (2) during the calendar year immediately following such Measurement Period (the "Waiting Period"), your Facility again experiences an average monthly occupancy rate of less than fifty percent (50%) of all rentable Guest Rooms; and (3) you provide written notice of termination under this Section 15.02(a)(i) to us within thirty (30) days following the end of any such Waiting Period. Any such termination shall become effective ninety (90) days following the date of such notice;

(ii)     for any Measurement Period, (1) your Facility experiences an average monthly occupancy rate of fifty percent (50%) or more but less than sixty percent (60%) of all rentable Guest Rooms and you provide written notification thereof to us within thirty (30) days following the end of any such Measurement Period; and (2) during the calendar year immediately following such Measurement Period (the "Waiting Period") your Facility experiences an average monthly occupancy rate of less than sixty percent (60%) of all rentable Guest Rooms; and (3) you provide written notice of termination under this Section 15.02(a)(ii) to us within thirty (30) days following the end of any such Waiting Period; and (4) you pay us a termination fee simultaneously with the provision of such termination notice in an amount equal to the total Royalty Fees payable during the twelve (12)-month period immediately preceding such termination notice. Any such termination shall become effective one-hundred twenty (120) days following the date of such termination notice; or

(iii)     for any Measurement Period, (1) your Facility experiences an average monthly occupancy rate of sixty percent (60%) or more but less than seventy percent (70%) of all rentable Guest Rooms, and you provide written notification thereof to us within thirty (30) days following the end of any such Measurement Period; and (2) during the calendar year immediately following such Measurement Period (the "Waiting Period") your Facility experiences an average monthly occupancy rate of less than seventy percent (70%) of all rentable Guest Rooms; and (3) you provide written notice of termination under this Section 15.02(a)(iii) to us within thirty (30) days following the end of any such Waiting Period; and (4) you pay us a termination fee simultaneously with the provision of such termination notice in an amount equal to the total Royalty Fees payable during the thirty (30) - month period immediately preceding such termination notice. Any such termination shall become effective one-hundred eighty (180) days following the date of such termination notice.

(b)     In addition to the requirements described above, in order to effectuate a termination under Sections 15.02(a)(i), (ii), or (iii), you shall provide evidence satisfactory to us confirming the average monthly occupancy rate of your Facility for the applicable Measurement Period and/or Waiting Period, as applicable; you must have implemented all recommendations that we may provide to you at our sole discretion related to marketing, sales, and revenue management and have otherwise cooperated with us with respect to marketing, sales, and revenue management efforts during the applicable Waiting Period; and you and your Principal Owners shall execute a general release of the Indemnitees in such form as we

may prescribe. You acknowledge and agree that the termination fees payable under Sections 15.02(a)(ii) and (iii) are reasonable and do not constitute a penalty.

### 15.03   Your Right To Terminate Due to Casualty or Condemnation.

You shall have the right, on the terms and conditions set forth in this Section 15.03, to terminate this Agreement upon the occurrence of: (i) a Casualty Event; or (ii) a Condemnation Event. You may terminate this Agreement by written notice provided to us at any time within ninety (90) days after the occurrence of a Casualty Event or a Condemnation Event. If you provide us with notice of a Casualty Event, this Agreement shall terminate effective upon the date that we receive your notice, unless we mutually agree to an alternate date. If you provide us with notice of a Condemnation Event, this Agreement shall terminate upon the date on which the Condemnation Event requires the closing of your Facility. In either event, you and we will have no further rights or obligations under this Agreement after such termination (except for those rights and obligations which expressly or by their nature survive the termination, including your obligations under Sections 18.01 and 18.02), provided you pay us, on or before the effective date of termination, a fee in an amount equal to the total Royalty Fees payable to us for the twelve (12)-month period immediately preceding the Casualty Event or the Condemnation Event, whichever applies. Notwithstanding the above, in the event of a Casualty Event, such payment shall be required only to the extent of any payment on an insurance policy applicable to the Facility which is attributable to or remuneration for fees payable under Sections 4.04 and 4.06 of this Agreement. In the event payment on any insurance policy does not clearly identify what portion of such payment is attributable to fees owed by you under Sections 4.04 and 4.06 of this Agreement, we shall have the right to determine, in our reasonable judgment, amounts owed by you under Sections 4.04 and 4.06 based upon values submitted in proofs of loss after consultation with you and payments received under a property insurance policy, which amounts shall be payable by you to us upon our demand.

## ARTICLE 16: DEFAULT AND REMEDIES

### 16.01   Events of Default.

A material breach and an event of default under this Agreement shall occur if:

(a)     you fail to make payment of any amounts due us or any of our Affiliates and do not correct such failure within ten (10) days after we deliver a notice of such failure to you;

(b)     you fail on three (3) or more separate occasions within any period of twelve (12) consecutive months to make payment of any amount due to us, any of our Affiliates or any unaffiliated suppliers or otherwise fail to comply with this Agreement (including the System Manual), which failures are brought to your attention by notices from us, regardless whether such failures are timely cured;

(c)     you materially breach any other agreement to which we or our Affiliates are a party, including any software license agreement, and fail to cure the breach within the time allowed for cure in that agreement;

(d)     you fail to make a timely payment of any amount due to a supplier unaffiliated with us (other than payments which are subject to bona fide dispute), and do not correct such failure within thirty (30) days after we deliver a notice of such failure to you;

(e)     you fail to comply with the construction and opening requirements described in Section 5.03(b), (c) or (f);

(f)     you fail to comply with the requirements of Section 7.01 and such failure presents an immediate threat to public health or safety or the health or safety of guests or your employees;

(g)     you rent Guest Rooms to the public at your Facility using the System and the Marks before the Opening Date;

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

(h)      your fee simple ownership or leasehold interest in your Facility or Site is transferred or terminated without our prior written consent or you otherwise lose the legal right to use and occupy your Facility or the Site as a La Quinta Lodging Facility as required by this Agreement;

(i)      you abandon your Facility or fail to operate your Facility for five (5) consecutive days during the Term without our prior written consent, or any shorter period in which we reasonably conclude that you do not intend to continue to operate your Facility, unless the failure to operate is due to Force Majeure;

(j)      you surrender or transfer control of the management or the operation of your Facility without our prior consent;

(k)      you make an unauthorized Transfer or fail to Transfer the interest of a deceased or Permanently Disabled Principal Owner as herein required;

(l)      you make any unauthorized use or disclosure of any Confidential Information or use, duplicate or disclose any portion of the System Manual in violation of this Agreement;

(m)      you fail or refuse to comply with any mandatory Standard prescribed by us, we reasonably believe your non-compliance may pose imminent danger or harm to guests or violate any health, safety or sanitation law, ordinance or regulation and you do not correct such failure or refusal within twenty four (24) hours after we deliver a notice of such failure to you;

(n)      you make or have made any material misstatement or omission in an application for a La Quinta franchise or in this Agreement, including the representations and warranties regarding anti-terrorism and anti-corruption laws contained in Section 13.02, or in any other information provided to us or breach any representation, warranty or covenant provided in Section 13.02;

(o)      you or any of your Principal Owners becomes a Restricted Person or otherwise violates any law referred to in Section 13.02;

(p)      you are convicted of, or plead no contest to, a felony or other crime or offense that we reasonably believe may adversely affect the goodwill associated with the Marks or the System;

(q)      you are adjudicated bankrupt or insolvent; you file a petition in bankruptcy, reorganization or similar proceedings under the bankruptcy laws of the United States or have such a petition filed against you which is not discharged within thirty (30) days, a receiver or other custodian, permanent or temporary, is appointed for your business, assets or property; you request the appointment of a receiver or make a general assignment for the benefit of creditors; a final judgment against you in the amount of $25,000 or more remains unsatisfied for thirty (30) days or longer; your bank accounts, property or accounts receivable are attached; execution is levied against your business or property; suit is filed to foreclose any lien or mortgage against any of your assets and such suit is not dismissed within thirty (30) days; or you voluntarily dissolve or liquidate or a petition for dissolution is filed against you and such petition is not dismissed within thirty (30) days;

(r)      you become insolvent by reason of your inability to pay your debts as they mature;

(s)      you breach any obligations contained in Article 11 hereof;

(t)      you do not obtain or maintain the insurance policies required under this Agreement, as the same may be modified from time to time in the Standards;

(u)      you understate Gross Room Revenues by more than five percent (5%) in any report required to be submitted to us hereunder, including all reports described in Section 9.03 hereof; or

(v)      you fail to comply with any provision of this Agreement (including the System Manual) other than those specifically referenced in  Section 16.01 (a) through (u) and do not correct such failure within thirty (30) days after we deliver a notice of such failure to you.

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

**16.02   Remedies**.

Upon the occurrence of an event of default described in Section 16.01, we shall have the right to exercise any one or more of the following remedies, in addition to any other remedies we may have at law or in equity (which may include without limitation, an action for specific performance and injunctive relief), without further opportunity to cure:

(a)      we shall have the right to terminate this Agreement and the franchise granted to you, effective immediately upon delivery of notice of termination to you; provided, however, that if you file a petition in bankruptcy, reorganization or similar proceedings under the bankruptcy laws of the United States or have such a petition filed against you which is not discharged within thirty (30) days, this Agreement shall automatically terminate without notice to you;

(b)      we shall have the right to suspend your participation in the Reservation System or otherwise cease providing reservation services for your Facility through the Reservation System until such default has been cured to our reasonable satisfaction;

(c)      we shall have the right to remove from our Web site all references to you and your Facility and/or disable any Web site page containing information about you or your Facility until the default has been cured to our reasonable satisfaction;

(d)      we shall have the right to disable your access to any intranet or extranet system, or other computer network or system which we have established or administer;

(e)      we shall have the right to refrain from providing or making available to you any advertising or promotional materials developed by the BMF; and

(f)      we shall have the right to temporarily or permanently reduce or eliminate the territorial protection granted to you in Section 3.02 hereof.

No action or inaction described in this Section 16.02 shall constitute a waiver of any other right or remedy available to us under this Agreement or applicable law if you are in default under this Agreement or any other agreement between you or your Principal Owners and us or our Affiliates. You waive all claims arising out of or related to the actions described in Sections 16.02(b)-(f) and release us and our Affiliates from all liability arising from such actions.

## ARTICLE 17: RENEWAL RIGHTS

### 17.01   Your Right To Acquire a Successor Franchise.

You have the right, subject to the conditions contained in Article 17, to acquire a successor franchise for your Facility for a term of ten (10) years on the terms and conditions of our then current form of successor franchise agreement for La Quinta Lodging Facilities (as further described in Section 17.03 hereof), if upon expiration of the Term: (a) you and your Principal Owners and Affiliates are in compliance with this Agreement and any other agreements with us or any of our Affiliates, and you and your Principal Owners have been in substantial compliance with this Agreement throughout the Term; (b) we are then offering new franchises for the development and operation of Facilities within the state in which your Facility is located; (c) we have not notified you of our determination that any federal or applicable state legislation, regulation or rule, which is enacted, promulgated or amended after the Effective Date, may have a materially adverse effect on our rights, remedies or discretion in licensing La Quinta Lodging Facilities; and (d) you maintain the right to possession of the Site for the term of the successor franchise agreement and enter into an agreement with us whereby you agree within a specified time period, starting on the signing of a successor franchise agreement, to upgrade and remodel your Facility, add or replace improvements, fixtures, furnishings, equipment and signs and otherwise modify your Facility to upgrade it to the Standards then applicable to new La Quinta Lodging Facilities. You will be obligated to pay us a successor fee equal to fifty percent (50%) of our then-current Initial Fee.

## 17.02 Renewal Notice.

You shall give notice of your desire to acquire a successor franchise not more than twenty four (24) months and not less than twelve (12) months prior to expiration of this Agreement. We will give you notice, not later than sixty (60) days after receipt of your notice, of our preliminary decision whether you have the right to acquire a successor franchise pursuant to Section 17.01. Notwithstanding any notice of our preliminary decision that you have the right to acquire a successor franchise for your Facility, your right will be subject to your continued compliance with all the provisions of this Agreement up to the date of its expiration.

## 17.03 Successor Franchise Agreements.

If you have the right to acquire a successor franchise in accordance with Section 17.01 and state your desire to exercise that right in accordance with Section 17.02, we and you (and, if applicable, your Principal Owners) will execute the form of franchise agreement (which may contain provisions, including royalty fees, materially different from those contained herein) and all ancillary agreements (including, personal guarantees by your Principal Owners and a unit upgrade agreement on such terms as we determine to be appropriate) which we then customarily use in granting successor franchises for the operation of La Quinta Lodging Facilities, and you and your Principal Owners shall execute general releases, in form and substance satisfactory to us, of any and all claims against the Indemnitees. Failure by you (and your Principal Owners) to sign such agreements and releases within thirty (30) days after delivery to you shall be deemed an election by you not to acquire a successor franchise for your Facility.

## ARTICLE 18: EFFECT OF TERMINATION OR EXPIRATION

### 18.01 Payment of Amounts Owed to Us.

Within thirty (30) days after the date of termination (for any reason) or expiration (without execution of a successor franchise agreement) of this Agreement, you shall pay us and our Affiliates all amounts due and owing as of the date of termination or expiration, including but not limited to: (i) all Royalty Fees, Marketing Fees, and Reservations Fees; (ii) all amounts owed for purchases from us or our Affiliates; (iii) all Booking Fees, Commissions and Other Charges due pursuant to Section 4.06; (iv) interest due on any of the foregoing; (iv) all other amounts owed to us or our Affiliates which are then unpaid; (v) and liquidated damages or other damages owed to us pursuant to Section 18.03. Any amounts that become due after the date of termination or expiration must be paid upon invoice.

### 18.02 Discontinue Use of Marks and Confidential Information.

Upon the termination (for any reason) or expiration (without execution of a successor franchise agreement) of this Agreement, you will:

(a)    immediately cease to operate your Facility as a La Quinta Lodging Facility utilizing the System;

(b)    not directly or indirectly at any time or in any manner use any Mark, any colorable imitation or other indicia of a La Quinta Lodging Facility or indicate, in any media, including the Internet, that you are a former La Quinta Lodging Facility franchisee;

(c)    take such action as may be required to cancel all fictitious or assumed name registrations relating to your use of any Mark;

(d)    notify the telephone company and all telephone directory publishers of the termination or expiration of your right to use any telephone number and any regular, classified or other telephone directory listings associated with any Mark and authorize transfer of the number to us or at our direction;

(e)    promptly remove from the Site, and discontinue using for any purpose, all signage and logo shaped trim, fixtures, furniture, decor items, advertising materials, forms and other materials and supplies which display any of the Marks or any distinctive features, images, or designs associated with La

35

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

Quinta Lodging Facilities and, at your expense, make such alterations as may be necessary to distinguish the premises of your Facility so clearly from its former appearance as a La Quinta Lodging Facility and from other La Quinta Lodging Facilities as to prevent any possibility of confusion by the public (including removal of distinctive room number signs on guest rooms and repainting in different colors guest room doors and interior and exterior trim). If your Facility includes a distinctive bell tower, you agree to modify the distinctive bell tower to remove all distinctive La Quinta features as we direct, including without limitation, the removal of all La Quinta signage and logo shape trim, the removal of all other distinctive trim detail and the removal of the faux window and balcony;

(f)      immediately cease to use all Confidential Information and return to us and/or delete from your computer system all copies of the System Manual and computer files and records, computer software systems, records, files, instructions, correspondence, and all other materials relating to the operation of your Facility that we have provided to you or that you have obtained by any other means;

(g)      immediately cease to use all computer software licensed by us or any of our Affiliates and comply with your obligations under any software license agreements; and

(h)      within thirty (30) days after the effective date of termination or expiration, furnish us evidence satisfactory to us of your compliance with the foregoing obligations.

## 18.03  Liquidated Damages.

You acknowledge and agree that: (a) by granting you the rights hereunder, we have foregone the opportunity to grant a franchise to another party or for us or our Affiliates to own and operate a La Quinta Lodging Facility at the Site or in proximity to the Site pursuant to Section 3.02; and (b) if this Agreement is terminated for any reason, other than as set forth in Sections 15.01 15.02 and 15.03, we will suffer substantial damages because of the termination, including lost Royalty Fees, lost market penetration and lost goodwill in the market area of the Site, lost opportunity costs, and the expense of developing another La Quinta Lodging Facility in the market area, which damages are difficult to calculate.

Accordingly, if this Agreement is terminated for any reason, except at the expiration of its term (without execution of a successor franchise agreement) or as set forth in Section 15.01, 15.02 or 15.03, then, in addition to our other remedies, you agree to pay us an amount as liquidated damages and not as a penalty, calculated as follows: (a) from the Effective Date of this Agreement until the first anniversary of the Opening Date, an amount equal to $2,500 per authorized Guest Room, with a minimum of $250,000; (b) from the first anniversary of the Opening Date until the18th anniversary of the Opening Date an amount equal to the greater of $2,500 per authorized Guest Room or three (3) times the annual total Royalty, Marketing and Reservation Fees payable during the twelve (12)-month period immediately preceding termination, with a minimum total liquidated damages of $250,000; and (c) from the 18th anniversary of the Opening Date to the end of the Term, an amount equal to the greater of $2,500 per authorized Guest Room or the average monthly Royalty, Marketing and Reservation Fees payable over the twelve (12)-month period prior to termination, multiplied by the number of months remaining in the Term.

The liquidated damages described in this Section 18.03 shall not constitute an election of remedies. It shall serve only as compensation for our lost Royalty, Marketing and Reservation Fees, lost market penetration and lost goodwill in the market area of the Site, lost opportunity costs and the expense of developing another La Quinta Lodging Facility in the market area, and shall not constitute compensation for any other purpose.

## 18.04  Continuing Obligations.

All obligations under this Agreement, which expressly or by their nature survive the expiration or termination of this Agreement, shall continue in full force and effect until they are satisfied in full or by their nature expire.

## ARTICLE 19: RELATIONSHIP OF THE PARTIES

**19.01   Independent Contractors.**

Neither this Agreement nor the dealings of the parties pursuant to this Agreement shall create any fiduciary relationship or any other relationship of trust or confidence between the parties hereto. Franchisor and Franchisee, as between themselves, are and shall be independent contractors.

Nothing contained in this Agreement, or arising from the conduct of the parties hereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever. You shall conspicuously identify yourself in all dealings with guests, customers, lessors, contractors, suppliers, public officials, employees and others as the owner of your Facility and shall place such other notices of independent ownership on such forms, business cards, stationery, signs, advertising, point of purchase, and other materials as we may require from time to time.

You may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in our name or on our behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors. We will not be obligated by or have any liability under any agreements made by you with any third party or for any representations made by you to any third party. We will not be obligated for any damages to any person or property arising directly or indirectly out of the development, construction, ownership, operation or closing of your business hereunder.

**19.02   Indemnification of Franchisee.**

We agree to indemnify you against, and to reimburse you for, all damages for which you are held liable as a result of a claim that your authorized use of any Mark or any of our other intellectual property rights pursuant to and in full compliance with this Agreement infringes on the rights of another person and, except as provided herein, for all costs you reasonably incur in defending any such claim brought against you, provided that you have timely notified us of such claim and provided further that you and your Principal Owners and Affiliates are in full compliance with this Agreement and with all other agreements entered into with us or any of our Affiliates. Worldwide, at its sole discretion, is entitled to prosecute, defend and/or settle any such proceeding arising out of your use of any Mark pursuant to this Agreement and, if Worldwide undertakes to prosecute, defend and/or settle any such matter, we have no obligation to indemnify or reimburse you for any fees or disbursements of any legal counsel retained by you.

**19.03   Indemnification of Franchisor.**

(a)      You shall at all times and to the fullest extent permitted by law, indemnify and defend the Indemnitees against and hold the Indemnitees harmless from, any and all Actions and all Losses and Expenses incurred in connection with any Action or any settlement of any Action (whether or not a formal proceeding has been instituted) that arises out of or is based upon any of the following acts or omissions:

(i)      The infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of the Principal Owners of any patent, trademark, copyright, or other proprietary right owned or controlled by any third party (except to the extent occurring with respect to any right to use the Marks or any copyrights or other proprietary information granted under this Agreement).

(ii)      The violation, breach or asserted violation or breach by Franchisee or any of the Principal Owners of any federal, state or local law, regulation, ruling, standard or directive or any industry standard.

(iii)      Libel, slander or any other form of defamation of us, our Affiliates, the System, or any franchisee operating under the System, and any owner or operator of an Affiliated Lodging Facility, by Franchisee or by any of the Principal Owners.

37

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

(iv)     The violation or breach by Franchisee or by any of the Principal Owners of any warranty, representation, agreement or obligation in this Agreement or in any other agreement between Franchisee and its Affiliates and us and our Affiliates, or the officers, directors, shareholders, partners, agents, representatives, independent contractors or employees of any of them.

(v)      Acts, errors or omissions of Franchisee, the Operating Partner, any of Franchisee's Affiliates, any of the Principal Owners, any Management Company engaged by Franchisee and their respective officers, directors, shareholders, partners, agents, representatives, independent contractors and employees in connection with the establishment and operation of your Facility, including any acts, errors or omissions of any of the foregoing in the operation of any motor vehicle. Franchisee specifically acknowledges that Franchisor cannot and does not exercise control over Franchisee's day-to-day operations (including safety and security, conditions or incidents that result in personal injury or accidents, the manner of operation of any motor vehicles used by or on behalf of Franchisee, or any employment decisions of Franchisee), and that all liability arising out of such matters is therefore, Franchisee's responsibility.

(b)      Franchisee covenants to give Franchisor immediate notice of any Action for which any Indemnitee may be entitled to indemnification and defense under Section 19.03(a), even if none of the Indemnitees are initially named as a party to the Action. At the expense and risk of Franchisee, Franchisor may elect to assume (but under no circumstance is obligated to undertake) control of its defense to any action or associate counsel of its own choosing with respect to the defense and/or settlement of any Action for which indemnification is or may be due under Section 19.03(a). The assumption of control of the defense of any Action by Franchisor will, in no manner or form, diminish the obligation of Franchisee to indemnify the Indemnitees.

(c)      In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, we may, at any time and without notice, consent or agree to settlements or take other remedial or corrective action that we consider expedient with respect to the Action if, in our judgment, there are reasonable grounds to believe that: (a) any of the acts or circumstances enumerated in Section 19.03(a)(i) through (iv) have occurred; or (b) any act, error or omission as described in Section 19.03(a)(v) may result directly or indirectly in damage, injury or harm to any person or any property.

(d)      All Losses and Expenses incurred under this Article 19 will be chargeable to and paid by Franchisee pursuant to its obligations of indemnity under this Section, regardless of any actions, activity, control or defense undertaken by us, or the subsequent success or failure of those actions, activity, control or defense. Franchisee shall remit to the Indemnitees payment for all such Losses and Expenses not later than thirty (30) days after receipt of a written invoice therefore.

(e)      The Indemnitees do not assume any liability for any acts, errors or omissions of any third party with whom Franchisee, the Operating Partner, any of the Principal Owners, any Management Company engaged by Franchisee, any of Franchisee's Affiliates or any of the officers, directors, shareholders, partners, agents, representatives, independent contractors or employees of Franchisee or its Affiliates may contract, regardless of whether the Indemnitees required, requested or suggested that Franchisee contract with such party (e.g. suppliers). Franchisee will indemnify the Indemnitees for all Losses and Expenses arising out of any acts, errors or omissions of Franchisee, the Operating Partner, the Principal Owners, any Management Company engaged by Franchisee, Franchisee's Affiliates, the officers, directors, shareholders, partners, agents, representatives, independent contractors and employees of Franchisee and its Affiliates and any such other third parties without limitation and without regard to the cause or causes of the acts, errors or omissions or the negligence (whether that negligence is sole, joint, or concurrent, and whether active or passive) or strict liability of Franchisor or any other party or parties arising in connection therewith.

(f)      Under no circumstances will the Indemnitees be required or obligated to seek recovery from third parties or otherwise to mitigate their losses in order to maintain a claim against Franchisee.

38

Franchisee agrees that the failure to pursue recovery from third parties or otherwise to mitigate loss will in no way reduce the amounts recoverable from Franchisee by the Indemnitees.

(g)    The terms of this Section 19.03 will survive the termination, expiration, or Transfer by any party of this Agreement or any interest in this Agreement.

### 19.04    Taxes.

You agree to promptly pay to us an amount equal to all taxes levied or assessed, including unemployment taxes, sales taxes, use taxes, withholding taxes, value added taxes, excise taxes, personal property taxes, intangible property taxes, gross receipt taxes, taxes on royalties, any similar taxes or levies, imposed upon or required to be collected or paid by us by reason of the furnishing of products, intangible property (including trademarks) or services to you. In the event of a bona fide dispute as to your liability for taxes, you may contest your liability in accordance with applicable law. In no event, however, will you permit a tax sale, seizure or attachment to occur against your Facility or any of its assets. Nothing in this Section 19.04 shall require you to pay or reimburse us for taxes in the nature of income taxes payable by us on our income.

### 19.05    Advisory Council.

We may, but are not obligated to, establish an advisory council for franchisees of La Quinta Lodging Facilities for advice on such matters as we, in our sole discretion, deem appropriate. It is contemplated that any such advisory council would act in a representative capacity for all franchisees of La Quinta Lodging Facilities. You agree that we may consider, but are not bound by, the advice of any such council.

### ARTICLE 20: MISCELLANEOUS.

### 20.01    Governing Law.

This Agreement shall be construed under the laws of the State of Texas, provided the foregoing shall not constitute a waiver of any of your rights under any applicable franchise law of another state. Otherwise, in the event of any conflict of law, Texas law will prevail, without regard to its conflict of law principles. However, if any provision of this Agreement would not be enforceable under Texas law, and if your Facility is located outside of Texas and such provision would be enforceable under the laws of the state in which your Facility is located, then such provision shall be construed under the laws of that state. Nothing in this Section is intended to subject this Agreement to any franchise or similar law, rule or regulation of the State of Texas to which it otherwise would not be subject.

### 20.02    Mediation.

(a)    All controversies and claims between the parties arising out of or related to this Agreement or the franchise granted by this Agreement shall be subject to non-binding mediation pursuant to the terms of this Section 20.02. The commencement or pendency of judicial proceedings shall not stay the mediation required hereunder, and the mediation required hereunder shall not stay any judicial proceedings. Mediation under this Section 20.02 is not intended to alter or suspend the rights or obligations of the parties under this Agreement or to determine the validity or effect of any provision of this Agreement, but is intended to provide the parties with an opportunity to amicably and expeditiously resolve disputes in a cost-effective manner on mutually acceptable terms and conditions.

(b)    A party demanding mediation hereunder shall give written notice of the demand for mediation to the party with whom mediation is sought, specifying with reasonable particularity the matter or matters on which mediation is being sought. Mediation shall be conducted for one (1) day by a mediator or mediation program we may designate from time to time. The mediation shall be conducted at our headquarters at a mutually acceptable time and date within sixty (60) days after the demand for mediation. The mediator will assist the parties in evaluating the dispute, but may not make a decision that is binding on any party, unless that party has so agreed in writing.

39

(c)      You and we agree that all information received by the mediator while serving in that capacity shall be kept confidential. Accordingly, the parties agree not to serve the mediator with any subpoena or discovery request (or otherwise compel the mediator's attendance or testimony) in connection with any legal or administrative action between the parties. Each party agrees to maintain the confidentiality of all communications it receives relating to the mediation, and not to use it for any purpose other than resolution of the dispute in the mediation process. Nothing contained in this Section 20.02, nor our participation in the mediation process, shall constitute a waiver of our right to terminate this Agreement at any time in accordance with its terms or in accordance with applicable law.

## 20.03  **Exclusive Jurisdiction**.

You and each of your Principal Owners agree that the U.S. District Court for the Northern District of Texas, or if such court lacks jurisdiction, the District Court (or its successor) for Dallas County, Texas shall be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Agreement and any guarantees by your Principal Owners. You and each of your Principal Owners irrevocably submit to the jurisdiction of such courts and waive any objections to either the jurisdiction of or venue in such courts. You and each of your Principal Owners agree that personal jurisdiction may be effected by service of process in accordance with Section 20.15 and that when so made shall be as if served personally. This Agreement was executed and accepted at our place of business in Irving, Texas. The parties anticipate that the performance of certain of your obligations arising under this Agreement, including the payment of certain monies due us, will occur in Irving, Texas.

## 20.04  **Acknowledgement**.

You, the Principal Owners and we each acknowledge and agree that Sections 20.01, 20.02, and 20.03 (pertaining to choice of law, mediation and exclusive jurisdiction provides each of the parties with mutual benefit of uniform interpretation both of this Agreement and any dispute arising out of this Agreement. You, the Principal Owners and we further acknowledge the receipt and sufficiency of mutual consideration for that benefit, and that each party's agreement regarding applicable state law, mediation and exclusive jurisdiction have been negotiated and are part of the benefit of the bargain reflected by this Agreement.

## 20.05  **Limitations on Legal Rights**.

(a)      Except with respect to obligations regarding use of the Marks in Article 11 and the Confidential Information in Section 12.01, Franchisor and Franchisee (and its Principal Owners) each waives, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary or special damages against the other. Franchisor retains all other rights and remedies, including the right to obtain liquidated damages as provided in this Agreement, direct and general damages, compensatory and consequential damages, injunctive and extraordinary relief, and attorney fees and costs. You and each of your Principal Owners also waive to the fullest extent permitted by applicable law, the right to recover consequential damages (including lost profits) for any claim directly or indirectly arising from or relating to this Agreement.

(b)      **In any judicial proceedings directly or indirectly arising from or relating to this Agreement, the parties hereby waive their respective rights to a jury trial, notwithstanding any state or federal constitutional or statutory right. The parties hereby agree that any judicial proceeding shall be tried before the court sitting without a jury.**

(c)      Any judicial proceeding directly or indirectly arising from or relating to this Agreement will be considered unique as to its facts and may not be brought as a class action. You and each of your Principal Owners waive any right to proceed against us by way of class action.

(d)      All claims, actions and proceedings between us and/or our Affiliates and you and/or your Principal Owners whether or not arising out of this Agreement, shall be filed before the expiration of the later of two (2) years after the date of discovery of the facts resulting in the alleged liability or obligation,

40

or two (2) years after the date of the first act or omission giving rise to the alleged liability or obligation, except that where state or federal law mandates or makes possible (by notice or otherwise) a shorter period, the shorter period will apply.

### 20.06   Injunctive Relief.

Notwithstanding Section 20.03, we may obtain in any court of competent jurisdiction any injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause us irreparable harm. We may have such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law. Without limiting the foregoing, you and each of your Principal Owners acknowledges that any violation of Section 18.02 would result in irreparable injury to us for which no adequate remedy at law may be available. Accordingly, you and each of your Principal Owners consent to the issuance of an injunction prohibiting any conduct in violation of Section 18.02.

### 20.07   Costs and Attorneys' Fees.

The party who prevails in any judicial proceeding will be awarded its costs and expenses incurred in connection therewith, including reasonable attorneys' fees and litigation-related expenses. Without limiting the provisions of the previous sentence, you agree to pay on demand: (A) all Losses and Expenses of us and our Affiliates in connection with any Event of Default (as set forth in 16.01 of this Agreement) and any Action related to the enforcement of this Agreement, including, without limitation, the fees and costs and expenses of our or our Affiliates' legal counsel; and (B) all costs, expenses, assessments, and other charges incurred in connection with incurred during any workout, restructuring or negotiations in respect of the relationship created by this Agreement, including, without limitation, the fees and costs and expenses of our legal counsel. You also agree that in the event that you (by your own action or the action of any of your beneficial owners or other creditors) shall (a) file with any bankruptcy court or be the subject of any petition for relief under the Bankruptcy Code, and indeed are the subject of any order for relief issued under the Bankruptcy Code, (b) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, receivership, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, or (c) seek, consent to, or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator, then all costs and expenses of us and our Affiliates incurred in connection with the enforcement of any and all rights, remedies and provisions of this Agreement, including, without limitation, the fees and costs and expenses of our and our Affiliates' legal counsel, shall constitute a component of (i) the monetary cure to be paid to us at the time of the assumption of this Agreement in order for this Agreement to be assumed pursuant to 11 U.S.C. §365 or any similar provision, or (ii) the allowed unsecured claim of the Franchisor in the event that this Agreement is rejected.

### 20.08   Severability and Substitution of Provisions.

If any provision of this Agreement or any Standard prescribed by us is invalid or unenforceable under applicable law, we have the right, in our sole discretion, to modify such invalid or unenforceable provision or Standard to the extent required to make it valid and enforceable, including the right to delete the provision in its entirety. It is hereby declared the intention of the parties that they would have executed this Agreement as so modified; provided, however, that if we, in our sole discretion, determine that such modification substantially impairs the value of this Agreement to us, then we may terminate this Agreement by written notice to you.

### 20.09   Waiver of Obligations.

We and you may by written instrument unilaterally waive or reduce any obligation of the other under this Agreement. Any waiver granted by us shall be without prejudice to any other rights we may have, will be subject to continuing review by us and may be revoked, in our sole discretion, at any time and for any reason, effective upon delivery to you, of ten (10) days prior notice. You and we shall not be deemed to have waived any right reserved by this Agreement by virtue of any custom or practice of the parties at

41

variance with it; any failure, refusal or neglect by you or us to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder; any waiver, forbearance, delay, failure or omission by us to exercise any right, whether of the same, similar or different nature, with respect to other La Quinta Lodging Facilities or any Affiliated Lodging Facility; or the acceptance by us of any payments due from you after any breach of this Agreement.

**20.10   Exercise of Rights**.

Except as otherwise expressly provided, the rights of Franchisor and Franchisee hereunder are cumulative and no exercise or enforcement by Franchisor or Franchisee of any right or remedy hereunder shall preclude the exercise or enforcement by Franchisor or Franchisee of any other right or remedy hereunder which Franchisor or Franchisee is entitled to enforce by law.

**20.11   Successors and Assigns**.

This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest, and, with respect to the Site and your Facility, shall be deemed a covenant running with the land and, thus, binding upon successor owners of the Site and Facility. Upon our request, you agree to execute a memorandum of this Agreement in form prescribed by us and such other documents as we may request to effectuate the purpose of this Section 20.11 and which we may record in the real property records of the county in which the Site is located. You shall cooperate with us and provide such other documents and materials as we may request in connection with any such recording or filing.

**20.12   Construction**.

The language of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party. This Agreement (including the documents appearing as Exhibits hereto), as well as the System Manual, constitute the entire agreement of the parties; provided, however, that nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the Franchise Disclosure Document that Franchisor furnished to you. Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Agreement, other than the Franchise Disclosure Document and the franchise application, that either party may or does rely on or that will have any force or effect. Nothing in this Agreement shall be deemed to confer any rights or remedies on any person or legal entity not a party hereto. Except as otherwise expressly provided herein, this Agreement may be modified only by a written agreement signed by both parties.

The headings of articles and sections are for convenience only and do not limit or construe their contents. Capitalized words shall have the meanings defined where such terms occur in quotation marks in this Agreement, whether in Article 2 or otherwise. All words used in any number or gender shall extend to include any other numbers or gender as the context may require. If any provision of this Agreement is capable of more than one construction, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning, which renders it valid. The word "including" shall be construed to include the words "without limitation." If two (2) or more persons or entities are at any time designated as Franchisee hereunder, whether as partners, joint venturers or otherwise; their obligations and liabilities to us shall be joint and several.

This Agreement may be executed in multiple counterparts which, when taken together, shall be deemed to constitute a fully-executed original. Time is of the essence in this Agreement.

**20.13   Discretion**.

The parties' acknowledge that various provisions of this Agreement specify that certain matters are within our discretion or judgment, or otherwise are to be determined unilaterally by us. If the exercise of our discretion or judgment as to any such matter is subsequently challenged, the parties expressly direct the

trier of fact that our reliance on a business reason in the exercise of our discretion or judgment is to be viewed as a reasonable and proper exercise of such discretion or judgment, without regard to whether other reasons for our decision may exist and without regard to whether the trier of fact would independently accord the same weight to the business reason.

## 20.14 Approvals and Consents.

In all cases where our prior consent or acceptance is required and no other method or timing for obtaining such consent or acceptance is prescribed, you shall request such consent or acceptance in writing, and we will notify you of our decision within thirty (30) days after receiving your written request and all supporting documentation requested. Whenever our consent or acceptance is required hereunder, such consent or acceptance shall be in writing. If we do not respond in writing to your request within such thirty (30)-day period, the request shall be deemed denied. Our consent to or acceptance of any request by you shall be effective only to the extent specifically stated and shall not be deemed to waive or render unnecessary our consent or acceptance of any subsequent similar request. Except where this Agreement expressly obligates us to reasonably accept or consent to (or not to unreasonably withhold our acceptance of or consent to) any action or request by you, we have the absolute right for any reason or no reason to withhold our acceptance of or consent to any action by you. On any occasion where we are required or permitted to make any judgment or determination, we may do so in our sole subjective judgment.

## 20.15 Notices.

All notices, requests and reports required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid or by facsimile (provided that the sender confirms the facsimile by sending an original confirmation copy by certified mail or expedited delivery service within three (3) calendar days after transmission) to the respective parties at the addresses reflected in the Basic Terms, unless and until a different address has been designated by written notice to the other party. Any notice will be deemed to have been given at the time of personal delivery or receipt or, in the case of facsimile, upon transmission (provided confirmation is sent as described above) or, in the case of expedited delivery service, on the following business day or, in the case of registered or certified mail, three (3) calendar days after the date and time of mailing; provided, however, that if delivery is rejected, delivery will be deemed to have been given at the time of such rejection.

## 20.16 Franchisor's Obligations.

Franchisee acknowledges that it is relying solely on Franchisor, and not on any parent companies related to Franchisor, with regard to Franchisor's financial and other obligations under this Agreement, and no employee or other person speaking on behalf of, or otherwise representing, Franchisor has made any statement or promise to the effect that Franchisor's affiliated entities or parent companies guarantee Franchisor's performance or financially back Franchisor.

## 20.17 Franchisee Bankruptcy/Foreclosure

Franchisee agrees that, in the event that you (by your own action or the action of any of your beneficial owners or other creditors) shall (i) file with any bankruptcy court or be the subject of any petition for relief under the Title 11 of the United States Code, as amended (the "Bankruptcy Code"), and are the subject of any order for relief issued under the Bankruptcy Code, (ii) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, receivership, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, or (iii) seek, consent to, or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator, we will be entitled to relief from any automatic stay imposed by Section 362 of the United States Bankruptcy Code, as amended, or otherwise, on or against the exercise of the rights and remedies otherwise available to us or our Affiliates as provided in this

43

Agreement, as it may be amended, and as otherwise provided by law, and you hereby waive the benefits of such automatic stay and consent and agree to raise no objection to such relief.

## ARTICLE 21: STATE LAW ADDENDA

**21.01   Scope of State Law Addenda**.

Franchisor and Franchisee acknowledge that certain state statutes have been enacted that may supersede various provisions of this Agreement. If the laws of a state require us to include a State Law Addendum, it is attached hereto as an Addendum. If a State Law Addendum is included in this agreement, it describes the provisions of that state's franchise laws, as such law(s) exist on the Effective Date of this Agreement. To the extent such law(s) are applicable to this Agreement and differ from the terms of this Agreement, as of the date(s) on which compliance with such law is sought (referred to herein as the "then-current law(s)"), the then-current law(s) shall prevail.

**21.02   Presumption of State Residency and Domicile**.

For purposes of determining the inclusion of a State Law Addendum, you are conclusively presumed to be a resident and domiciliary of the state in which your Facility is located, unless at the time you execute this Agreement, you notify us in writing that you are a resident and/or domiciliary of another state.

*<Remainder of Page Intentionally Blank>*

44

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

## ARTICLE 22: ACKNOWLEDGMENTS

### 22.01  Domicile.

You acknowledge that you are not a domiciliary or a resident of any state other than the state where the Facility is located or, if different, the state listed in the Basic Terms as Franchisee's address.

Initials _____ / _____

### 22.02  Receipt of Franchise Disclosure Document and Agreement.

You acknowledge that you received a complete copy of this Agreement and all related attachments and exhibits and a complete copy of Franchisor's Franchise Disclosure Document required by the Federal Trade Commission's Franchise Trade Regulation Rule (16 C.F.R. Part 436) within the time period required by applicable law. You have read and you understand this Agreement and our Franchise Disclosure Document.

Initials _____ / _____

### 22.03  No Inconsistent Representations.

You acknowledge that no representations have been made to you which are inconsistent with information presented in our disclosure document, and you have not relied upon any representations inconsistent with or not contained in our disclosure document.

Initials _____ / _____

### 22.04  Business Risks; Independent Investigation.

You recognize that the nature of La Quinta Lodging Facilities may change over time, that an investment in a La Quinta Lodging Facility involves business risks and that the success of the venture is largely dependent on your own business abilities, efforts and financial resources. You have conducted an independent investigation of the business contemplated by this Agreement and recognize that the lodging industry is highly competitive.

Initials _____ / _____

### 22.05  Independent Counsel.

You acknowledge that you have had the opportunity to seek independent counsel concerning the execution of this Agreement and operation of the Facility.

Initials _____ / _____

### 22.06  No Guarantee or Assurance.

You have not received from us or our representatives or relied on any guaranty or assurance, express or implied, as to the revenues, profits or success of the business venture contemplated by this Agreement nor have you received from us or our representatives any information from which you may easily ascertain a specific level or range of actual or potential sales, income, costs, gross or net profits from franchised or non-franchised La Quinta Lodging Facilities.

Initials _____ / _____

IN WITNESS WHEREOF, each party has executed and delivered this Agreement on the date set forth below its signature below, effective for all purposes as of the Effective Date.

**FRANCHISOR**
**LA QUINTA FRANCHISING LLC,**
a Nevada limited liability company

By:

Name: Rajiv Trivedi
Title: Executive Vice President
and Chief Development Officer

Date: \_\_\_\_1 – 13 – 16\_\_\_\_

**FRANCHISEE**
**SUGARLOAF CAPITAL BUFORD, LLC**
a Georgia limited liability company

By: _____

Name: Sonial Patel
Title: Sole Member and Manager

Date: \_\_\_\_1 6 2016\_\_\_\_

46
Atlanta (Duluth), GA #0264_Rev1_Transfer FA

## AGREEMENT OF PRINCIPAL OWNERS

Each of the undersigned, being included within the term "Principal Owner(s)", executes this Agreement for the sole purpose of agreeing to and making the representations and agreements of the Principal Owners set forth in Section 12.01 (Confidential Information), Section 13.02 (Anti-Terrorism, Anti-Bribery and Anti-Corruption laws), Article 14 (Transfer), Article 20 (Governing Law; Mediation; Exclusive Jurisdiction; Acknowledgement; Limitation on Legal Rights; and Injunctive Relief) and Exhibit A. Each of the undersigned has read this Agreement, agrees that execution of this Agreement by each is in partial consideration for, and a condition to, the granting of this franchise, and acknowledges that Franchisor would not have granted this franchise without the foregoing agreements by each of the undersigned Principal Owners.

Principal Owners:

Name: Sonial Patel

47
Atlanta (Duluth), GA #0264_Rev1_Transfer FA

## EXHIBIT A

### FRANCHISEE OWNER INFORMATION

<u>Principal Owners</u>.  Franchisee represents and warrants that the following is a complete and accurate list of all Principal Owners of Franchisee, including the full name and mailing address of each Principal Owner, and fully describes the nature and extent of each Principal Owner's interest in Franchisee.

<u>Principal Owner's Name and Address</u>                    <u>Description of Interest</u>

Sonial Patel                                                    100% Member
2253 Gradyridge Trail
Duluth, GA  30097

**FRANCHISEE**

**SUGARLOAF CAPITAL BUFORD, LLC**
a Georgia limited liability company

By: _____
Name:  Sonial Patel
Title:  Sole Member and Manager

Date: _____1|6|2016_____

## EXHIBIT B

## MAP OF ASSIGNED AREA



B-1

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

## EXHIBIT C

## COMPUTER SYSTEM LICENSE AND MAINTENANCE AGREEMENT

THIS COMPUTER SYSTEM LICENSE AND MAINTENANCE AGREEMENT (this "Agreement") is made as of _____, 2015 (the "Effective Date"), between LA QUINTA FRANCHISING LLC, a Nevada limited liability company ("Franchisor" or "we"), and SUGARLOAF CAPITAL BUFORD, LLC a Georgia limited liability company ("Franchisee" or "you").

### RECITALS

WHEREAS, Franchisor and Franchisee have entered into a Franchise Agreement dated _____, 2015 (the "Franchise Agreement") whereby Franchisee has been granted the right to develop and operate a La Quinta® Inn or a La Quinta® Inn and Suites lodging facility (the "Facility") at 2370 Stephens Center Drive, Duluth, GA  30096 (the "Site"). Pursuant to the Franchise Agreement, Franchisee has agreed to use such computer systems as Franchisor may require from time to time and to execute this Agreement in connection therewith.

WHEREAS, Franchisor has determined that NiteVision in conjunction with NetREZ should currently be used at La Quinta Inns and La Quinta Inns and Suites to facilitate property management, rate management, reservations and reporting functions.

WHEREAS, Franchisee acknowledges having read this Agreement and accepts its terms as being reasonably necessary to protect Franchisor's interests and the interests of third parties rendering services, hardware or software in connection with the System, as defined in Article I.

NOW, THEREFORE, based on the foregoing recitals and in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

### AGREEMENTS

### ARTICLE 1

### DEFINITIONS

1.1     "Certified User" shall mean any owner, manager or employee of Franchisee who has taken the necessary System training programs and has received the minimum passing score on the program examination.

1.2     "Confidential Information" shall have the meaning defined in Section 6.1 of this Agreement.

1.3     "Derivative" shall mean any and all tangible information, documents, software, and other materials, in any medium, format, use, or form (whether now known or later discovered), that are based upon or derived from the System or that use or incorporate the System or any part or aspect thereof, including (i) any enhanced, modified, revised, updated, or upgraded version thereof; (ii) any translation, abridgement, revision, or other form in which the same may be recast, transformed, or adapted; and (iii) any improvement thereon, in each case made by the party that owns any component of the System.

1.4     "Designated Computers" shall mean the computer system at the Facility on which the System is installed.

1.5     "Documentation" shall mean available functional specifications, reference manuals, user guides, system operation guides and other materials supplied by Franchisor or Vendors to Franchisee in written or machine readable form, and all revisions and additions thereto, and all copies thereof pertaining to the System.

1.6     "Intellectual Property" shall mean any and all now known or hereafter known tangible and intangible (a) rights associated with works of authorship, including but not limited to copyrights and

C-1

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

moral rights; (b) trademark, trade name and trade dress rights and similar rights; (c) trade secret rights; and (d) patents, designs, algorithms and other industrial property rights; all other intellectual and industrial property rights (of every kind and nature throughout the world and however designated), whether arising by operation of law, contract, license or otherwise; and all registrations, initial applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force.

1.7     "Licensed Software" shall mean all software necessary for Franchisee to operate the System, including, but not limited to:

a.     NiteVision 3.1 Property Management System, which is a 32 bit Windows based software program designed and intended to manage accumulated data, including but not limited to, data relating to reservations, occupancy, guest services, marketing support, registration information, check-in and check-out information, housekeeping data, and accounts receivable data.

b.     NetRez Revenue Management, which is an internet based revenue management tool that interfaces with NiteVision 3.1 and our central reservations system to allow for actions related to, including, but not limited to, modification of rate plans, allocations of room types and rate types and creation of rate types for planning and managing revenues.

1.8     "System" shall mean the Licensed Software and Documentation.

1.9     "Vendors" shall mean any third-party vendor retained by Franchisor to supply hardware, software or services in connection with the System.

1.10     Other capitalized terms used herein shall have the meanings ascribed to them in the Franchise Agreement.

## ARTICLE II

### LICENSE

2.1     License. Franchisor hereby grants to Franchisee, and Franchisee hereby accepts from Franchisor, during the term of this Agreement, a nonexclusive, nontransferable license to (a) use the System only in the operation of the Facility at the Site, and (b) use the Documentation only in connection with use of the System. This license transfers to Franchisee neither title nor any proprietary or intellectual property rights to the System or any part thereof, or any copyrights, patents, or trademarks, embodied or used in connection therewith. In addition to the terms and conditions set forth herein, this Agreement shall be subject to the terms and conditions of the Franchise Agreement.

2.2     Restrictions on Licensed Rights. Except as permitted by this Agreement or in writing from Franchisor or Vendors, Franchisee has no right, with respect to the System, to (i) install, sublicense, rent, lease, share, distribute, grant access to, use, modify, translate, copy or reproduce the System, in whole or in part; (ii) revise, translate, compile, decompile, reverse engineer or disassemble the System, in whole or in part or otherwise attempt to reconstruct any source code or object code, and any Derivatives thereof, that is a component of the System; (iii) obfuscate, remove or alter any Intellectual Property; (iv) add or permit any third party to add, any markings, notices or legends to the System or any Derivatives thereof, in whole or in part; (v) use, reproduce, modify, or translate the Documentation; (vi) use the system to provide any services other than services provided at, through or from the Facility in accordance with the Franchise Agreement; (vi) use the System to process any data other than Franchisee's own data relating to the Facility located at the Site or (viii) knowingly permit any third party to perform any of the foregoing. Franchisee shall maintain accurate and up-to-date records of the number and location of all copies and modifications or enhancements to the System and inform Franchisor in writing of such location(s). All copies of any part of the System, including any produced by Franchisee with Franchisor's or Vendors' consent, shall be the sole and exclusive property of Franchisor. All copies and modifications or enhancements of the System will be subject to all terms and conditions of this Agreement. Whenever Franchisee is permitted to copy or reproduce all or any part of the System, all titles, trademark symbols, copyright symbols and legends, and other proprietary markings must be reproduced.

C-2

## ARTICLE III

### FEES

3.1     Installation/Purchase of Hardware and Software/Initial Training/Initial Training Fee. Franchisee shall pay to Franchisor a fee of up to $45,000, depending on the size of the Facility and the required labor necessary for installation of the System at the Facility, to acquire and install the Licensed Software, Designated Computers and the System and to provide System training to Franchisee.

3.2     Maintenance Fee. Franchisee shall pay to Franchisor a monthly maintenance fee established by Franchisor, which is currently $6.00 per month per room, but is subject to increase by Franchisor from time to time upon written notice.

3.3     Additional Support Costs. Franchisee shall reimburse Franchisor for all reasonable costs and expenses (including but not limited to travel, living expenses reasonably convenient to the Site and labor costs for Franchisor's installer) incurred by Franchisor in connection with additional support, training, project management and other services requested by Franchisee and performed at the Facility or other location requested by Franchisee.

3.4     Shipping Fee. Franchisee shall reimburse Franchisor for reasonable shipping charges incurred by Franchisor to ship the System, or any component thereof, including any hardware upon which the System is installed, from Franchisor's office to the Facility.

3.5     Enhancements and Modifications. Franchisee shall pay a fee established by Franchisor for any enhancements or modifications to the System or any component thereof.

3.6     Late Fees. If any amount is past due pursuant to this Agreement or the Franchise Agreement, in addition to Franchisor's rights of termination provided herein, Franchisee agrees to pay Late Fees, as such term is defined in the Franchise Agreement.

3.7     Taxes. All amounts described herein are exclusive of all federal, state, municipal or other governmental excise, sales, value-added, use, personal property and occupational taxes, excises, withholding obligations and other levies now in force or enacted in the future and, accordingly, the amount of all payments hereunder is subject to an increase equal to the amount of any tax Franchisor may be required to collect or pay in connection with the Software and related services other than any tax on the net income of Franchisor.

3.8     No Offset or Liens. Franchisee shall not withhold any payments due Franchisor hereunder on grounds of alleged nonperformance by Franchisor hereunder or Vendors or under the Franchise Agreement, nor shall Franchisee set off any such payments against amounts owing or allegedly owing by Franchisor or Vendors to Franchisee. Franchisee shall neither seek nor obtain a lien against the Licensed Software, the Documentation or any embodiment of them.

## ARTICLE IV

### DELIVERY, INSTALLATION AND UPDATING OF THE SYSTEM

4.1     Delivery and Installation. Franchisee shall, at Franchisee's expense, obtain all computer hardware, software, equipment and communications services and lines which Franchisor may from time to time deem necessary or advisable, in its sole discretion, for use in connection with the System and ship such hardware and software to one of the following, as designated by Franchisor: (i) the Facility, (ii) Franchisor or (iii) a third party designated by Franchisor. Franchisor shall arrange for the installation of the System on the computer hardware and, if applicable, deliver the installed System, including any hardware upon which the System is installed, to the Facility. Such installation, and, if applicable, such delivery of the installed System, shall occur within thirty (30) days after the delivery of the software and hardware to the location or party designated by Franchisor above.

     4.2    Modifications/Enhancements: Franchisor reserves the right, on behalf of itself and any Vendors, to modify or enhance the System, at any time in its sole discretion. All modifications and enhancements shall be delivered to Franchisee by such means as Franchisor deems appropriate. Franchisee shall pay any delivery and other charges associated therewith. Franchisee agrees to install, at Franchisee's expense, all modifications and enhancements at the earliest possible opportunity, but in no event later than fifteen (15) days after Franchisee's receipt of such modification or enhancement or download instructions therefor from Franchisor or Vendors. If Franchisee requires the assistance of Franchisor to install any modification or enhancement, Franchisor, through itself or Vendors, will provide such assistance (provided Franchisee shall reimburse Franchisor for the costs incurred by Franchisor in providing such assistance), and Franchisee agrees to abide by such terms, conditions and directions as established by Franchisor (e.g., making computer system available to Franchisor or Vendors, Franchisee's employees performing operational tests at Franchisor or Vendors' direction, upgrading hardware, software, equipment and communications services and lines, etc.)

     4.3    Training. Franchisor shall provide training to Franchisee with respect to the use of the System at the Facility as described in the Franchise Agreement. Franchisee acknowledges that its employees must obtain a score satisfactory to Franchisor on the training examination to become a Certified User. Franchisor reserves the right to charge Franchisee for any training requested by Franchisee in excess of normal Facility training requirements. Franchisee may reproduce for training purposes training materials utilized by Franchisor in connection with the training of Franchisee's personnel. Any such reproductions shall include any copyright or similar proprietary notices contained in the materials being reproduced. All training materials shall be deemed Confidential Information.

## ARTICLE V

## SOFTWARE SUPPORT

     Franchisor shall furnish or arrange for the furnishing of the following System services and support services in connection with the System:

     5.1    System Deviations. In the event that the operation of the System deviates materially from its specifications and such deviation can be replicated by Franchisee, Franchisee shall give Franchisor written notification of the deviation in sufficient detail to permit replication and analysis, and shall provide Franchisor or, if Franchisor directs, Vendors with (a) all printouts and other information reasonably requested, and (b) telecommunications access to the Designated Computers as requested by Franchisor or Vendors. Upon receipt of notice from Franchisee of any deviation, Franchisor shall use commercially reasonable efforts to diagnose or cause Vendors to diagnose the cause of the deviation. Upon completion of the diagnosis, Franchisor or Vendors shall advise Franchisee of the source of the deviation. Franchisor shall use commercially reasonable efforts, without charge, to correct or avoid the deviation. If such deviation falls within the Exceptions to Support as provided in Section 5.6 below, Franchisor shall furnish Franchisee with a written estimate of the cost of correction, and if Franchisee authorizes correction, Franchisor shall use commercially reasonable efforts to correct or cause Vendors to correct the deviation at Franchisee's sole cost and expense.

     5.2    Telephone Support. Franchisor's or Vendors', as applicable, support desk will be available to answer questions regarding the system from Franchisee (if Franchisee is a natural person) or from any of Franchisee's Certified Users and, as appropriate, to render by telephone other software support services as described throughout this Article V. Such services shall be provided hereunder 24 hours a day, seven days a week, in accordance with such terms and conditions as Franchisor may establish from time to time in its sole discretion. Franchisor reserves the right to set reasonable support service usage limits and charge Franchisee for support service requested by Franchisee in excess of those limits.

     5.3    Network Security. Franchisee will maintain commercially reasonable security policies and procedures that are directed at deterring (a) the use of Franchisee's connection to the System by

unauthorized personnel or for unauthorized purposes; and (b) improper access to, use of or loss of data residing on Franchisor's or Vendors' systems by means of Franchisee's connection to the System. Franchisee will, when requested by Franchisor or Vendors, (i) identify the individuals given access by Franchisee to Franchisor's or Vendors' networks and systems and notify Franchisor or Vendors of any changes to such group; and (ii) complete a network security survey, if applicable. Franchisor or Vendors may deny access by Franchisee or any individual to Franchisor's or Vendors' networks and systems due to reasonable security concerns. Franchisee will require each third-party to which Franchisee outsources or subcontracts any data center operations to comply with this section, and Franchisor or Vendors may exercise any of its rights under this section with respect to such a third party.

5.4     Conditions to Support Obligations. Franchisor's and Vendors' obligations set forth in the preceding subparagraphs are conditioned upon (i) Franchisee reporting the issue to Franchisor's support desk by use of a designated telephone number, facsimile number or e-mail address; (ii) Franchisee taking such reasonable actions within its control as are required to resolve or mitigate the issue; and (iii) Franchisee committing personnel and resources as necessary and without regard to normal business hours to research and resolve the issue.

5.5     Exclusions. Neither Franchisor nor Vendors shall be required to provide any support services described in this Article V which are necessitated by, with respect to, or otherwise in connection with (a) any restricted use of the System as set forth in Section 2.2, or (b) any malfunction of Franchisee's hardware.

5.6     Exclusive Remedy. In the event of any failure of the System, or any part thereof, or any failure of the hardware installed by Franchisor or Vendors to perform as a result of Franchisor's or Vendors' installation of such hardware, the only liability of Franchisor or Vendors, and Franchisee's sole and exclusive remedy, shall be use by Franchisor of commercially reasonable efforts to correct the failure or cause Vendors to correct the failure.

## ARTICLE VI

## CONFIDENTIALITY

6.1     Confidentiality. For purposes of this Agreement, "Confidential Information" of a party means all information furnished by Franchisor or Vendors to Franchisee in connection with this Agreement that is designated or treated as confidential by Franchisor or Vendors or that is by its nature confidential. All information concerning the design, functionality and operation of the System is Confidential Information. Confidential Information does not include any information that (a) is already lawfully known by Franchisee when received hereunder; (b) is independently developed by Franchisee without use of any of Franchisor's or Vendors' Confidential Information; (c) is now or hereafter becomes generally available to the public through no fault of Franchisee; (d) is received by Franchisee from a third party legally entitled to make such disclosure; (e) is required to be disclosed by law, regulation, judicial process or order of a governmental authority (but only to the extent required by, and for the purpose of, such disclosure); or (f) is disclosed after Franchisee obtains prior written approval from Franchisor or Vendors for such disclosure. Franchisee shall not use Franchisor's or Vendors' Confidential Information for any purpose other than to fulfill Franchisee's obligations arising under this Agreement. Franchisee will use reasonable efforts to keep confidential Franchisor's or Vendors' Confidential Information and will not disclose such information to any person or entity other than Franchisee's employees, agents, and affiliates who agree to comply with this Section 6.1 or other than as required to fulfill its obligations arising under this Agreement. Franchisee will be responsible for the breach of this Section 6.1 by its employees, agents, and affiliates.

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

## ARTICLE VI

### INTELLECTUAL PROPERTY RIGHTS; OWNERSHIP OF DATA

7.1     Ownership. Franchisor and/or Vendors shall retain exclusive ownership of all right, title and interest, including without limitation, all Intellectual Property in and to the System, including, but not limited to, the Licensed Software and Documentation; the design, functionality, operation and components of the same; all modifications, enhancements and upgrades to the same; and Franchisor's or Vendors' business methods. Except as otherwise provided herein or in the Franchise Agreement, no right, title or interest of any kind in the foregoing is granted to Franchisee pursuant to this Agreement.

7.2     Use of Intellectual Property. Franchisee shall not use Franchisor's or Vendors' Intellectual Property in any way not expressly authorized under this Agreement or the Franchise Agreement, including without limitation in any advertising or promotional materials, without the prior written approval of Franchisor or Vendors, as applicable.

7.3     Unauthorized Use. Franchisee agrees to notify Franchisor immediately of the unauthorized possession, use, or knowledge of any item supplied under this Agreement and of other information made available to Franchisee under this Agreement, by any person or organization not authorized by this Agreement to have such possession, use or knowledge. Franchisee will promptly furnish full details of such possession, use or knowledge to Franchisor, will assist in preventing the recurrence of such possession, use or knowledge, and will cooperate with Franchisor or Vendors, as applicable, in any litigation or other acts against third parties deemed necessary by Franchisor or Vendors to protect Franchisor's or Vendors' proprietary rights. Franchisee's compliance with this Section shall not be construed in any way as a waiver of any right by Franchisor to recover damages or obtain other relief against Franchisee for any act or omission which may have resulted in the unauthorized possession, use or disclosure.

## ARTICLE VIII

### WARRANTY AND DISCLAIMERS; LIMITATIONS OF LIABILITY;

### IP INDEMNIFICATION

8.1     Disclaimers. FRANCHISOR, FOR ITSELF OR ON BEHALF OF VENDORS, MAKES NO WARRANTIES, WHETHER EXPRESS, IMPLIED, OR STATUTORY REGARDING OR RELATING TO THE SYSTEM, LICENSED SOFTWARE, ANY HARDWARE, THE DOCUMENTATION, ANY MATERIALS OR SERVICES PROVIDED TO FRANCHISEE UNDER THIS AGREEMENT, INCLUDING MAINTENANCE AND SUPPORT. FRANCHISOR SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO SYSTEM, LICENSED SOFTWARE, ANY HARDWARE, THE DOCUMENTATION, ANY MATERIALS OR SERVICES PROVIDED TO FRANCHISEE UNDER THIS AGREEMENT, INCLUDING MAINTENANCE AND SUPPORT, AND ANY OTHER MATERIALS OR SERVICES, AND WITH RESPECT TO THE USE OF ANY OF THE FOREGOING.

8.2     Limitation of Liability. IN NO EVENT WILL FRANCHISOR OR VENDORS BE LIABLE FOR ANY LOSS OF PROFITS, LOSS OF USE, BUSINESS INTERRUPTION, LOSS OF DATA, COST OF RECOVERY OR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND IN CONNECTION WITH OR ARISING OUT OF THE FURNISHING, PERFORMANCE OR USE OF THE SYSTEM, LICENSED SOFTWARE, ANY HARDWARE, THE DOCUMENTATION, AND ANY MATERIALS OR SERVICES PROVIDED TO FRANCHISEE UNDER THIS AGREEMENT, INCLUDING MAINTENANCE AND SUPPORT, WHETHER ALLEGED AS A BREACH OF CONTRACT OR TORTIOUS CONDUCT, INCLUDING NEGLIGENCE, EVEN IF FRANCHISOR OR VENDORS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN ADDITION, FRANCHISOR AND VENDORS WILL NOT

C-6

BE LIABLE FOR ANY DAMAGES CAUSED BY DELAY IN DELIVERY OR FURNISHING THE SYSTEM, LICENSED SOFTWARE, ANY HARDWARE, THE DOCUMENTATION, AND ANY MATERIALS OR SERVICES PROVIDED TO FRANCHISEE UNDER THIS AGREEMENT, INCLUDING MAINTENANCE AND SUPPORT. FRANCHISOR'S AND VENDORS' LIABILITY UNDER THIS AGREEMENT FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, RESTITUTION, WILL NOT, IN ANY EVENT, EXCEED THE LICENSE FEE PAID BY FRANCHISEE TO FRANCHISOR UNDER THIS AGREEMENT.

8.3     Intellectual Property Indemnification.

a.      If any third party asserts a claim alleging that Franchisee's use of any part of the System provided by Vendors constitutes infringement of any United States patent, copyright, license or other property right (an "IP Claim"), Franchisor will notify Vendors of such IP Claim and, in accordance with and subject to the limitations of the terms of any agreements between Franchisor and Vendors, Franchisor shall use commercially reasonable efforts to cause Vendors to, at Vendors' expense, defend such IP Claim and indemnify Franchisee from and against all losses, claims, liability, costs, damages, fines, and expenses (including all reasonable legal costs) (collectively, "Losses") suffered or incurred by Franchisee as a result of or in connection with such IP Claim, except to the extent that the IP Claim arises as a result of (a) a breach by Franchisee of its obligations under this Agreement; (b) any violation of Section 2.2 of this Agreement; (c) use of the System by Franchisee in combination with hardware or software not supplied by or not approved in advance by Franchisor or Vendors; (d) the acts or omissions of a third party (other than an agent or other representative of Franchisor or Vendors); or (e) Franchisee's use of other than the latest version of the System, or any part thereof, provided that (i) Franchisee promptly advises Franchisor of the IP Claim after receiving notice of it; (ii) Vendors may, at their sole option, assume sole control of the defense of the IP Claim and any related settlement negotiations; and (iii) Franchisee gives Franchisor or Vendors all authority, information and assistance reasonably necessary to settle or defend the IP Claim.

b.      Franchisor shall indemnify, defend and hold Franchisee harmless in accordance with the terms and conditions contained in Section 17.03 of the Franchise Agreement from and against any and all Losses and Expenses arising from IP Claim initiated by any third party based upon infringement of a patent, copyright, trade secret or other proprietary right as a result of Franchisee's use of any part of the System that is proprietary to Franchisor except to the extent that the IP Claim arises as a result of (a) a breach by Franchisee of its obligations under this Agreement; (b) any violation of Section 2.2 of this Agreement; (c) use of the System by Franchisee in combination with hardware or software not supplied by or not approved in advance by Franchisor or Vendors; (d) the acts or omissions of a third party (other than an agent or other representative of Franchisor or Vendors); or (e) Franchisee's use of other than the latest version of the System, or any part thereof, provided that (i) Franchisee promptly advises Franchisor of the IP Claim after receiving notice of it; (ii) Franchisor may, at its sole option, assume sole control of the defense of the IP Claim and any related settlement negotiations; and (iii) Franchisee gives Franchisor all authority, information and assistance reasonably necessary to settle or defend the IP Claim.

c.      If the System, or any part thereof, is held to infringe upon any Intellectual Property Rights of a third party and Franchisee's use of the System, or any part thereof, is enjoined, at Franchisor's or Vendors' option and sole expense, as soon as reasonably practicable after such injunction, Franchisor shall, or Franchisor shall use commercially reasonable efforts to cause Vendors to, (i) procure for Franchisee the right to continue using the system free of any liability for infringement or (ii) replace or modify the System with a non-infringing product of equivalent or better functionality, in Franchisor's or Vendors' sole discretion.

d.      **THIS ARTICLE VIII SETS FORTH FRANCHISEE'S SOLE AND EXCLUSIVE REMEDY WITH RESPECT TO ANY IP CLAIM.**

C-7

8.4     Acknowledgment. The parties acknowledge that they have reached agreement on the license fees, maintenance fees and other charges set forth in this Agreement in reliance on the disclaimers of warranty and limitations and exclusions of liability set forth in this Agreement and that the same form an essential basis of the bargain between the parties.

## ARTICLE IX

## TERM AND TERMINATION

9.1     Term. This Agreement and any license granted hereunder shall be co-terminus with the Franchise Agreement and shall expire or terminate upon expiration or termination of the Franchise Agreement, unless otherwise terminated pursuant to this Article IX. Franchisee's failure to comply with the terms of this Agreement, including failure to timely pay the Fees described in Article III above or any other fees described herein, shall be considered a default by Franchisee under the terms of the Franchise Agreement.

9.2     Termination and Other Remedies. This Agreement and any licensed rights granted hereunder may be terminated by Franchisor in the event that Franchisee has not performed any material obligation or has otherwise breached any material term of this Agreement (a) immediately upon receipt of written notice thereof if the breach or nonperformance is incapable of cure, or (b) upon the expiration of thirty (30) days after receipt of written notice thereof if the breach or nonperformance is capable of cure and has not then been cured. In addition to Franchisor's right to terminate this Agreement and to take such action as may be permitted by applicable law, Franchisor shall have the right, upon an event of default hereunder or if Franchisee is in default under any other agreement between Franchisee and Franchisee's Principal Owners and Franchisor, Franchisor's Affiliates or any Vendor, to disable the System until such default has been cured to Franchisor's reasonable satisfaction.

9.3     Termination Due to New System. If Franchisor determines that the best interests of the La Quinta System will be served by the adoption and use of a new computer software system, this Agreement may be terminated by Franchisor upon thirty (30) days written notice, and Franchisee shall be obligated to use such new system and enter into appropriate agreements in accordance with the terms of the Franchise Agreement.

9.4     Subsequent Obligations. Upon any termination of this Agreement, Franchisee shall promptly return to Franchisor Confidential Information, the Licensed Software and the Documentation, including all such copies or modifications and enhancements of the foregoing prepared by or for Franchisee or otherwise in Franchisee's possession. Within thirty (30) days after the effective date of termination, Franchisee shall certify in writing that all such materials have been returned and that all intangible copies of the Licensed Software have been purged from Franchisee's computers. Notwithstanding the foregoing, Franchisee shall not be obligated to purge intangible copies and modification or enhancements of the Licensed Software dedicated exclusively to the preservation of historical data, so long as any such copy is used solely for the purpose of retrieving, but not otherwise processing, such historical data.

## ARTICLE X

## DISPUTE RESOLUTION

10.1    Mediation. All controversies and claims between the parties arising out of or related to this Agreement shall be subject to non-binding mediation in accordance with the terms of the Franchise Agreement.

10.2    Exclusive Jurisdiction. Franchisee agrees that the U.S. District Court for the Northern District of Texas, or if such court lacks jurisdiction, the District Court (or its successor) for Dallas County, Texas shall be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Agreement. Franchisee irrevocably submits to the jurisdiction of such courts and waives any objections to either the jurisdiction of or venue in such courts.

C-8

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

10.3 Injunctive Relief. Franchisor or Vendors may obtain in any court of competent jurisdiction any injunctive relief against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause Franchisor or Vendors irreparable harm, without bond. Franchisee's sole remedy in the event of the entry of such injunction shall be its dissolution, if warranted, upon hearing duly had (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). Franchisee agrees that the existence of any claim Franchisee may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement of any of Sections 2.2 and 6.1 hereof.

10.4 Costs and Attorneys' Fees. The party who prevails in any judicial proceeding will be awarded its costs and expenses incurred in connection therewith, including reasonable attorneys' fees.

10.5 Governing Law. This Agreement will be construed under the substantive laws of the State of Texas, without regard to its conflict of law principles.

## ARTICLE XI

### GENERAL TERMS

11.1 Assignment. Franchisor may freely transfer or assign this Agreement and any and all part of its rights or obligations in this Agreement to any person or Legal entity. Neither this Agreement nor any rights granted hereby may be assigned by Franchisee without the prior written consent of Franchisor. Franchisor specifically waives and disclaims any right to impose any charge in connection with a permitted assignment by Franchisee so long as Franchisee retains no copy, modification or other portion of the System, and the assignee agrees to abide by the terms and conditions of this Agreement.

11.2 Modification. This Agreement can only be modified by a written agreement duly signed by persons authorized to sign agreements on behalf of Franchisee and of Franchisor.

11.3 Severability. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable for any reason, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

11.4 Relationship of Parties. Neither this Agreement nor the dealings of the parties pursuant to this Agreement shall create a fiduciary relationship or any other relationship of trust or confidence between the parties hereto. Franchisor and Franchisee will be and shall act as independent contractors, and neither party is authorized to act as an agent or partner of, or joint venturer with, the other party for any purpose. Neither party by virtue of this Agreement shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other party.

11.5 Agreement of Principals. Each of the undersigned designated as Principals individually, jointly and severally, unconditionally and irrevocably guarantee that each of Franchisee's obligations hereunder shall be punctually paid and performed. Without effecting the obligations of any of the Principals under this Section 11.5, Franchisor may, without notice to the Principals, waive, renew, extend, modify, amend or release any indebtedness or obligation of Franchisee or settle, adjust, or compromise any claims that Franchisor may have against Franchisee. Each Principal waives all demands and notices of every kind with respect to the enforcement of this Section 11.5, including notices of presentment, demand for payment or performance by Franchisee, any default by Franchisee or any guarantor, and any release of any guarantor or other security for this guarantee or the obligations of Franchisee. Franchisor may pursue its rights against any Principal without first exhausting our remedies against Franchisee and without joining any Principal.

11.6 Notices and Payments. All notices, requests and reports permitted or required to be delivered by this Agreement shall be delivered and deemed delivered as provided in the Franchise Agreement. All payments and reports required by this Agreement shall be sent to Franchisor at the address identified in the Franchise Agreement unless and until a different address has been designated by written notice in accordance with the terms of the Franchise Agreement. No restrictive endorsement on

C-9

any check or in any letter or other communication accompanying any payment shall bind Franchisor, and Franchisor's acceptance of any such payment shall not constitute an accord and satisfaction.

11.7  Force Majeure. Neither party shall be liable for any damages or penalty for any delay in performance of, or failure to perform, any obligation hereunder or for failure to give the other party prior notice thereof when such delay or failure is due to Force Majeure.

11.8  Non-Waivers. No express or implied waiver by either party of any event of default hereunder shall in any way be, or be construed as, a waiver of any future or subsequent event of default.

11.9  Survival. All provisions hereof which expressly or by reasonable implication contemplate performance following the expiration, termination or assignment of this Agreement shall survive such expiration termination or assignment.

11.10  Additional Equipment. Franchisee is solely responsible for all hardware, operating systems, and other software and peripherals required to make the System operate as intended, including but not limited to all costs and expenses related to a personal computer and a compatible operating system. In the event the operation of the System requires an Internet, dial-up, VPN, T1 or other connection to a remote computer designated or approved by Franchisor, Franchisee shall be responsible for all hardware, software, and telecommunications charges and expenses in connection therewith.

11.11  Entire Agreement. The parties acknowledge that this Agreement, together with the Franchise Agreement, set forth the complete, exclusive and integrated understanding of the parties which supersedes all proposals or prior agreements, oral or written, and all other prior communications between the parties relating to the subject matter of this Agreement; provided, however, that nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the Franchise Disclosure Document that Franchisor furnished to you.

11.12  Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

**IN WITNESS WHEREOF**, each party has executed and delivered this Agreement on the date set forth below its signature below, effective for all purposes as of the Effective Date.

**FRANCHISOR**
**LA QUINTA FRANCHISING LLC**
a Nevada limited liability company

By:

Name: Rajiv Trivedi
Title: Executive Vice President
and Chief Development Officer

Date: _____ | - | 3 - | b _____

**FRANCHISEE**
**SUGARLOAF CAPITAL BUFORD, LLC**
a Georgia limited liability company

By: _____

Name: Sonial Patel
Title: Sole Member and Manager

Date: _____ | - | - | b _____

C-10
Atlanta (Duluth), GA #0264_Rev1_Transfer FA

## EXHIBIT D

## PROPERTY IMPROVEMENT PLAN

LA**QUINTA**
INNS & SUITES

## PROPERTY IMPROVEMENT PLAN

### TRANSFER PIP

| Date | December 8, 2015 |
|---|---|
| **Facility Address** | 2370 Stphens Center Drive |
| | Duluth, GA 30096 |
| **Telephone** | (678) 957 0500 |
| **Facility Type** | La Quinta Inn & Suites |
| **Property ID Number** | 0264 |
| **Date Opened in System** | 12/31/2002 |
| **Number of Floors** | 3 |
| **Number of Rooms** | 83 |
| **Physical Inspection Date** | November 20, 2015 |

**Brief Description of Facility:**

This is a 5 year old, 3-story, interior corridor property with 83 guest rooms, business center, breakfast area, guest laundry, Outdoor pool, This Property Improvement Plan is based on the review of all public areas and guest rooms 102,116,161,172,212,241,262,263

**General Notes:**

1. If applicable, all FF&E and other materials specified for replacement in this PIP must be replaced with one of the La Quinta décor packages or an approved alternate. Likewise, all other replacement materials must be submitted to La Quinta for approval.

2. Except as otherwise indicated, all work referenced in this PIP must be completed within one hundred eighty (180) days after the Effective Date. This includes, but is not limited to the facility complying with all local, state and federal laws and building codes, including The Americans with Disabilities Act and other codes applicable to the modification of buildings for persons whose disabilities are protected by law.

3. Refer section numbers listed in this PIP (in the left column of each line item) to the Property Improvement Plan Support Appendix document for details.

4. All proposed architectural designs, product replacement or new finishes shall be submitted to La Quinta for review and approval prior to installation. All proposed substitutions to La Quinta specified materials or products shall be submitted to La Quinta for review and approval prior to installation.

5. Franchise owner is required to hire an architect to develop the plans and elevations based on this PIP.

6. Franchise owner is required to select an FF&E Scheme and hire an approved FF&E procurement company to design and purchase all

7. If the facility has a heated swimming pool, a carbon monoxide detection system must be installed per La Quinta specifications.

D-1

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

**Property Improvement Plan**
**Duluth, GA**

LAQUINTA
INNS & SUITES

Refer section numbers listed in this PIP (in the left column of each line item) to the Property Improvement Plan Support Appendix document for details and clarifications.

| Site | |
|---|---|
| Section 1.0.1 | Landscaping - Clean, groom and supplement the planting and ground cover around the property where necessary. Ensure existing planting beds are filled with new healthy plant material and ground cover (rocks, mulch, etc.) at the entry to the site, around the building perimeter, and parking islands. Remove weeds, stumps, exposed infrastructure etc. as necessary. |
| Section 1.0.7 | Site Accessories - Refinish all site accessories (trash cans, smoke bins, benches, etc.) to a like-new condition. Replace as necessary. |
| Section 1.1.1 | Paving (light damage) - Patch and repair any significant damage to the asphalt and apply a seal coat to the parking lot. Restripe all parking lines and drive areas per jurisdiction. Maintain proper slopes for drainage. Ensure the count and design of standard and accessible spaces and accessible paths meet all jurisdictional codes. |
| Section 1.1.3 | Decorative Paving - Patch all cracks and damage in the decorative paving at the entry drive, power wash and restore to a like-new condition. |
| Section 1.2.2 | Concrete Curbs - Restore all curbs to a like new condition. Repair all chips, cracks, etc. and pressure wash. Repaint all curbs as necessary per jurisdictional requirements. |
| Section 1.2.4 | Sidewalks - Restore all sidewalks to a like-new condition. Repair all chips, cracks, etc. in the sidewalks and pressure wash. |
| Section 1.3.1 | Trash Dumpster Enclosure - Place the exposed trash bins and storage items in a masonry wall enclosure with a metal gate per LQ guidelines. Paint to match building. Provide plans for approval. |
| Section 1.4.1, 1.4.2 | Lighting - Ensure all existing parking lot lighting has a minimum 2 foot candle lighting level. Remove rust/ water stains from site poles and bases and repaint as necessary. |
| Section 1.5.1/1.5.2 | Flag Poles - LQ requires 3 Flags (US, State and LQ) to be provided on 20'-0" high white poles with required lighting (unless otherwise required by any jurisdiction) near the main entrance/ Porte Cochere Area. Provide a decorative landscape bed around the base of the flagpoles. Provide plans for approval. |

| Signage | |
|---|---|
| Section 2.0.1 - 2.0.4 | Signage - Replace all signage per current La Quinta signage standards. Replace any non-standard interior, directional, guestroom, and informational signs. Replace missing or damaged signage at the pool area. |

| Exterior of Building | |
|---|---|
| Section 3.0.1 | Overall building - Paint entire building  per La Quinta guidelines. Provide plans for approval. |
| Section 3.0.1/3.0.2 | Porte Cochere - Remove existing lights and install recessed can lights. |
| Section 3.1.1 | Exterior entry doors - Replace doors and widen openings to install automatic sliding doors. |
| Section 3.1.2 | Exterior service  Doors - Treat for rust and paint to match building. |
| Section 3.2.0 | Exterior Windows - Treat windows and framing for rust/ damage and paint per LQ guidelines. |
| Section 3.3.1/3.3.2 | Lighting - Remove existing wall sconces on building and Porte Cochere. Provide new decorative wall sconces on Porte Cochere column, Pediments and entry/ exit doors per LQ Urban/Traditional design prototype. |

| Pool Area (Outdoor) | |
|---|---|
| Section 4.0.2 | Deck and Coping -  Power wash the existing deck and coping to like new condition. |
| Section 4.0.4 | Pool Fence / enclosure - Treat for rust / damage and repaint the metal pool fence. |
| Section 4.0.5 | Furniture - Provide new table and chair sets for the pool area per new design scheme. |
| Section 4.0.8 | Lighting and Accessories  (outdoor) Provide new pool area lighting fixtures. Ensure all metal accessories, furniture, piping, etc. is of a corrosion proof material (aluminum). |

| All Public / Guestroom Areas | |
|---|---|
| | Exposed wires and Conduits - Remove or conceal all exposed wires and conduits. |
| | Electrical, Mechanical, Plumbing, Elevators and Fire Safety Systems - All Electrical, Mechanical, Plumbing, Elevators and Fire Safety Systems shall be inspected by licensed contractor for proper functioning. Provide a copy of report for La Quinta's records. Replace all old and damaged light switches, outlets and thermostats. |
| | Doors and Windows- Clean all windows and doors and restore to a like-new condition. Refinish to like-new or replace all tarnished door hardware (lever handles, push plates, pulls, hinges, closers, card key access hardware, etc.). |
| | Accessories - Ensure all light switches, cover plates, door stops and other similar accessories are "modernized" and in like-new condition. |

| Great Room (Lobby) | |
|---|---|
| Section 5.0.1 | General - Renovate the public areas per one of La Quinta's new Interior Design schemes. Remove walls as required and reconfigure the connection between the Lobby and Breakfast area to create a single "Great Room." Provide plans for review. |
| Section 5.0.2 | Front Desk Area - Remove existing desk and provide 2 freestanding front desk counters (pods) with stone top and decorative front paneling per the new design scheme. Rework the back wall of the front desk area and provide artwork mural of local area interest per new La Quinta design scheme. Provide plans for approval. |
| Section 5.0.3 | Flooring - Replace existing tile with new ceramic tile per new design scheme. Install carpeted areas at soft seating areas per the new LQ Interior Design scheme. Replace carpet with new per new design scheme. |
| Section 5.0.4 | Walls - Provide new perforated wall covering per new design scheme. |
| Section 5.0.5 | Ceiling - Paint the ceiling per new design scheme. |
| Section 5.0.6 | Doors - Paint the doors and frames per new design scheme. Replace door hardware. |
| Section 5.0.7 | Lighting - Replace all floor, wall and ceiling light fixtures per new design scheme. Install pendant lighting at the front desk area and above seating areas as required by the new design scheme |
| Section 5.0.9 | Furniture, Lighting and Décor - Remove existing furniture and FF&E and provide new lobby furniture, window coverings, artwork, etc. per an approved La Quinta interior design scheme. |
| Section 5.0.10 | Vestibule - Paint the walls and replace the walk off mat. Replace tile to match lobby. |

| Brightside Market | |
|---|---|
| Section 6.0.0 | Replace all components in sundry shop and Remodel the sundry shop per LQ design standards with all standard components including full sized refrigerator, full sized freezer, proper shelving and sundry cabinet cisplay. LQ requires use of one of the approved sundry vendors: Vistar or Tradavo for procurement and layout of sundry items. Provide plans for approval. |

| Business Center | |
|---|---|
| Section 7.0.0 | Business Center - Provide 2 all-in-one computer stations per LQ guidelines. Provide 2 ergonomic chairs. Replace artwork. Remove fake plants. Provide plans for approval. LQ recommends to remove walls and door around existing business center and open space up to become additional Great room space. Provide a standing print station per LQ guidelines. |

| Great Room (Breakfast) | |
|---|---|
| Section 8.0.1 | Breakfast Area - Renovate the breakfast area per one of La Quinta's new Interior Design schemes. Provide a new layout per the LaQuinta great room layout. Remove molding from columns and reface per new design scheme. |
| Section 8.0.2 | Breakfast Bar - Remove walls around business center and relocate pantry into existing board room. Create new serving area in space currently occupied by pantry/ business center. Replace the cabinets and countertop per new design scheme. Fill in the hole in the wall to make it flush. Install the LaQuinta slat-wall display above the primary counter and install a full height tile backsplash above all secondary counters. Provide plans for approval. |
| Section 8.0.2A | Coffee station - Provide a dedicated 24-hr accessible coffee station per new design scheme. Provide water and electrical connection for a liquid coffee machine. Provide plans for approval. |
| Section 8.0.3 - 8.0.8 | Finishes - Provide all new finish materials, equipment, millwork etc. consistent with Sections 5.0.3 - 5.0.8 . Floor material, walls, ceiling, doors and HVAC shall have a continuous design flow between the Lobby and Breakfast area to establish the Great Room concept. Provide plans for approval. |
| Section 8.0.9 | Furniture, Lighting and Décor - Remove all existing furniture and FF&E and provide new breakfast furniture (including soft seating areas, lounge seating, etc.), window treatments, area rugs, artwork and a communal table etc. per new Interior design scheme. Provide a 55" TV. |
| Section 8.0.10 | Communal Table - Provide a communal table with 42" high counter with matching stone top and high chairs in the Great Room dining area. Provide power outlets in the center of the table top. Provide plans for approval. |

| Board Room | |
|---|---|
| Section 9.0.1 | General - Remove board room and amenities and convert into pantry/ breakfast area space per new design layout. Relocate board room to existing fitness center. Provide plans for approval. |
| Section 9.0.2 | Serving Counter - Install a serving counter. |
| Section 9.0.3 | Flooring - Replace the carpet per new design scheme. |
| Section 9.0.4 | Walls -Provide new perforated wall vinyl per new design scheme. |
| Section 9.0.5 | Ceiling - Paint the ceiling per new design scheme. |
| Section 9.0.6 | Doors - Replace the door. |
| Section 9.0.7 | Lighting - Remove existing wall lighting and install recessed can lighting per LQ standards. Provide pendent lighting as required per the new design scheme. |
| Section 9.0.9 | FF&E - Replace the chairs per new design scheme and ensure all tables are in like-new condition. Provide new artwork and window coverings per new design scheme. Install a flat screen TV on the wall (47" or bigger). |

| Fitness Center | |
|---|---|
| Section 10.0.1 | Fitness Center - Convert existing fitness center into the board room. Relocate fitness center into 2 guestrooms creating a 500sf fitness center per LQ guidelines. Provide plans for approval. |
| Section 10.0.2 | Equipment - Replace all equipment and install all required equipment and accessories per LQ guidelines. |
| Section 10.0.3 | Flooring - Remove the carpet and base and provide new rubber sheet flooring per La Quinta standards. |
| Section 10.0.4 | Walls - Provide new wall vinyl. Provide large 6'x6' framed mirrors on the wall and provide the LQ signature wall vinyl on the full height opposite the mirror wall per LQ guidelines. |
| Section 10.0.5 | Ceiling - Paint the ceiling per new design scheme. |
| Section 10.0.6 | Doors - Provide a new door with a glass panel to the Fitness Center with card-key access. |
| Section 10.0.7 | Lighting - Existing ceiling ighting may remain. |
| Section 10.0.9 | Artwork and Windows - Replace the artwork and window coverings per new design scheme. |

D-3

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

| Guest Laundry | |
|---|---|
| Section 11.0.2 | Equipment - Ensure existing washers, dryers and other equipment is fully operational and in like-new condition. Remove table and install a millwork folding counter with stone top. Replace artwork. |
| Section 11.0.3 | Flooring - Replace the flooring with new 12"x24" tile. |
| Section 11.0.4 | Walls - Patch any damage to the walls and paint per new design scheme. |
| Section 11.0.5 | Ceiling - Paint the ceiling per new design scheme. |
| Section 11.0.6 | Doors - Refinish the door to a like-new condition. |
| | |
| **Public Toilets** | |
| Section 12.0.2 | Vanity - Remove existing and provide a new furniture style vanity with stone top and replace sinks and hardware. Provide a new decorative framed mirror per new La Quinta design scheme. |
| Section 12.0.3 | Flooring - Replace the existing tile and base with new 12"x24" tile flooring |
| Section 12.0.4 | Walls - Replace wall vinyl per new design scheme. Replace wall tile. Provide new laminate covering over toilet partition walls. |
| Section 12.0.5 | Ceiling - Paint the ceiling per new design scheme. |
| Section 12.0.6 | Doors - Restore door and frame to a like-new condition. |
| Section 12.0.7 | Lighting - Replace the existing ceiling fixtures with recessed can lighting. Replace vanity light fixture. |
| Section 12.0.9 | Accessories - Replace or refinish the toilet paper holders, paper towel dispensers and other wall/ceiling mounted accessories as required. |
| | Accessibility - Ensure accessibility of toilet rooms. |
| | |
| **Corridors, Hallways, Elevators, Elevator Lobby, and Vending** | |
| Section 13.0.2 | Corner Guards - Install new corner guards per LQ guidelines. |
| Section 13.0.3 | Floor - Replace all corridor, vending and exit vestibule tile, carpet and base per new design scheme. |
| Section 13.0.4 | Walls - Remove existing wall covering and replace with new per new design scheme. Remove all old phone booth shelves and other unused or unnecessary wall amenities. |
| Section 13.0.5 | Ceiling - Replace any damaged ceiling tiles to match surrounding. Ensure all metal grid is free from rust, bending and in like-new condition. |
| Section 13.0.6 | Doors - Ensure all guestroom doors are free from scuffs, scratches, etc. and are in a like-new condition. Paint the corridor doors per new design scheme. Replace door hardware. |
| Section 13.0.7 | Lighting - Replace all corridor lighting including ceiling fixtures and wall sconces with LED fixtures. |
| Section 13.0.9 | Furnishings - Replace console tables, mirrors, window treatments and other corridor furnishings and décor per new design scheme. |
| Section 13.0.10 | Elevators - Replace the ceiling with new stainless steel panels with recessed can lighting. Replace the existing flooring with new ceramic tile. Apply a new veneer to the wall panels (3M or similar). Provide plans for approval. |
| | |
| **Stairways** | |
| Section 14.0.1 | Metal Stairs - Install carpet on the staircases and landings per new design scheme. Install tile flooring on 1st floor landing. |
| Section 14.0.2 | Metal Railing - Treat for rust and paint the metal rails and trim. |
| Section 14.0.4 | Walls - Paint the walls per new design scheme. |
| Section 14.0.5 | Ceiling - Paint the ceiling per new design scheme. |
| Section 14.0.6 | Doors - Paint the doors and frame per LQ guidelines. |
| Section 14.0.7 | Lighting - Provide decorative wall fixtures per LQ guidelines. |
| | Accessibility - Ensure accessibility of stair and handrails. |
| | |
| **Guestrooms** | |
| Section 15.0.1 | Case goods - Replace all casegoods (headboards, end tables, coffee tables, work desk, etc.) per a new La Quinta interior design package. |
| Section 15.0.2 | Softgoods – Provide new bedding and fitted bed base wrap, window treatments, upholstered items and ergonomic desk chair per LQ design scheme. Provide new Simmons Beautyrest pillow-top mattresses in all rooms per LQ standards. |
| Section 15.0.3 | Flooring - Replace the carpet in all guestrooms per new design scheme. Install new ceramic tile flooring in the guestroom entries, closets and bathrooms per LQ guidelines. |
| Section 15.0.4 | Walls - Repair any scuffs and damage to the walls and paint per new design scheme. |
| Section 15.0.5 | Ceiling - Paint the ceilings per new design scheme. |
| Section 15.0.6 | Doors - Restore all doors to a like-new condition free of scuffs, scratches, etc. Replace/ update all door locks, knobs, hinges and other outdated and tarnished door hardware. |
| Section 15.0.7 | Lighting - Provide new wall mounted, nightstand, desk and floor lamps per new LQ interior design scheme. Replace dome light at entry. |
| Section 15.0.8 | Artwork and mirrors - Provide new artwork and framed mirrors per new design scheme. |
| Section 15.0.9 | Closet - Replace door hardware. Ensure iron, ironing board, luggage racks, shelves, etc. are in like-new condition or replace. |
| Section 15.0.10 | Micro /fridge - Ensure all microwave and refrigerator units are current (10 yrs. max) models and functioning in like-new condition. Ensure all units have a stainless steel or black finish. Ensure all units are housed in a casegood or millwork |
| Section 15.0.13 | TV – Provide new 37" (min) Flat Panel LCD or Plasma TV 's (dresser mounted, conceal wiring and TV box). |
| Section 15.0.15 | PTAC and EMS - Provide an Energy Management System with wall mounted thermostat. Replace all PTACs older than 10 years of age. |
| Section 15.0.17 | Dry bar - Provide a dry bar with a stone top counter and wood cabinetry below to house the mini fridge and open cubby above to house the microwave. |
| | Accessibility - Verify adequate number and design of accessible rooms. Smoke detectors are required in all guestrooms. |

D-4

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

| Guestroom Bath | |
|---|---|
| Section 16.0.1 | Vanity - Remove existing vanity and provide a "stand alone furniture style" vanity with stone top, millwork apron, shelf and four legs. |
| Section 16.0.2 | Millwork Cubby - Remove existing towel rack. |
| Section 16.0.3 | Flooring - Replace existing flooring with new ceramic tile flooring in the bathrooms, guestroom entries and closets. |
| Section 16.0.4 | Walls - Remove existing wall covering and provide a textured and painted gypsum finish. Replace all switches and switch plates, electrical receptacle plates etc. with updated fixtures. |
| Section 16.0.5 | Ceilings - Paint the ceilings per new design scheme. |
| Section 16.0.6 | Doors - Restore doors to a like-new condition free of scuffs, scratches, etc. and paint/ stain per new design scheme. |
| Section 16.0.7 | Lighting - Replace vanity light and ceiling light with new LED fixtures. |
| Section 16.0.8 | Artwork and mirror - Provide a full width decorative framed mirror above the vanity and artwork above the toilet per new design scheme. |
| Section 16.0.10 | Fixtures - Clean tubs and surrounds to like-new condition. Clean all tarnished lavatory and tub plumbing faucets and accessories. |
| Section 16.0.11 | Accessories - Provide new accessories (curved shower rods, towel bars, robe hooks, etc.) as needed and ensure clean installation. |
| | Accessibility - Ensure adequate number and design of accessible bath rooms. |
| | |
| Section 17.0.0 | FF&E Technical Specifications |
| | |
| Section 18.0.0 | Front Desk and Property Management System Requirements |
| | |
| Section 19.0.0 | Front and Back Office Requirements |
| | |
| Section 20.0.0 | Telephone Requirements |
| | |
| **PIP Prepared By:** | |
| Name: Carlos Tripp | |
| Title: Design Manager | |
| Phone: 602.516.6373 | |
| Fax: 972-505-7796 | |
| E-mail: carlos.tripp@laquinta.com | |

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

**EXHIBIT E**

**INSURANCE REQUIREMENTS**

**Minimum Required Coverage, Limits and Provisions:** The insurance policies to be procured and maintained include the following:

**(a) WORKERS' COMPENSATION & EMPLOYERS LIABILITY:**

- Worker's Compensation:
  - o Statutory limits in compliance with laws of applicable states
- Employer's Liability:
  - o Limits of not less than $1,000,000. Each Accident / $1,000,000 Disease-Policy Limit / $1,000,000 Disease-Each Employee
- If insured through a monopolistic State Fund, Stop Gap coverage or an endorsement on the CGL policy, the policy is required with amount not less than $1,000,000 limit per claim.
- Policy must be extended to cover "All States", Voluntary Workers' Compensation and Longshoreman & Harbor Workers' Compensation Act on an "if any" basis, if applicable.

**(b) COMMERCIAL GENERAL LIABILITY ("CGL"):** CGL insurance to cover claims or damages arising or resulting from the operations/premises of the applicable Facility or Facilities underwritten on a "per "occurrence" basis for bodily injury, property damage, personal injury, and advertising liability with the following minimum limits and coverage terms and conditions:

- Limits of not less than $1,000,000 per occurrence / $2,000,000 General Aggregate
  - o Aggregate limits to apply on a per location basis if multiple locations are covered by the policy.
- The Policy also shall provide the following:
  - o Damage to property of others and bodily injury to include sickness, disease and death.
  - o Products/Completed Operations
  - o Liability assumed in Contracts
  - o Innkeepers Liability – insuring for loss or damage to guests' property *(which may be satisfied by coverage under the CGL and/or separate Crime Insurance policies)*.
  - o Liquor liability – Limits of not less than $1,000,000 each occurrence for bodily injury and property damage arising out of the sale, distribution or serving of alcoholic beverages at the Facility, if any.
  - o Independent contractor's coverage – coverage for liability incurred arising out of operations performed for Franchisee by persons other than Franchisee's own employees.
  - o Pollution coverage for liability arising out of heat, smoke or fumes from a hostile fire, or smoke, fumes, vapor or soot produced by or originating from equipment used to heat, cool or dehumidify, or equipment that is used to heat water or vapors or fumes from paint, carpet or materials at the Facility.
  - o Terrorism insurance as available under the Terrorism Risk Insurance Act, as the same may be amended or replaced. May be provided by opting in on CGL policy or by separate policy.
  - o Worldwide liability coverage for lawsuits brought anywhere in the world arising out of the Facility or the operations connected with it recommended.

E-1

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

- In addition, CGL coverage shall include and not exclude loss arising from explosion, collapse and underground coverage during any construction;

### (c) AUTOMOBILE LIABILITY:

- Limits of not less than $1,000,000 each accident
  - o Include coverage for Owned, Non-Owned and/or Hired Vehicles
- Garage-Keepers Liability (if the Facility's operations includes parking operations) with limits adequate to cover the full actual value of all automobiles while in the care, custody and control of the Franchisee at any one time.

### (d) EXCESS/UMBRELLA LIABILITY:

- Limits of not less than $5,000,000 limit of liability per occurrence in excess of the primary limits of liability insurance described under the CGL and Automobile Liability requirements noted above and with coverage as broad as the requirements noted therein and underwritten on a "follow form" basis, to include terrorism coverage if opted in under CGL or separate policy;

### (e) PROPERTY INSURANCE: Property insurance providing "All Risks" coverage for loss of or damage to all real and personal property including the Facility, and all building(s), contents, machinery, equipment, furniture, fixtures and inventory, with limits sufficient to insure the value of such covered property on a replacement cost basis with the following minimum terms and conditions:

- Special "All Risks" policy form including, without limitation, coverage for:
  - o Buildings & Contents at 100% of insurable replacement value
    - ▪ Eliminate co-insurance clause penalty
  - o Business Interruption with limits adequate to cover (a) the loss of *net profits and continuing expenses* of the Facility for a 12 month period.
    - ▪ Continuing expenses must specifically include royalty/marketing/reservation fees and other fees payable to us as determined under Sections 4.04 and 4.06 of the Franchise Agreement, including but not limited to those fees that are calculated as a percentage of gross room revenue or number of rooms and those that are fixed monthly fees regardless of revenues, had no loss or damage occurred.
  - o Coverage for loss or damage caused by Named Windstorms and Fire
  - o Extended Period of Indemnity for 12 months to allow for the delay before the momentum of the business is regained.
  - o Contingent Business Interruption
  - o Civil Authority-Ingress/Egress for mandated closure by governmental authority.
  - o Building Law and Ordinance coverage included for enforcement of codes regulating construction and repair of damaged buildings.
  - o Extra Expense for reimbursement of reasonable expense beyond the fixed or continuing costs incurred to continue business operations while under repair.
- Flood Insurance- where applicable, with coverage limits as close to full replacement cost of the building as reasonably available and must include business interruption coverage as described above.
  - o Coverage only applies if the location is in the special flood hazard areas of Zones A and V (any combination therein) as determined by FEMA.

E-2

- Earthquake Insurance, where applicable, with coverage limits as close to 70% replacement cost of the building as reasonably available and must include business interruption coverage as described above.
  - o Coverage applicable if location of the Facility is within a hazard zone of 16 or higher as determined by the United States Geological Survey.
- Terrorism insurance as available under the Terrorism Risk Insurance Act, as the same may be amended or replaced. May be provided by opting in on CGL policy or by separate policy.
- During any period of construction, Franchisee shall procure and maintain "Builder's Risk" coverage for those portions of the Facility under construction providing coverage terms and conditions as enumerated above.

### (f) BOILER & MACHINERY/EQUIPMENT BREAKDOWN INSURANCE:

- Broad Form coverage
  - o 100% replacement value
  - o Include Business Interruption
    - ▪ Limits shall be adequate to cover full recovery of *net profits and continuing expenses* of the Facility.
      - Continuing expenses must specifically include royalty/license fees and other fees payable to us as determined under Sections 4.04 and 4.06 of this Agreement including but not limited to those fees that are calculated as a percentage of gross room revenue, had no loss or damage occurred.

**(g) TERRORISM INSURANCE (Recommended):** If elected, coverage shall be obtained and maintained for both first party damage and third party liability either on a stand-alone policy basis, through a government operated or mandated pool, or as part of the General/Third Party Liability coverage policies and in conjunction with procuring the Property Insurance policy.

**(h) OTHER INSURANCE:** Such other insurance policies as Franchisor may reasonably designate from time to time in the System Manual or otherwise in writing.

### Other Policy Requirements:

(a)     All insurance policies required by the Franchise Agreement shall be placed with insurance companies with a financial strength rating of "A" or higher by Standard & Poor's or "A-, VII" or higher by A.M. Best and as reasonably acceptable to Franchisor and licensed or otherwise permitted to do business in the state where the Facility is located.

(b)     Franchisee shall not self-insure, through the use of a captive or otherwise, any of the insurance coverage required by the Franchise Agreement, or non-subscribe to any State's applicable worker's compensation laws without the prior written consent of Franchisor. Franchisee will be a named insured under all insurance policies. Any deductible or retention within the insurance policies required shall not exceed $25,000, unless approved in writing in advance by Franchisor. Franchisee shall be responsible for payment of any and all deductibles, self-insured retentions or coinsurance penalties, if any, from insured claims under its policies of insurance.

(c)     With the exception of workers' compensation insurance and property insurance, all insurance coverage required by the Franchise Agreement shall by endorsement specifically name as unrestricted additional insured: "La Quinta Franchising LLC, LQ Management L.L.C., La Quinta Holdings Inc., each of their respective affiliates, and the respective officers, directors, agents, servants, employees, joint ventures, and partnerships of each". With respect to the property insurance required by

E-3

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

the Franchise Agreement, such insurance shall by endorsement specifically name as loss payees the following entities: La Quinta Franchising LLC, LQ Management L.L.C., and La Quinta Holdings Inc.

(d)     All insurance required by the Franchise Agreement shall be specifically endorsed to provide coverage on a primary basis to each additional insured and that any insurance carried by any additional insured shall be excess and non-contributory. Franchisee's obligation to obtain and maintain the foregoing policy or policies of insurance in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor or any of its affiliates. In the event that payments are required to be made under Franchisor's or Franchisor's affiliates' own insurance policies or self-insurance (whether for defense or indemnity) before the applicable coverage limits for the insurance policies obtained by Franchisee are exhausted, then Franchisee hereby agrees to reimburse, hold harmless and indemnify the Franchisor and its insurers for such payments.

(e)     All policies of insurance required by the Franchise Agreement shall provide that such policies shall not be canceled, modified or changed without first giving thirty (30) days prior written notice thereof to Franchisor.

(f)     All liability insurance required by the Franchise Agreement shall expressly provide that coverage thereunder applies separately to each insured and additional insured party against whom a claim is brought as though a separate policy had been issued to each.

(g)     All liability insurance required by the Franchise Agreement shall provide just as broad coverage to the parties required to be named as an additional insureds under the Franchise Agreement as the coverage provided to the first named insured.

(h)     All insurance required by the Franchise Agreement shall provide that the insurer(s) waive and release any and all rights of subrogation against "La Quinta Franchising LLC, LQ Management L.L.C., and La Quinta Holdings Inc., each of their respective affiliates, and the respective officers, directors, agents, servants, employees, joint ventures, and partnerships of each".

(i)     Franchisee shall deliver to Franchisor the following documents, evidencing the required coverage and indicating all deductible or self-insured retention amounts, if any:

- Certificate of Liability Insurance Coverage
- Certificate of Property Insurance Coverage
- Certified copy of the Additional Insured Endorsement and/or Loss Payee Endorsement, as applicable
- Certificate Holder to read:

  La Quinta Franchising LLC
  LQ#0264
  c/o CertFocus

If requested by Franchisor, Franchisee shall provide a certified copy of the entire insurance policy, with all endorsements. Any policies or certificates (or certified copies of the policies if requested by Franchisor) shall be delivered to Franchisor within ten (10) days of any request by Franchisor and not less than ten (10) days prior to their respective inception/renewal dates. Failure of Franchisor to demand evidence of compliance with the insurance requirements specified herein or failure to identify a deficiency from evidence of insurance provided shall not be construed as a waiver of Franchisee's obligation to maintain such required insurance.

(j)     Above coverage types, limits and requirements apply to Conversion properties and Transfers beginning on the Effective Date of the Franchise Agreement and to New Construction properties beginning no later than the Commencement of Construction.

E-4

Atlanta (Duluth), GA #0264_Rev1_Transfer FA

**EXHIBIT F**

**LANDLORD ESTOPPEL AND RECOGNITION AGREEMENT**

## LANDLORD ESTOPPEL AND RECOGNITION AGREEMENT

THIS ESTOPPEL AND RECOGNITION AGREEMENT (this **"Estoppel Agreement"**) is made and entered into on ᒎＡＮＵＡＲＹ ⎯⎯ ⎯⎯ , 201ᅛby and among MRL HOSPITALITY, LLC (**"Landlord"**), SUGARLOAF CAPITAL BUFORD, LLC (**"Tenant"**), and La Quinta Franchising LLC, a Nevada limited liability company (**"La Quinta"**).

WHEREAS, Tenant has executed or intends to execute a Franchise Agreement with La Quinta for the operation of a La Quinta Lodging Facility at the premises situated at 2370 Stephens Center Drive, Duluth, GA 30096 (the **"Premises"**); and

WHEREAS, Tenant and Landlord entered into a Hotel Lease Purchase Agreement dated January 1, 2016, that governs Tenant's use and occupancy of the Premises (the **"Lease"**); and

WHEREAS, the Franchise Agreement requires Tenant to agree to certain provisions in the event that it leases, rather than owns, the Premises and to provide La Quinta with certain agreements and assurances from the landlord under its lease.

NOW, THEREFORE, in consideration of mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord, Tenant and La Quinta hereby agree as follows:

1. CERTIFICATIONS OF LANDLORD. Landlord certifies to La Quinta as follows:

1.1 Landlord owns fee simple title to the Premises.

1.2 A true and complete copy of the Lease is attached hereto as Attachment A.

1.3 The Lease (i) is in full force and effect as of the date hereof in accordance with its terms, (ii) is the entire agreement between Landlord and Tenant relating to the Premises, and (iii) has not been altered, amended, or modified in any manner. The term of the Lease is scheduled to expire March 31, 2016, when Tenant acquired fee simple title to the Premises pursuant to the terms of the Lease.

1.4 Landlord is not in default under the Lease and has not received any notice of default from Tenant under the Lease which remains uncured.

1.5 Landlord has not provided any notices of default to Tenant which remain uncured, nor does Landlord have knowledge of any default by Tenant under the Lease or any event or condition which, with the passage of time or the delivery of notice or both, would constitute a default by Tenant under the Lease.

1.6 Landlord has no notice or knowledge of any sale, transfer, pledge, assignment, or encumbrances of Tenant's interest in the Lease.

2. RECOGNITION OF LA QUINTA'S MARKS AND CONFIDENTIAL INFORMATION. Landlord acknowledges and agrees that La Quinta is the sole and exclusive owner of (a) the trademarks, service marks and trade dress (the **"Marks"**) used to identify the La Quinta Lodging Facility to be operated by Tenant at the Premises in accordance with the Franchise Agreement and (b) certain confidential information and proprietary software, manuals and other materials relating to the operation of

F-1

Landlord Estoppel and Recognition Agreement
Atlanta (Duluth), GA #0264_Rev1_Transfer FA

La Quinta lodging facilities (the "**Confidential Information**"), such Marks and Confidential Information being more fully described in the Franchise Agreement. Landlord agrees that it shall not contest La Quinta's interest in or ownership of the Marks and Confidential Information.

3.    MODIFICATIONS TO LEASE, OR TERMINATION OF LEASE. Landlord and Tenant agree that, notwithstanding anything to the contrary contained in the Lease, throughout the term of the Franchise Agreement, and any renewal or extension thereof, the term of the Lease shall automatically renew for successive periods of one (1) year each such that the term of the Lease shall expire only following the expiration or earlier termination of the Franchise Agreement. Furthermore, Landlord and Tenant agree that, so long as the Franchise Agreement remains in effect, both Landlord and Tenant undertake to notify La Quinta of any sale or transfer of the Premises to a third party and/or any modification to, assignment of or termination of the lease that affect's Tenant's right to use and enjoy the Premises (including, without limitation, the use of the Premises for the operation of a La Quinta Lodging Facility). In the event of a sale of the Premises and/or assignment of the Lease, La Quinta may require that the new owner/landlord enter into an estoppel agreement on terms similar to this Estoppel Agreement. Landlord and Tenant acknowledge that La Quinta would not enter into the Franchise Agreement with Tenant but for the assurances contained herein that Tenant would have the right to occupy, use and enjoy the leased premises under the Lease throughout the term of the Franchise Agreement and any renewal or extension thereof.

4.    COPIES OF NOTICES. Landlord shall deliver to La Quinta a copy of any notice of default or termination of the Lease or termination of Tenant's right to possession of the Premises at the same time such notice is delivered to Tenant.

5.    NOTICES. All notices pursuant to this Estoppel Agreement shall be in writing and shall be personally delivered, sent by certified or registered mail or reputable overnight delivery service or by other means which afford the sender evidence of delivery or rejected delivery to the addresses set forth below or to such other address as any party to this Estoppel Agreement may, either by written notice, instruct that notices be given.

Landlord: MRL Hospitality, LLC
Attn: Rajesh Lakhani
6910 Midlothian Turnpike
Richmond, VA 23225
rrhotels@aol.com

Tenant:  Sugarloaf Capital Buford, LLC
Attn: Sonial Patel
2253 Grady Ridge Trail
Duluth, GA 30097
spatel@sugarloafcap.com

La Quinta: La Quinta Franchising LLC
909 Hidden Ridge, Suite 600
Irving, TX  75038
Attn:  Legal Dept.
Facsimile:  (214) 492-6740

F-2

6.     ACCESS TO THE PREMISES

6.1     Tenant is required under the Franchise Agreement to allow La Quinta and its employees or agents to enter the Premises for certain purposes, such as reviewing whether Tenant is operating its La Quinta Lodging Facility in accordance with the Franchise Agreement. Landlord hereby consents to La Quinta's entry into the Premises and agrees not to interfere with or prevent such entry by La Quinta, its employees or agents.

6.2     If the Franchise Agreement expires (without renewal) or is terminated, Tenant is obligated to (a) take certain steps under the Franchise Agreement to remove La Quinta's signs, trade dress and other materials displaying La Quinta's Marks, and to de-identify the Premises as a La Quinta Lodging Facility, and (b) cease using and/or return to La Quinta all of La Quinta's Confidential Information, such obligations being more fully described in the Franchise Agreement. In the event Tenant fails to perform any of those obligations following the expiration or termination of the Franchise Agreement, Landlord agrees to allow La Quinta, its employees or agents to enter the Premises for the purpose of performing such obligations and recovering the Confidential Information, provided La Quinta shall bear the expense of repairing any damage to the Premises as a result thereof (the removal of the Marks and Confidential Information shall not be considered damage to the Premises). Accordingly, La Quinta may so enter upon the Premises without being guilty of trespass or tort, notwithstanding that the Lease or Tenant's right to possession of the Premises may have been terminated by Landlord. Tenant agrees to reimburse La Quinta upon demand for all costs and expenses incurred by La Quinta in performing any of Tenant's obligations under the Franchise Agreement described in this paragraph above.

6.3     Tenant agrees that the foregoing shall not constitute a waiver of any of Tenant's obligations to Landlord under the Lease concerning the removal of signage or additions or alterations upon the termination of the Lease.

7.     CONFLICTS. The terms contained herein shall supersede any terms to the contrary set forth in the Lease.

8.     NO LEASE ASSUMPTION BY LA QUINTA. BY EXECUTING THIS ESTOPPEL AGREEMENT, LA QUINTA DOES NOT ASSUME ANY LIABILITY WITH RESPECT TO THE PREMISES OR ANY OBLIGATION UNDER THE LEASE, AND SHALL HAVE NO SUCH LIABILITY OR OBLIGATION.

9.     COMPLETE AGREEMENT. This Estoppel Agreement contains the entire agreement between all of the parties hereto and supersedes all prior agreements, understandings and arrangements, oral or written, between the parties hereto with respect to the subject matter hereof.

<Signatures on Following Page>

F-3

Landlord Estoppel and Recognition Agreement
Atlanta (Duluth), GA #0264_Rev1_Transfer FA

EXECUTED by the parties as of the date first set forth above.

LANDLORD:

MRL HOSPITALITY, LLC

By:_____
Name: Rajesh Lakhani,
Title:

TENANT:

SUGARLOAF CAPITAL BUFORD, LLC

By:_____
Name: Sonial Patel
Title: Sole Member and Manager


LA QUINTA FRANCHISING LLC

By:_____
Name:  Rajiv Trivedi
Title:    Executive Vice President and Chief
            Development Officer

Landlord Estoppel and Recognition Agreement
Atlanta (Duluth), GA #0264_Rev1_Transfer FA

**ATTACHMENT A TO LANDLORD ESTOPPEL AND RECOGNITION AGREEMENT**

**COPY OF THE LEASE AND ALL AMENDMENTS**

*Final Version Lone*

# HOTEL LEASE AGREEMENT WITH PURCHASE OPTION

## BETWEEN

## MRL HOSPITALITY, LLC

### AND

## SUGARLOAF CAPITAL BUFORD, LLC

Effective Date: January 1, 2016

for

La Quinta Inn
Duluth, GA

## HOTEL LEASE AGREEMENT WITH PURCHASE OPTION

This HOTEL LEASE AGREEMENT WITH PURCHASE OPTION (hereinafter referred to as the "Lease") is entered into between MRL HOSPITALITY, LLC, a Virginia limited liability company, whose address is 6910 Midlothian Turnpike, Richmond, Virginia 23225 (hereinafter referred to as "Landlord"), and  SUGARLOAF CAPITAL BUFORD, LLC a Georgia limited liability company whose address is 2253 Grady Ridge Trail, Duluth, Georgia 30097 (hereinafter referred to as "Tenant") effective as of the 1st day of January, 2016.

In consideration of the mutual covenants and agreements of this Lease, and other good and valuable consideration, (a) Landlord demises and leases to Tenant, and Tenant leases from Landlord, the premises commonly known as La Quinta Inn, located at 2370 Stephens Center Drive, in the City of Duluth, Georgia, 30096, and the personal property as is defined herein; the premises are more particularly described in Exhibit "A", the legal description, which is attached to and incorporated into this Lease, and are referred to in this Lease as the "Premises "and (b) agrees to sell the Premises and all personal property therein ("Property") pursuant to the Option to Purchase contained in Article 17 of this Lease. This Lease supercedes the Agreement of Purchase and Sale, dated November 12, 2015, between Landlord and Tenant ("Purchase Agreement") and at the option of Landlord's mortgage lender, at any time upon written notice from Landlord's mortgage lender to Landlord and Tenant.

### ARTICLE 1
### TERM

#### Term of Lease

§ 1.01. The term (herein, the "term" or "Term") of this Lease is twelve (12) months beginning on January 1, 2016 (the "Commencement Date") and ending on December 31, 2016 unless extended by mutual written agreement or terminated sooner as provided in this Lease. Additionally the Term shall terminate simultaneously with the closing of the purchase of the Property ("Closing").

#### Holdover

§ 1.02. INTENTIONALLY DELETED

### ARTICLE 2
### RENT

§ 2.01. Tenant will pay Landlord, MRL HOSPITALITY, LLC, One Hundred and NO/100 Dollars ($100.00) per month on or before the 1st day of the month as primary fixed rent ("Primary Fixed Rent") beginning January 1, 2016. The said monthly rental payment shall be paid in arrears.

§ 2.02. Rent for any fractional month at the beginning or end of the Lease term will be prorated on a per-day basis. Tenant will pay the Primary Fixed Rent to Landlord, at the address set forth above, or such other location or locations that Landlord may from time to time designate by written notice to Tenant.

### Taxes and Assessments

§ 2.03. Tenant shall be responsible for all ad valorem and personal property tax assessments as well as any special assessments levied against any part of the Premises or property located therein by any governmental entity for 2016 and during the term of this Lease.

## ARTICLE 3
## SECURITY DEPOSIT

INTENTIONALLY DELETED

## ARTICLE 4
## USE OF PREMISES

### Tenant's Warranty Regarding Use

§ 4.01. Tenant represents and warrants to Landlord that Tenant intends to use the Premises for a hotel. Subject to applicable employment regulations, Tenant is under no obligation to retain existing employees. Tenant's use of the Premises is restricted to those purposes specified in this section unless Tenant obtains Landlord's prior written consent to any change in use.

### Compliance With Laws

§ 4.02. (a)Tenant may not use, or permit using, the Premises in any manner that results in waste of premises or constitutes a nuisance or for any illegal purpose. Tenant, at its own expense, will comply, and will cause its officers, employees, agents, and invitees to comply, with all applicable laws, ordinances, and governmental rules and regulations concerning the use of the Premises, including Hazardous Materials Laws. Tenant is not responsible for any environmental condition previously existing prior to the execution of this Lease.

§ 4.02. (b) Tenant, at its sole cost, must comply with all Hazardous Materials Laws in connection with Tenant's use of the Premises.

§ 4.02. (c) "Hazardous Materials" means any substance, material, or waste that is or becomes regulated by any local governmental agency, the State of Georgia, or the federal government, including, but not limited to, any material or substance that is designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. § 1251 et seq., or listed pursuant to Section 307 of the Clean Water Act, 33 U.S.C. § 1317, (ii) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., (iii) defined as a "hazardous waste"

pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., (iv) petroleum, (v) asbestos, and (vi) polychlorinated biphenyls].

§ 4.02. (d) "Hazardous Materials Laws" means any federal, state, or local statute, ordinance, order, rule, or regulation of any type relating to the storage, handling, use, or disposal of any Hazardous Materials, the contamination of the environment, or any removal of such contamination, including, without limitation, those statutes referred to in subsection (c).

### Rights of Inspection

§ 4.03. Tenant must permit Landlord and Landlord's agents, servants, and employees, including but not limited to legal counsel and consultants and engineers, access to the Premises for the purpose of conducting any inspections during regular business hours, and during other hours by agreement of the parties. Tenant may not restrict access to any part of the Premises, and Tenant may not impose any conditions to access. During the Landlord's inspections, Landlord must use its best efforts to avoid interfering with Tenant's use of the Premises, and on completion of any inspections or testing must repair and restore the affected areas of the Premises as made necessary by any inspections or testing.

## ARTICLE 5
## REPAIRS AND MAINTENANCE

### Repairs and Maintenance by Tenant

§ 5.01. Tenant will, throughout the Lease term and any extensions of it, at its own expense and risk, maintain the Premises and all improvements on them in good order and condition, including but not limited to making all repairs and replacements necessary to keep the Premises and improvements in good condition and to meet all quality assurance standards as set by the Laquinta franchisor for the Premises. All maintenance, repairs, and replacements required by this section must be performed promptly when required and so as not to cause depreciation in the value of the Premises.
Tenant shall be responsible to correct and repair any roof leaks and Tenant shall be responsible for any major repairs or replacement of the roofing and structural integrity of the existing buildings during said initial term or extension thereof. Unless otherwise expressly stated to the contrary, Tenant shall have the obligation to maintain, repair, replace and renovate the Premises from time to time so as to keep the Premises and each portion thereof as it exists on the Effective Date of this Lease to a standard of comparable well maintained limited service hotels in Duluth, Georgia and does hereby agree to do so.

### Tenant's Failure To Repair or Maintain

§ 5.02. If Tenant fails to perform its obligation to repair, replace, or maintain, as set forth in § 5.01 above, within a reasonable time after notice from Landlord of the need for the repair, replacement, or maintenance, Landlord may enter the Premises and make the repairs or replacements, or perform the maintenance, or have the repairs or replacements made or maintenance performed, at its own expense. On Landlord's notice to Tenant of the performance

and cost of any maintenance, repairs, or replacements under this section, Tenant must immediately reimburse Landlord for any reasonable costs incurred by Landlord under this section, together with interest at the rate of twelve percent (12%) per annum from the date of the notice until the date paid by Tenant to Landlord.

### Allocation of Environmental Cleanup Costs

§ 5.03.  Tenant is responsible only for the payment of that portion of any cleanup costs necessary for compliance with Hazardous Materials Laws that arise as a result of Tenant's discharge of hazardous materials on the Premises during the Tenant's occupancy of the Premises. Tenant is not responsible for any environmental clean-up costs or expenses as to any environmental hazard pre-existing on the Premises prior to the terms of the said Lease, and Landlord shall indemnify and hold Tenant, its officers, shareholders, directors and employees harmless from any costs or expenses resulting from environmental conditions existing on the Premises prior to the Effective Date.

### ARTICLE 6

### UTILITIES AND GARBAGE REMOVAL

### Utility Charges

§ 6.01.  From the date of execution of the said Lease, Tenant will place in its name and pay all utility charges for water, electricity, heat, gas, cable charges, and telephone service used in and about the Premises during the Lease term. Tenant will pay the charges directly to the utility company or municipality furnishing the service before the charges are delinquent. Tenant shall cause such charges to be placed in the name of the Tenant immediately upon execution of this said Lease and post all required bonds and deposits.

### Garbage Removal

§ 6.02.  Tenant will pay for all garbage removal from the Premises during the Lease Term.

### Operations Generally

§ 6.03.  Tenant shall pay when due and without delinquency or late charge all expenses incurred in connection with the operation of the Premises and, upon request of Landlord, deliver evidence thereof (and all other expenses for which Tenant is obligated) to Landlord within fifteen (15) days of such request.

### ARTICLE 7
### ALTERATIONS, ADDITIONS, AND IMPROVEMENTS

### Consent of Landlord

§ 7.01. Tenant may make any alterations, additions, or improvements to the Premises which improve the Premises and do not decrease its functionality or revenue generating potential without Landlord's prior written consent.

## Property of Landlord

§ 7.02. All alterations, additions, or improvements made by Tenant will become Landlord's property when this Lease terminates. But Landlord may require that Tenant remove any alterations, additions, and improvements installed or made by Tenant, and any other property Tenant placed on the Premises, when the Lease terminates. If Landlord requires Tenant to remove the alterations, additions, or improvements, Tenant must repair any damage to the Premises caused by the removal.

## ARTICLE 8
## TRADE FIXTURES AND SIGNS

### Trade Fixtures

§ 8.01. Tenant may, at all times, erect or install shelves, bins, machinery, equipment, or other trade fixtures, in, on, or about the Premises, if Tenant complies with all applicable governmental laws, ordinances, and regulations regarding the fixtures. Tenant may not remove any trade fixtures when this Lease terminates.

### Signs

§ 8.02. Tenant may erect signs on any portion of the Premises, including but not limited to the exterior walls, subject to applicable laws, ordinances, and regulations. Tenant shall not remove any signs when this Lease terminates as the signs shall remain with the Premises.

## ARTICLE 9
## MECHANIC'S LIENS

§ 9.01. (a) From and after the date of the Lease forward, Tenant will not permit any mechanic's lien or liens to be placed upon the Premises or improvements on the Premises as a direct result of nonpayment by Tenant for work, labor or materials requested by the said Tenant. Tenant will promptly pay any mechanic's lien that is filed on the Premises or on improvements located on the Premises. If default in payment of the lien continues for 10 days after Landlord's written notice to Tenant, Landlord may, at its option, pay the lien or any portion of it without inquiring into its validity. Any amounts Landlord pays to remove a mechanic's lien caused by Tenant to be filed against the Premises or improvements on them, including expenses and interest, are due from Tenant to Landlord and must be repaid to Landlord immediately on rendition of notice, together with interest at twelve (12%) percent annually until repaid.

§ 9.01. (b) Landlord's interest in the Premises is not subject to mechanics' liens for improvements made, or contracted for, by Tenant. Tenant must give written notification to all contractors making any improvements on the Premises this Lease provision.

## ARTICLE 10
## INSURANCE AND INDEMNITY

### Property and Other Insurance

§ 10.01.  Tenant must, at its own expense during the Lease term, keep all buildings and improvements on the Premises insured against loss or damage by fire or theft, with extended coverage if obtainable at a price not less than 100% of the greater of the replacement cost or the fair market value of the Premises that is available in Gwinnett County, Georgia for the Premises, said insurance to include direct loss by windstorm, hail, explosion, riot or riot attending a strike, civil commotion, aircraft, vehicles, and smoke.  Tenant shall maintain twelve (12) months of business interruption and lost rents insurance. All insurance policies shall be subject to Landlord's mortgage Lender's approval.  The insurance is to be through an insurer licensed to do business in Georgia and approved by Landlord and Landlord's mortgage lender.  The insurance policy or policies must name Landlord and Tenant as co-insureds and Landlord's mortgage lender as an additional insured.  The policies must provide that any proceeds for loss or damage to buildings or to improvements are payable to Landlord's mortgage lender as lost payee, who will each use the sum for repair and restoration purposes if permitted by the loans of Landlord secured by the Premises.  Tenant shall immediately (and 30 days prior to the expiration of any such insurance) provide Landlord and Landlord's mortgage lender with a Certificate of Insurance which not only lists Landlord as an insured but also Landlord's underlying Lender as to the Lender's interest including naming Landlord's mortgage lender as an additional insured on the several liability insurance and the loss payee on the property insurance.  Tenant shall comply with Georgia laws with respect to workman's compensation insurance in accordance with all applicable laws.

### Liability Insurance

§ 10.02.  Tenant, at its own expense, must provide and maintain in force during the Lease term, liability insurance in the amount of Two Million and No/100 Dollars ($2,000,000.00), plus an additional Five Million and No/100 Dollars ($5,000,000.00) umbrella and with such higher amounts on the mortgage required under the Landlord's mortgage loan documents or the La Quinta Inn franchise agreement.  The said insurance must be in accordance with any applicable La Quinta Inn requirements, pre-approved by Landlord and Landlord's mortgage lender and to include business interruption insurance.  The policy must cover Landlord as well as Tenant, for any liability for property damage or personal injury arising from Tenant's occupying or Landlord's owning the Premises.  This insurance is to be through an insurer that is duly licensed to issue said policies in the State of Georgia.  Landlord may require at Landlord's request for the Tenant to utilize existing liability insurance and property damage insurance of the said Landlord. Tenant shall cause the insurance premium to be placed in a monthly reserved account to be maintained by the said Tenant.

### Remedy for Failure To Provide Insurance; General; Lenders

§ 10.03. Tenant must furnish Landlord with certificates of all insurance required by this article. If Tenant does not provide the certificates when Landlord delivers possession to Tenant or within five (5) days after obtaining possession, or if Tenant allows any insurance required under this article to lapse, Landlord may, at its option, take out and pay the premiums on the necessary insurance to comply with the Tenant's obligations under this article. Landlord shall be entitled to reimbursement from Tenant all amounts spent to procure and maintain the insurance, with interest at the rate of twelve (12%) percent annually from the date either receives notice of payment until reimbursement. In all events, all insurance coverages, amounts, sub-limits, deductibles, payment terms and other insurance related matters shall be satisfactory to the secured lenders of the Premises. All such secured lenders shall be named as additional insureds and/or loss payee, as their interest may appear, and a waiver of subrogation shall be issued for all coverages in favor of all of them and Landlord.

## General Indemnity

§ 10.04. Tenant and Landlord herein indemnify and hold each other harmless against any claims, demands, damages, costs, and expenses, including reasonable attorney's fees for defending claims and demands, arising from the conduct or management of the business on the Premises or its ownership and/or use of them by the Landlord while Landlord manages same prior to the commencement of the Term or by Tenant during its tenancy for the Term of this Lease from any breach by Tenant or Landlord of any conditions of this Lease; or from any act or negligence of either party, their agents, contractors, employees, subtenants, concessionaires, or licensees in or about the Premises. If any action or proceeding is brought against Tenant by reason of any such claim or against the Landlord by reason of any such claim, the indemnitor, upon timely notice to the indemnities, will defend the action or proceeding and indemnify the indemnities from any such claims and expenses. This section survives the expiration or earlier termination of this Lease.

## Tenant's Environmental Indemnity

§ 10.05. Tenant herein indemnifies, defends, and agrees to hold harmless Landlord from and against all claims, liabilities, losses, damages, and costs, foreseen or unforeseen, including without limitation counsel, engineering, and other professional or expert fees, that Landlord may incur by reason of Tenant's action or inaction with regard to Tenant's obligations under this Lease. This section survives the expiration or earlier termination of this Lease.

§ 10.06. Notwithstanding any term or provision herein to the contrary, (a) if Tenant is unable to procure the required insurance coverage in Tenant's name because Tenant is not the owner of the Premises, (i) Landlord shall procure said insurance coverage from insurers licensed to issue said policies in the State of Georgia, shall name Tenant as a co-insured, (ii) Tenant shall reimburse Landlord for the premium paid for said coverage upon receipt of a certificate of insurance for said coverage, (iii) Landlord shall cause the policies to contain endorsements and/or clauses providing (A) that the insurer shall notify each insured at least thirty days prior to any change or termination or cancellation of said policies, of any claims, payment and or communications concerning said policies, and/or any claims made under said policies and (B) waiver of subrogation in favor of all co-insureds and additional insureds; (b) if Tenant procures

the required coverages and pre-pays the premium for said coverages, Tenant shall have no obligation to pay any premium amounts to Landlord; (c) at Tenant's option, Landlord shall continue Landlord's existing property damage, loss, liability and loss income insurance coverage, modified to name Tenant as a co-insured and to contain the endorsements and clauses described in subsection 10.06 (a)(iii) above; and (d) if any insurance claim amount is used by Landlord's mortgagor or lender to pay down Landlord's mortgage or loan, Landlord shall pay a similar amount to Tenant for Tenant to repair the damage to the Premises or the loss income or Tenant may terminate the Lease, in which event the entire Security Deposit shall be returned to Tenant as a condition precedent to Tenant delivering possession of the Premises to Landlord.

## ARTICLE 11
## DAMAGE OR DESTRUCTION

### Notice to Landlord

§ 11.01. If the Premises, or any structures or improvements on them, are damaged or destroyed by fire, tornado, act of god, or other casualty, Tenant must immediately give Landlord written notice of the damage or destruction, including a description of the damage and, as far as known to Tenant, the cause of the damage.

### Destruction

§ 11.02. If the building on the Premises is totally destroyed by fire, tornado, or other casualty , or if it is so damaged that rebuilding or repairs cannot reasonably be completed within the time period covered by Tenant's lost rents and/or business interruption insurance (during which time Landlord shall be paid all rent and other charges which would be due it under this Lease in the absence of such casualty event) at a cost not to exceed the amount covered by Tenant's, or at Landlord's option, Landlord's insurance for the Premises, this Lease will terminate, and rent will be abated for the unexpired portion of this Lease, effective as of the date determined by Landlord, but no later than the expiration or coverage under any lost rents or business interruption insurance coverage procured or which Tenant is obligated to procure under this Lease.

### Reconstruction

§ 11.03. If the building or other improvements on the Premises are damaged by fire, tornado, act of god, or other casualty, but the Lease does not terminate under Section 11.02 above, the following provisions shall govern and this Lease will not terminate except as follows:

(a)     If the Premises are partially destroyed, Landlord must, at its sole cost and risk, proceed immediately to rebuild or repair the damaged buildings and improvements to substantially the condition they were in before the damage. If the damage renders the Premises untenantable in whole or in part, the rent payable during the period in which they are untenantable will be adjusted equitably. If Landlord fails to complete the rebuilding or repairs within thirty (30) working days from the date of Tenant's written notification to Landlord of the

damage, Tenant may terminate this Lease by written notification to Landlord. Upon the notification, all rights and obligations under this Lease will cease.

(b)     All of Landlord's obligations under this Section 11.03 and Article 10 shall be subject to all rent and other payments due hereunder being kept current and the availability of adequate insurance proceeds to demolish, complete, reconstruct and re-fit all effected aspects of the Premises like new.

(c)     Notwithstanding the rights of the Landlord or Tenant to terminate the Lease as set forth in this Article, or in any other provisions of this Lease, such termination shall not impact, restrict or limit Tenant's purchase option set forth herein which shall remain in full force and effect.

## ARTICLE 12
## CONDEMNATION

### Total Condemnation

§ 12.01. If, during the Lease term or any extension or renewal of it, all of the Premises are taken for any public or quasi-public use under any governmental law, ordinance, or regulation, or by right of eminent domain, or are sold to the condemning authority under threat of condemnation, this Lease will terminate, and the rent will be abated during the unexpired portion of this Lease, effective as of the date the condemning authority takes the Premises and Landlord's right of possession or use thereof ceases to exist. Tenant shall not make a claim for condemnation proceeds payable to Landlord as owner of the Premises in such event, but Tenant may separately pursue the claims usually available to tenants, including claims for reimbursement of moving expenses.

### Partial Condemnation

§ 12.02. (a)     If less than all, but a sufficient amount to render the Premises unusable as a hotel is taken for any public or quasi-public use under any governmental law, ordinance, or regulation, or by right of eminent domain, or is sold to the condemning authority under threat of condemnation, Tenant may terminate the Lease by giving Landlord written notice within thirty (30) days after the entity exercising the power of condemnation takes possession of the condemned portion.

§ 12.02. (b)     If the Premises are partially condemned and Tenant is not permitted to terminate the Lease under this section, this Lease will not terminate, but Landlord promptly shall, at its sole expense, restore and reconstruct the building and other improvements situated on the Premises to make them reasonably tenantable and suitable for the uses for which the Premises are leased. The Fixed Rent payable under § 2.01 of this Lease will be adjusted equitably during the unexpired portion of this Lease.

§ 12.02. (c)     Rent shall be abated during all periods in which Tenant is unable to operate the hotel in the Premises due to condemnation, taking or sale in lieu thereof. If Landlord fails to complete the rebuilding or repairs within thirty (30) working days from the effective date

of condemnation, taking or sale in lieu thereof, Tenant may terminate this Lease by written notification to Landlord. Upon the notification, all rights and obligations under this Lease will cease.

## Condemnation Award

§ 12.03. In the event of a partial taking, Landlord and Tenant are each entitled to receive and retain such separate awards and portions of lump-sum awards as are allocated to their respective interests in any condemnation proceedings. The termination of this Lease will not affect the rights of the respective parties to the awards.

## ARTICLE 13
## FINANCIAL REPORTING & RECORDKEEPING

### Accounting

§ 13.01. Tenant shall maintain adequate and separate complete books and records for the Property in line with GAAP accounting, the entries to which shall be supported by sufficient documentation to ascertain that said entries are properly and accurately recorded to Property.

### Reporting

§ 13.02. Tenant shall  provide the Landlord and the holding of the Existing Mortgage with monthly managers' reports.

§ 13.03. Tenant shall satisfy all reporting requirement of any secured lender of the Premises of which Landlord notifies Tenant in writing.

## ARTICLE 14
## DEFAULT

### Tenant's Default

§ 14.01(a). Tenant shall be in default under this Lease upon the occurrence of any one or more of the following events or occurrences:

> Landlord does not actually receive any payment of the Primary Fixed Rent within ten (10) days of the due day thereof, provided, Landlord shall provide written notice to the Tenant notifying of its failure to pay the Primary Fixed Rent and provided Tenant with ten (10) days notice to pay such Fixed Primary Rent;

> Tenant fails to fully and punctually observe or perform any of the terms of covenants of this Lease, other than the payment of rent, and shall not cure such failure within thirty (30) days after notice to Tenant of such failure;

§ 14.01(b). Upon the occurrence of any one or more of the aforesaid events of default, or upon the occurrence of any other default or defaults by Tenant under this Lease, Landlord may, at Landlord's option, Landlord's option, after landlord has provided Tenant with written notice of this default and provided Tenants with ten (10) days within which to cure an event of default involving the payment of money, and thirty (30) days within which to cure an event of default not involving the payment of money, terminate this Lease by giving Tenant notice of termination, in which event this Lease shall expire and terminate on the date specified in such notice of termination, and Tenant shall remain liable for all obligations under this Lease arising up to the date of such termination, and Tenant shall surrender the Premises to Landlord on the date specified in such notice. Provided, however, notwithstanding the rights of the Landlord to terminate this Lease as set forth in this Article 14, such termination shall not terminate, restrict, limit or impair the Tenant's purchase option set forth herein, which purchase option shall remain in full force and effect.

## Landlord's Lien

§ 14.02. If Tenant defaults in paying rent or any other sum due from Tenant to Landlord under this Lease, Landlord has a lien on all fixtures, chattels, or other property of any description belonging to Tenant that is placed in, or becomes a part of, the Premises as security for rent due and to become due for the remainder of the current Lease term and any other sum Tenant owes Landlord. This lien is not in lieu of--nor in any way does it affect--the statutory landlord's lien but is in addition to that lien. Tenant grants Landlord a security interest in all of Tenant's property placed in or on the Premises for purposes of this contractual lien. Tenant may sell any merchandise in the ordinary course of business free of such Landlord's lien.

## Cumulative Remedies

§ 14.03.  All Landlord's and Tenant's rights and remedies under this Article are cumulative, and none will exclude any other right or remedy provided by law or any other provision of this Lease.  All the rights and remedies may be exercised and enforced concurrently and whenever occasion for their exercise arises.

## Waiver of Breach

§ 14.04. Any waiver by Landlord of a breach of this Lease by Tenant by the other party must be in writing does not constitute a continuing waiver or a waiver of any subsequent breach.

### ARTICLE 15
### INSPECTION BY LANDLORD

§ 15.01. Tenant will permit Landlord and its agents, representatives, and employees to enter the Premises at all reasonable times for the purpose of inspection or any other purpose necessary to protect Landlord's interest in the Premises or to perform Landlord's duties under this Lease.

### ARTICLE 16
### ASSIGNMENT AND SUBLEASE

### Assignment and Subletting by Tenant

§ 16.01. Tenant may not sublet, assign, encumber, or otherwise transfer this Lease, or any right or interest in it or in the Premises or the improvements on them, without Landlord's written consent and the written consent of the holder of the Existing Mortgage. If Landlord consents in writing to an assignment, sublease, or other transfer of all or any of Tenant's rights under this Lease, the assignee or subtenant must assume all of Tenant's obligations under this Lease, and Tenant will be released under every obligation under the Lease. Landlord may not arbitrarily or unreasonably withhold consent under this section.    Tenant may assign this Lease to a 1031 exchange company or other entity established by Tenant for the purpose of purchasing the Property.

### Assignment by Landlord

§ 16.02. Landlord may encumber, refinance, finance, assign or transfer any of its interests under this Lease without Tenant consent.

### ARTICLE 17
### PURCHASE OPTION

§ 17.01. As a condition of this Lease, Landlord (the "Seller") has agreed to extend to Tenant (the "Buyer") a right and an option to purchase ("Option to Purchase") the Property. This Option shall not be binding on Landlord's mortgage lender and in the event Landlord's mortgage lender succeeds to the Landlord's interest in this Lease, this Article 17 shall become null and void. The terms for the Option to Purchase are as follows:

(1)     The Purchase Price shall be equal to: Four Million and No/100 Dollars ($4,000,000.00). The security deposit if any shall be offset against the purchase price at Closing.

(2)     The Closing Date will be Ten (10) days after notification by Tenant in writing to Landlord, unless another time is agreed by Landlord, that Tenant is exercising its Option to Purchase the Premises pursuant to this Section 17.01.

(3)     This Lease shall terminate as of the Closing Date.

(4)     The Landlord shall be responsible for all closing costs including seller's attorney fees, the payoff of Seller's Existing Mortgage (as said term is hereinafter defined) and other liens placed against the Property by or through Seller, and the payment of other items expressly agreed to be paid by Seller under this Lease.

(5)     Landlord shall deliver unencumbered fee simple title to the Property at Closing, evidenced by a Special Warranty Deed and Bill of Sale with warranty of title to all personal property used in connection with the Property.

(6)     Buyer shall have the right and remedy to enforce specific performance if Seller defaults under the Lease.

(7)     All income from the operation of the Property during the term of the Lease shall belong to Buyer prior and up to the Closing.

(8)     The laws of the State of Georgia shall govern and control the interpretation and enforcement of the Lease. The parties concede to the jurisdiction of the state courts of the State of Georgia, sitting in Gwinnett County, Georgia, for all actions between the parties. Venue for all actions arising under the Lease or relating to the parties and/or the Property shall be in Gwinnett County , Georgia.

(9)     Seller has obtained all authority, approvals and all other consents to enter into and perform the Lease.

(10)     Buyer may assign the Option to Purchase to any other person or company, including, but not limited to, a 1031 exchange company or other entity established by or for Buyer for the purpose of purchasing the Property or to any third-party, provided said assignee assumes all of Buyer's obligations with respect to the purchase of the Property.

§ 17.02.   There is no real estate company or broker involved in this transaction representing either party.

### ARTICLE 18
### MISCELLANEOUS

#### Notices and Addresses

§ 18.01. All notices required under this Lease must be given by certified or registered mail, addressed to the proper party, at the following addresses:

Landlord:          MRL HOSPITALITY, LLC
                   Attn: Rajesh Lakhani
                   6910 Midlothian Turnpike
                   Richmond, Virginia 23225
                   (757) 288-6989 - Telephone Number
                   rrlhotels@aol.com

Tenant:            SUGARLOAF CAPITAL BUFORD, LLC
                   Attn: Sonial Patel
                   2253 Grady Ridge Trail
                   Duluth, GA 30097
                   (678) 468-4254 - Telephone Number
                   spatel@sugarloafcap.com

§ 18.02. Either party may change the address to which notices are to be sent by sending written notice of the new address to the other party in accordance with this section.

18.03.    "As Is" Transfer.   Tenant acknowledges that,  neither Landlord  nor anyone acting for or on behalf of landlord has made any representation, warranty or promise to tenant concerning the physical aspects and condition of any of the Property, including, but not limited to, the following: any dimensions or specifications of any of the Property; the feasibility, desirability or convertibility of any of the Property into any particular uses; the zoning, building and land use restrictions applicable to the Property; the projected and historical income or expenses for any of the Property, the Property's compliance with applicable laws, ordinances an regulations; the condition of soils, subsoils, groundwater and surface waters; the presence of toxic wastes and hazardous substances or materials, the availability or adequacy of utilities. TENANT ACKNOWLEDGES AND AGREES THAT TENANT HAS NOT RELIED ON ANY REPRESENTATION, STATEMENT OR WARRANTY OF LANDLORD OR ANYONE ACTING FOR OR ON BEHALF OF LANDLORD, THAT TENANT IS A KNOWLEDGEABLE TENANT OF DEVELOPMENTS SUCH AS THE PROPERTY AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF TENANT'S CONSULTANTS, THAT TENANT WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AND SHALL RELY UPON SAME, AND UPON CLOSING, SHALL ASSUME THE RISK OF ANY ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, THAT MAY NOT HAVE BEEN REVEALED BY BUYER'S    INSPECTIONS    AND    INVESTIGATIONS.    TENANT    FURTHER ACKNOWLEDGES AND AGREES THAT TENANT IS ACQUIRING THE PROPERTY ON AN "AS IS" PHYSICAL CONDITION AND IN AN "AS IS" STATE OF REPAIR AND "WITH ALL FAULTS" AND TENANT DOES HEREBY WAIVE, AND LANDLORD DOES HEREBY DISCLAIM, ALL WARRANTIES OF ANY TYPE OR KIND WHATSOEVER WITH RESPECT TO THE PROPERTY, EXPRESS OR IMPLIED, INCLUDING, BY WAY OF DESCRIPTION, BUT NOT LIMITATION, THOSE OF FITNESS FOR A PARTICULAR PURPOSE, TENTABILITY, HABITABILITY AND USE, AND COMPLIANCE WITH LAWS.    BUYER HEREBY EXPRESSLY WAIVES ANY AND ALL CLAIMS FOR DAMAGES OR FOR RECISION OR CANCELLATION OF THIS AGREEMENT BECAUSE OF ANY REPRESENTATIONS MADE BY LANDLORD OR ANY AGENT OF TENANT. TENANT HEREBY EXPRESSLY ASSUMES THE RISK THAT ADVERSE PHYSICAL CONDITIONS AND THE FULL EXTENT THEREOF (INCLUDING, WITHOUT LIMITATION, SOIL, GROUNDWATER AND SURFACE WATER CONTAMINATION FROM HAZARDOUS SUBSTANCES) MAY NOT BE REVEALED BY BUYER'S INSPECTIONS, REVIEWS AND STUDIES OF THE PROPERTY

### Parties Bound

§ 18.04.  This agreement binds and inures to the benefit of the parties to the Lease and their respective heirs, executors, administrators, legal representatives, successors, and assigns when this agreement permits.

### Choice of Law

§ 18.05. This agreement is to be construed under Georgia law, and all obligations of the parties created by this Lease are performable in Gwinnett County, Georgia and venue for any litigation by and between the parties shall be Gwinnett County, Georgia by agreement.

## Legal Construction

§ 18.06. If one or more of the provisions contained in this agreement are for any reason held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability will not affect any other provision of the agreement, which will be construed as if it had not included the invalid, illegal, or unenforceable provision. Signatures delivered electronically shall be binding upon the parties.

## Prior Agreements Superseded

§ 18.07. This agreement constitutes the parties' sole agreement and supersedes any prior understandings or written or oral agreements between the parties with respect to the subject matter.

## Amendment

§ 18.08. No amendment, modification, or alteration of this agreement is binding unless in writing, dated subsequent to the date of this agreement, and duly executed by the parties.

## Rights and Remedies Cumulative

§ 18.08. The rights and remedies provided by this Lease are cumulative, and either party's using any right or remedy will not preclude or waive its right to use any other remedy. These rights and remedies are in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

## Attorney's Fees and Costs

§ 18.09. If, as a result of either party's breaching this agreement, the other party employs an attorney or attorneys to enforce its rights under this Lease, then the breaching or defaulting party will pay the other party the reasonable attorney's fees and costs incurred to enforce the Lease.

## Force Majeure

§ 18.10. Neither Landlord nor Tenant is required to perform any term or covenant in this Lease so long as performance is delayed or prevented by *force majeure*, which includes acts of God, strikes, lockouts, material or labor restrictions by any governmental authority, civil riot, floods, hurricanes, and any other cause not reasonably within Landlord's or Tenant's control and that Landlord or Tenant cannot, by exercising due diligence, prevent or overcome, in whole or part. In no event shall any *force majeure* delay be allowed for more than 30 days (such days to be counted cumulatively and need not be consecutive).

## Time of Essence; Subordination

§ 18.11. Time is of the essence as to all parts and terms as set forth in this Lease. Tenant agrees that his Lease shall be subordinate to any security deed or mortgage now or hereinafter encumbering the Property or any interest therein and to all advances made or thereafter to be made upon the security thereof, together with any renewals, extensions, modifications, consolidations and replacements of any security deed, mortgage or other encumbrance or indenture. The terms of this provision shall be self-operative and no further instrument of subornation shall be required.   Tenant, however, upon request of any party in interest, shall execute such instruments or certificates as may be responsibly be required to carry out the intent hereof within five (5) days of written request thereof.

### Assumption of Obligations

§ 18.12  In addition to paying the minimum rents as referred to herein above, the Tenant agrees to have all existing contracts, service contracts, leases, third party contracts existing at the said premises which it elects to assume in writing transferred over into the Tenant's name which said "assumed obligations" will be current at the time of transfer into Tenant's name and the Tenant indemnifies and holds the Landlord harmless in regard to said "assumed obligations" from the date of the Lease forward. Landlord shall terminate all existing contracts, service contracts, leases, third party contracts which Tenant has not elected to assume in writing.

§ 18.13 Based upon the "assumed obligations" being transferred to the Tenant in good standing, the Tenant herein agrees to assume and indemnify the Landlord from each of those obligations referred to herein.  The Landlord will have each of the said obligations transferred into the Tenant's name and will notify the Tenant immediately upon the said transfer.  Landlord reserves the right and Tenant agrees to reassign these obligations to the Landlord upon any termination of this Lease.  Therefore, the Tenant agrees to reassign each of the above obligations upon a default to the said Landlord.

§ 18.14.  Tenant shall have no obligation to employ any employee of Landlord currently being employed at the Premises. To the extent any of Landlord's current employees is certified by the franchisor and required to be employed at the Premises, Tenant shall not terminate said employee without cause until Tenant has caused another employee to be so certified; Landlord will assist Tenant in obtaining franchise certification for Tenant's employee until the franchise has been transferred to Tenant or until the franchisor approves this Lease and Tenant's operation of the Premises under the franchise agreement.

### Estoppel Certificate, Attornment and Subordination

§ 18.15.  Within ten (10) days after the request by Landlord, Tenant shall deliver to Landlord a written and acknowledged statement certifying that Landlord has completed all of its obligations in regard to the Premises, that Tenant has accepted possession of the Premises, that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), and the dates to which the Fixed Rent and other

charges have been paid in advance, if any, it being intended that any such statement delivered pursuant to this Article may be relied upon by any prospective purchaser or mortgagee of the fee of the Premises. Landlord represents to Tenant that, as of the Effective Date, there are no liens, mortgages, or other encumbrances granted, claimed and/or filed against the Property, except that certain mortgage and lien granted by Landlord's to National Republic Bank Chicago, to secure a promissory note and loan in the original principal amount of $3,440,000, dated the 29th day of November, 2010, with an outstanding balance of $3,418,015.15 as of the Effective Date ("Existing Mortgage").

§ 18.16. Upon request of Landlord, Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under the Existing Mortgage made by Landlord covering the Premises, attorn to purchaser upon any such foreclosure or sale and recognize such purchaser as Landlord under this Lease. Notwithstanding the foregoing, this Lease shall become voidable by any purchaser at such foreclosure sale.

§ 18.17. Upon request of Landlord, Tenant shall, in writing, subordinate its right hereunder to any ground leases or to the lien of any mortgage or mortgages, or the lien resulting from the other method of financing or refinancing, now or hereafter in force against the land and/or buildings of which the Premises are a part, or against any buildings hereafter placed upon the land of which the Premises are a part, and to all advances made or hereafter to be made upon the security thereof.

§ 18.18. Tenant, upon request of any party in interest, shall execute promptly such instruments or certificates to carry out the intent of § 18.15 to § 18.17 above. Tenant hereby irrevocably appoints Landlord as attorney-in-fact for Tenant with full power and authority to execute and deliver in the name of Tenant any such instruments or certificates.

§ 18.19. This Lease shall not be recorded without the prior written consent of Landlord. Upon the request of Landlord, Tenant shall execute a short form of this Lease which may be recorded in Landlord's sole discretion.

THE UNDERSIGNED Landlord and Tenant execute this Lease as of the date first written above.

LANDLORD:
MRL HOSPITALITY, LLC


By: Rajesh Lakhani
Title: Managing Member                    Witness: _____


TENANT:
SUGARLOAF CAPITAL BUFORD, LLC


By: Sonial Patel
Title: Managing Member                    Witness: _____

## ADDENDUM RELATING TO
## DULUTH, GA FRANCHISE AGREEMENT

THIS ADDENDUM TO FRANCHISE AGREEMENT ("Addendum") is made and entered into on ___April  11___, 2016, by and between La Quinta Franchising, LLC, a Nevada limited liability company ("La Quinta") and Sugarloaf Capital Buford, LLC, a Georgia limited liability company ("Franchisee") and is attached to and hereby made a part of that certain Franchise Agreement between Franchisor and Franchisee with an Effective Date of January 1, 2016.

### RECITALS

WHEREAS, The Franchisee agreed among other things to operate and maintain a La Quinta Lodging Facility located at 2370 Stephens Center Drive, Duluth, GA  30096 designated by Franchisor as Inn #0264. Franchisee has obtained from a lender a loan ("Loan") in which funding is provided with the assistance of the United States Small Business Administration ("SBA"). SBA requires the execution of this Addendum as a condition for obtaining the SBA assisted financing.

NOW, THEREFORE, in consideration of the mutual promises below, and for good and valuable considerations in hand paid by each of the parties to the others, the receipt and sufficiency of which the parties acknowledge the parties agree as follows:

1. Notwithstanding anything to the contrary in Section 14.04 of the Franchise Agreement, if the Franchisee becomes disabled and the parties are unable to agree as to whether the Franchisee is permanently disabled, the disability shall be determined by three Physicians chosen in the following manner. Franchisee shall select one and the Franchisor shall select one, and the two Physicians so chosen shall select a third Physician. The decision of the majority of the Physicians so chosen shall be conclusive. Franchisor will pay the cost of the Physician designated by Franchisor; Franchisee will pay the cost of the Physician designated by Franchisee; and Franchisor and Franchisee will split the cost of the third Physician with each paying half.

2. This Addendum automatically terminates on the earliest to occur of the following: (i) a Termination occurs under the Franchise Agreement; (ii) the Loan is paid; or (iii) SBA no longer has any interest in the Loan.

3. In all other respects, the Franchise Agreement remains in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly signed and executed this Addendum as of the day and year first above written.

| FRANCHISOR: | FRANCHISEE: |
|---|---|
| **LA QUINTA FRANCHISING LLC,** a Nevada limited liability company | **SUGARLOAF CAPITAL BUFORD, LLC** a Georgia limited liability company |
| By: _____ Name: Rajiv Trivedi Title: Executive Vice President & Chief Development Officer | By: _____ Name: Sonial Patel Title: Manager |

#0264 Duluth, GA

## FIRST AMENDMENT TO FRANCHISE AGREEMENT

THIS FIRST AMENDMENT TO FRANCHISE AGREEMENT ("First Amendment"), dated effective April __13__, 2016 ("Amendment Date") by and between **LA QUINTA FRANCHISING LLC**, a Nevada limited liability company ("La Quinta") and **SUGARLOAF CAPITAL BUFORD, LLC**, a Georgia limited liability company (collectively "Franchisee").

### R E C I T A L S

**WHEREAS**, Franchisee and La Quinta entered into a certain Franchise Agreement dated January 1, 2016 (the "Franchise Agreement") and certain related documents, including, without limitation, a Computer System License and Maintenance Agreement of even date therewith (collectively, the Franchise Agreement and related documents are the "Franchise Documents") granting Franchisee the right to operate a La Quinta lodging facility at 2370 Stephen Center Drive, Duluth, GA and known as #0264 (the "Facility") according to the terms of the Franchise Agreement; and

**WHEREAS**, the Franchise Agreement reflected that Sonial Patel was the sole Member and Manager of Franchisee, however the ownership interests in Franchisee were modified by Amended and Restated Operating Agreement dated effective December 1, 2015 adding Jay Patel as a member and Manager; and

**WHEREAS**, Franchisee desires that Exhibit A to the Franchise Agreement and the Agreement of Principal Owners attached to the Franchise Agreement correctly reflect the ownership structure; and

**WHEREAS**, La Quinta is willing to amend the Franchise Agreement as requested on the terms and conditions in this First Amendment.

**NOW THEREFORE**, for and in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree to amend the Agreement as follows:

1.    **Exhibit A**. Exhibit A to the Franchise Agreement shall be deleted in its entirety and replaced with Exhibit A attached hereto.

2.    **Principal Owners**. The Agreement of Principal Owners attached to the Franchise Agreement shall be deleted in ots entirety and replaced with the Agreement of Principal Owners attached hereto.

3.    **Full Force and Effect**. Except as amended by this First Amendment, the Franchise Agreement remains in full force and effect.

4.    **Conflict.** In the event of conflict between the terms and conditions of this First Amendment and the terms and conditions of the Franchise Agreement, the terms and conditions of this First Amendment shall control.

1

#0264 Duluth, GA_A1



5.    **Defined Terms**. Capitalized terms used, but not otherwise defined in this First Amendment shall be given the meaning given said terms in the Franchise Agreement.

6.    **Counterparts & Facsimile Signatures**. This First Amendment may be signed in counterparts, each of which, when taken together, shall be deemed an original for all purposes. Copies of an executed First Amendment received by facsimile transmission shall be deemed an original executed First Amendment.

7.    **Confidentiality**. Franchisee agrees (and Franchisee shall cause all of its principals and agents to agree) to keep confidential the terms of this First Amendment and not to disclose any of the terms, or the negotiations leading to those terms, without the prior written consent of La Quinta, provided however, Franchisee may make such disclosures as are necessary for the sole purpose of complying with, and only to the extent required by, federal or state law or regulation.

**IN WITNESS WHEREOF**, the parties have executed this First Amendment as of the date first written above.

**LA QUINTA FRANCHISING, LLC**
a Nevada limited liability company


By: _____
Name:  Rajiv Trivedi
Title:   Executive Vice President
         & Chief Development Officer

**SUGARLOAF CAPITAL BUFORD, LLC**
a Georgia limited liability company


By: _____
Name: Sonial Patel
Title:  Manager

#0264 Duluth, GA_A1



## AGREEMENT OF PRINCIPAL OWNERS

Each of the undersigned, being included within the term "Principal Owner(s)", executes this Agreement for the sole purpose of agreeing to and making the representations and agreements of the Principal Owners set forth in Section 12.01 (Confidential Information), Section 13.02 (Anti-Terrorism, Anti-Bribery and Anti-Corruption laws), Article 14 (Transfer), Article 20 (Governing Law; Mediation; Exclusive Jurisdiction; Acknowledgement; Limitation on Legal Rights; and Injunctive Relief) and Exhibit A. Each of the undersigned has read this Agreement, agrees that execution of this Agreement by each is in partial consideration for, and a condition to, the granting of this franchise, and acknowledges that Franchisor would not have granted this franchise without the foregoing agreements by each of the undersigned Principal Owners.

Principal Owners:

_____
Name: Sonial Patel

_____
Name: Jay Patel

Agreement of Principal Owners

#0264 Duluth, GA_A1

## EXHIBIT A

## FRANCHISEE OWNER INFORMATION

<u>Principal Owners</u>. Franchisee represents and warrants that the following is a complete and accurate list of all Principal Owners of Franchisee, including the full name, mailing address and social security number of each Principal Owner, and fully describes the nature and extent of each Principal Owner's interest in Franchisee.

| <u>Principal Owner's Name, Address</u> | <u>Description of Interest</u> |
|---|---|
| Sonial Patel<br>2253 Gradyridge Trail<br>Duluth, GA  30097 | 81% Member |
| Jay Patel<br>2253 Gradyridge Trail<br>Duluth, GA  30097 | 19% Member |

**FRANCHISEE**

**SUGARLOAF CAPITAL BUFORD, LLC**
a Georgia limited liability company

By: _____
Name: Sonial Patel
Title: Manager

Date: _____4-12-16_____



## SECOND AMENDMENT TO FRANCHISE AGREEMENT

**THIS SECOND AMENDMENT TO FRANCHISE AGREEMENT** (this "Second Amendment"), is made and entered into on this __16__ day of __February__, 2017 (the "Amendment Date") by and between **LA QUINTA FRANCHISING LLC**, a Nevada limited liability company ("Franchisor") and **SUGARLOAF CAPITAL BUFORD, LLC**, a Georgia limited liability company ("Franchisee").

## R E C I T A L S:

**WHEREAS**, Franchisor and Franchisee entered into that certain Franchise Agreement and Exhibits thereto with an Effective Date of January 1, 2016 (the "Franchise Agreement"), as amended pursuant to that certain First Amendment to Franchise Agreement dated April 13, 2016 (the "First Amendment"), and certain related documents including, without limitation, that certain Computer System License and Maintenance Agreement of even date therewith (the "Computer Agreement") (collectively, the Franchise Agreement and related documents, as each may be amended, are the "Franchise Documents"), granting Franchisee the right, subject to the terms of the Franchise Agreement, to operate a La Quinta Inn Lodging Facility on that certain Site located at 2370 Stephens Center Drive, Duluth, GA 30096 and known as Inn #0264 (the "Facility"); and

**WHEREAS**, Franchisee has completed a Property Improvement Plan ("PIP") required to qualify the Facility to be operated as a La Quinta Inn & Suites Lodging Facility; and

**WHEREAS**, Franchisor is willing to amend the Franchise Agreement to change the Facility Type to La Quinta Inn & Suites subject to the terms and conditions set forth in this Second Amendment.

**NOW THEREFORE**, for and in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree to amend the Franchise Agreement as follows:

1.   **Change of Facility Type**. Paragraph B of the Basic Terms is hereby revised by changing the Facility Type from "La Quinta Inn" to "La Quinta Inn & Suites".

2.   **Full Force and Effect**.   Except as amended by this Second Amendment, the Franchise Documents remain in full force and effect.

3.   **Conflict**.  In the event of conflict between the terms and conditions of this Second Amendment and the terms and conditions of the Franchise Documents, the terms and conditions of this Second Amendment shall control.

4.   **Defined Terms**.  Capitalized terms used, but not otherwise defined in this Second Amendment shall be given the meaning given said terms in the Franchise Agreement.

5.   **Counterparts & Facsimile Signatures**.  This Second Amendment may be signed in counterparts, each of which, when taken together, shall be deemed an original for all purposes.

1

#0264 Atlanta Duluth, GA_A2

Copies of an executed Second Amendment received by facsimile transmission or other electronic means shall be deemed an original executed Second Amendment.

6.   **Choice of Law, Jurisdiction and Venue**. THIS SECOND AMENDMENT WILL BE CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES. THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, OR IF SUCH COURT LACKS JURISDICTION, THE DISTRICT COURT (OR ITS SUCCESSOR) FOR DALLAS COUNTY, TEXAS SHALL BE THE VENUE AND EXCLUSIVE FORUM IN WHICH TO ADJUDICATE ANY DISPUTES RELATING TO THIS SECOND AMENDMENT.

7.   **Confidentiality**.   Franchisee agrees (and Franchisee shall cause all of its principals and agents to agree) to keep confidential the terms of this Second Amendment and not to disclose any of the terms, or the negotiations leading to those terms, without the prior written consent of Franchisor, provided however, Franchisee may make such disclosures as are necessary for the sole purpose of complying with, and only to the extent required by, federal or state law or regulation.

**IN WITNESS WHEREOF**, the parties have duly executed this Second Amendment on the Amendment Date.

**FRANCHISOR:**                           **FRANCHISEE:**

**LA QUINTA FRANCHISING LLC,**           **SUGARLOAF CAPITAL BUFORD, LLC,**
a Nevada limited liability company       a Georgia limited liability company

By:                                      By:
Name: Rajiv Trivedi                      Name: Sonal Patel
Title:   Executive Vice President        Title:   Manager
         and Chief Development Officer

Date:   2/16/17                          Date:   2/16/17

#0264 Atlanta Duluth, GA_A2

2

## CONSENT TO RESTRUCTURE OF OWNERSHIP INTERESTS AND THIRD AMENDMENT TO FRANCHISE AGREEMENT

THIS CONSENT TO RESTRUCTURE OF OWNERSHIP INTERESTS AND THIRD AMENDMENT TO FRANCHISE AGREEMENT (this "Consent and Third Amendment") is made and entered into on this 24ᵗʰ day of _April_, 2018 (the "Consent Date") by and among **LA QUINTA FRANCHISING LLC**, a Nevada limited liability company ("Franchisor"); **SUGARLOAF CAPITAL BUFORD LLC**, a Georgia limited liability company ("Franchisee") and **SONIAL PATEL**, an individual, **SHAMA PATEL**, an individual, and **ST. MARY'S CAPITAL, INC.**, a Georgia corporation (each a "Shareholder" and "Principal Owner" and collectively "Shareholders" and "Principal Owners").

### R E C I T A L S:

WHEREAS, Franchisee and Franchisor entered into a certain Franchise Agreement and Exhibits thereto with an Effective Date of January 1, 2016 (the "Franchise Agreement"), and certain related documents including, without limitation, that certain Computer System License and Maintenance Agreement of even date therewith (the "Computer Agreement"), a Revenue Management Services Agreement dated March 29, 2016 (the "RMS Agreement"), a Front Desk Advantage Services Agreement dated June 15, 2017 (the "FDAS Agreement"), a First Amendment to Franchise Agreement with an Effective Date of April 13, 2016 (the "First Amendment") and a Second Amendment to Franchise Agreement with an Effective Date of February 16, 2017 (the "Second Amendment"). Collectively the Franchise Agreement, Computer Agreement, RMS Agreement, FDAS Agreement, First Amendment and Second Amendment, as each may be amended, are known as the Franchise Documents (the "Franchise Documents"). The Franchise Documents grant Franchisee the right to operate an 83-Guest Room La Quinta Inn on that certain Site located at 2370 Stephen Center Drive, Duluth, GA 30096 and known as Inn #0264 (the "Facility") according to the terms of the Franchise Agreement; and

WHEREAS, in consonance with the Effective Date and Section 15.01 of the Franchise Agreement, as amended by the Basic Terms of the Franchise Agreement ("Basic Terms"), the next two reciprocal termination rights become effective on January 1, 2021 (the "5-Year Termination Right") and January 1, 2026 (the "10-Year Termination Right"), respectively; and

WHEREAS, in order to facilitate a financing transaction related to the Facility, Franchisee has requested that the Franchise Agreement be amended to eliminate the 5-Year Termination Right and the 10-Year Termination Right and Franchisor is willing to do so on the terms and conditions of this Consent and Third Amendment; and

WHEREAS, in accordance with the First Amendment, the membership interests of Franchisee were assigned as follows: Sonial Patel (81%) and Jay Patel (19%); and

WHEREAS, subsequent to the execution of the First Amendment but before this Consent and Third Amendment, the Ownership Interests in Franchisee again changed; and

WHEREAS, in accordance with Franchisee's Amended and Restated Operating Agreement, the current members of Franchisee and their respective interests are as follows: Sonial Patel (98.5%), Shama Patel (1%), and St. Mary's Capital (0.5%) (collectively, the "Current Members"); and

1

**WHEREAS,** the Current Members accept this transfer and wish to amend the Franchise Agreement to reflect such change in the ownership structure of Franchisee (the "Restructure"); and

**WHEREAS,** the Franchise Agreement prohibits any assignment or Transfer of an Ownership Interest in or Restructure of Franchisee without Franchisor's prior written approval; and

**WHEREAS,** Franchisor is willing to approve the Transfer and Restructure under the terms set forth in this Consent and Third Amendment; and

**WHEREAS,** as a result of this Transfer, Sonial Patel will retain majority Ownership Interest and Control and therefore the Transfer Fee outlined in Section 14.02(h) of the Franchise Agreement is waived; and

**WHEREAS,** the parties have agreed that the Franchise Agreement be amended to reflect the Restructure, subject to the terms and conditions set forth in this Consent and Third Amendment.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained in this Consent and Third Amendment and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Consent to Transfer and Restructure**. Franchisor hereby consents to the Transfer and Restructure effective on the Consent Date. Franchisee and Principal Owners acknowledge and agree that Franchisor's consent to the Transfer and Restructure does not constitute:

    a.  a representation as to the fairness of the terms of any agreement or arrangement between Franchisee and Principal Owners or as to the prospects of success of the Facility following the Restructure; or

    b.  except as provided in this Consent and Third Amendment, a release or novation of Franchisee or Principal Owners, a waiver of any claims against Franchisee or Principal Owners, or a waiver of Franchisor's right to demand Franchisee's or Principal Owners' exact compliance with the Franchise Documents.

2.    **Future Assignments or Transfers**. Franchisor's consent herein will not be construed as its consent to any future assignment or Transfer of Ownership Interests in Franchisee, the Franchise Documents or the Facility, or to the waiver of any future rights that it may have under the Franchise Documents. Any further assignment or transfer may be effected only with Franchisor's prior written consent in accordance with the Franchise Agreement.

3.    **Acknowledgments of Franchisee and Principal Owners**. Franchisee and Principal Owners hereby acknowledge, represent and warrant to Franchisor that:

    a.  Principal Owners have conducted an independent investigation of the Facility and the Franchise Documents and recognize that the interest granted to Franchisee and Principal Owners under the Franchise Documents has evolved and may further change over time, that the acquisition of the member interests in Franchisee involves business risks, and that the success of the Facility depends primarily on the efforts of its independent owner and operator;

2

b. They have made no misrepresentation in any statements made or documents submitted to Franchisor in connection with the Transfer and Restructure;

c. Franchisee is duly organized and validly existing under the laws of the state of its organization, and, if a foreign business corporation, partnership, limited liability company or other legal entity, it is duly qualified to transact business in the state in which the Facility is located;

d. Franchisee has the authority to execute and deliver this Consent and Third Amendment and to perform its obligations hereunder; its execution and delivery of this Consent and Third Amendment has been duly and validly authorized by all necessary corporate or organizational action; and no other corporate or organizational proceedings on its part are necessary for it to authorize this Consent and Third Amendment;

e. This Consent and Third Amendment has been duly executed and delivered by Franchisee and Principal Owners and, assuming the due authorization, execution and delivery by Franchisor, constitutes a legal, valid and binding obligation of Franchisee and Principal Owners, enforceable in accordance with its terms;

f. Franchisee's and Principal Owners' execution and delivery of this Consent and Third Amendment does not, and its performance of its obligations under this Consent and Third Amendment and under the Franchise Documents, with or without the giving of notice or the lapse of time or both, (i) conflict with or violate its organizational documents, (ii) conflict with or violate any law, statute, ordinance, rule, regulation, order, judgment or decree applicable to it, or (iii) result in any breach of or constitute a default under, any contract, agreement, lease, license, permit, franchise or other instrument or obligation to which it is a party or by which it is bound; and

g. True and complete copies of Franchisee's articles of incorporation, partnership agreement, bylaws, articles of organization and operating agreement, as applicable, and all other documents relating to its ownership, organization, management and control have been delivered to Franchisor, and all amendments thereto shall be promptly delivered to Franchisor.

4.     **Additional Agreements and Amendments to Franchise Agreement**. The following additional agreements and amendments apply:

(a)     Franchisee's Operating Partner, as reflected in Paragraph C of the Basic Terms, shall remain Sonia1 Patel.

(b)     The Agreement of Principal Owners in the Franchise Agreement is hereby deleted in its entirety and the Agreement of Principal Owners, attached hereto, is inserted in lieu thereof.

(c)     Exhibit A to the Franchise Agreement is deleted in its entirety and Exhibit A, Franchisee Owner Information, attached hereto, is inserted in lieu thereof.

(d)     Section 15.01 of the Franchise Agreement shall be deleted in its entirety and replaced with the following:

**15.01  Reciprocal Right To Terminate Without Cause**.

We and, subject to all the provisions of this Section 15.01, you shall each have the right to terminate this Agreement without any reason at all, and without the need

3

to obtain the authorization of any third party or any arbitral, judicial or administrative resolution, without liability to us, and without prejudice to our corresponding collection of damages and/or losses effective on the fifteenth (15th) anniversary of the Effective Date by giving the other party written notice thereof at least twelve (12) months prior to such fifteenth (15th) anniversary of the Effective Date. Your right to terminate this Agreement pursuant to this Section 15.01 is conditioned on the following: (i) on the date you give notice and on the applicable anniversary of the Effective Date you and your Principal Owners and Affiliates must be in full compliance with this Agreement and all other agreements that you have entered into with us or any of our Affiliates; (ii) you and your Principal Owners must execute a general release of the Indemnitees in such form as we may prescribe; and (iii) you must have paid us and our Affiliates all outstanding amounts under this Agreement and all other Agreements that you have entered into with us or any of our Affiliates. If then-current applicable law would prohibit us from terminating this Agreement pursuant to this Section 15.01, then you will likewise not have the foregoing right to terminate this Agreement.

5. **Release of Franchisor Parties and Covenant Not to Sue**. Franchisee and Principal Owners, for themselves and on behalf of each of their partners, shareholders, members, officers, employees, agents, heirs, successors and assigns (collectively, the "Releasing Parties"), hereby forever releases and discharges Franchisor and its affiliates, and their respective officers, directors, members, partners, shareholders, employees, agents, representatives, successors and assigns (collectively, the "Franchisor Parties"), from any and all claims, damages, demands, causes of action, debts, costs, suits, duties, liabilities and agreements of any nature and kind whatsoever which any of the Releasing Parties now has, ever had, or, but for this Consent and Third Amendment, hereafter would or could have against any of the Franchisor Parties in any way relating to or arising in connection with the Franchise Agreement or the Facility, or otherwise relating to or arising in connection with the Releasing Parties' relationship with any of the Franchisor Parties, at any time prior to the Consent Date. Franchisee and Transferor, for themselves and the other Releasing Parties, further covenant not to sue any of the Franchisor Parties on any of the claims, damages, demands, causes of action, debts, costs, suits, duties, liabilities and agreements released by this paragraph. Franchisee and Transferor hereby represent and warrant to the Franchisor Parties that: (a) they have full power and authority to execute this Consent and Third Amendment and bind all of the Releasing Parties to its provisions; and (b) none of the Releasing Parties has assigned any of the claims, damages, demands, causes of action, debts, costs, suits, duties, liabilities and agreements released by this Section to any individual or entity, including Transferee, who is not bound by this paragraph.

6. **Indemnification of Franchisor Parties**. Franchisee and Principal Owners agree to indemnify any and all of the Franchisor Parties for, and to defend and hold any and all of the Franchisor Parties harmless from, any loss, cost, damage, liability, or expense (including, without limitation, attorneys' fees, arbitrators' fees, expert witness fees, costs of investigation and proof of facts, and other costs of litigation or arbitration, whether or not litigation or arbitration is commenced) arising out of or relating directly or indirectly to the breach of any provision of this Consent and Third Amendment by any of the Releasing Parties.

7. **Role of Franchisor**. Franchisee and Principal Owners acknowledge and agree that they have negotiated the proposed Restructure between them without substantial involvement by Franchisor, that Franchisor has not affected or arranged the Restructure, and that Franchisor's

4

only involvement in the transaction has been for the purpose of exercising its right of consent to the proposed Transfer and Restructure in accordance with the Franchise Agreement.

8.    **Conflicting Provisions**. If there is any conflict between the provisions of this Consent and Third Amendment and the provisions of the Franchise Documents, the provisions of this Consent and Third Amendment will control.

9.    **Binding Effect**. This Consent and Third Amendment inures to the benefit of Franchisor and its successors and assigns and will be binding upon Franchisee, Transferor, Transferee and their respective successors, permitted assigns and legal representatives.

10.    **Notices**. All notices, requests and reports required or permitted under this Consent and Third Amendment and the Franchise Documents shall be in writing and shall be personally delivered or sent by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid or by facsimile (provided that the sender confirms the facsimile by sending an original confirmation copy by certified mail or expedited delivery service within three (3) calendar days after transmission) to the respective parties at their addresses set forth in the Franchise Agreement, unless and until a different address has been designated by written notice to the other party. Any notice will be deemed to have been given at the time of personal delivery or receipt or, in the case of facsimile, upon transmission (provided confirmation is sent as described above) or, in the case of expedited delivery service, on the following business day or, in the case of registered or certified mail, three (3) calendar days after the date and time of mailing; provided, however, that if delivery is rejected, delivery will be deemed to have been given at the time of such rejection.

11.    **Miscellaneous**.

a.  Any capitalized term used herein but not defined herein shall have the meaning assigned to it in the Franchise Agreement.

b.  Except for additional documents that Franchisee and Principal Owners might need to sign in order to consummate the Transfer of the Ownership Interests in Franchisee, this Consent and Third Amendment constitutes the entire understanding between the parties with respect to the Transfer and Restructure. In addition, the parties acknowledge and agree that the Franchise Documents, as same may be amended from time to time, constitutes the entire agreement pertaining or relating to the right of Franchisee to continue to operate the Facility as a La Quinta Lodging Facility. Except as otherwise expressly provided herein and by the Franchise Documents, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Consent and Third Amendment or the subject matter of the Franchise Documents.

c.  THIS CONSENT AND THIRD AMENDMENT WILL BE CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

d.  The captions and headings are only for convenience of reference, are not a part of this Consent and Third Amendment, and will not limit or construe the provisions to which they apply. All references in this Consent and Third Amendment to the singular usage will be construed to include the plural and the masculine and neuter usages to include the other and the feminine.

e.  This Consent and Third Amendment may be executed in multiple counterparts, each of which will be deemed an original, but all of which when taken together will constitute

5

one and the same instrument. Signatures exchanged by facsimile or other electronic means shall be as effective as originals.

f.   THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, OR IF SUCH COURT LACKS JURISDICTION, THE DISTRICT COURT (OR ITS SUCCESSOR) FOR DALLAS COUNTY, TEXAS SHALL BE THE VENUE AND EXCLUSIVE FORUM IN WHICH TO ADJUDICATE ANY DISPUTES RELATING TO THIS CONSENT AND THIRD AMENDMENT. FRANCHISEE AND PRINCIPAL OWNERS IRREVOCABLY SUBMIT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTIONS TO EITHER THE JURISDICTION OF OR VENUE IN SUCH COURTS.

*{Signatures on Next Page}*

## AGREEMENT OF PRINCIPAL OWNERS

Each of the undersigned, being included within the term "Principal Owners", executes this Agreement for the sole purpose of agreeing to and making the representations and agreements of the Principal Owners set forth in Section 12.01 (Confidential Information), Section 13.02 (Anti-Terrorism. Anti-Bribery and Anti-Corruption Laws), Article 14 (Transfer), Article 20 (Governing Law; Mediation; Exclusive Jurisdiction; Acknowledgement; Limitation on Legal Rights; and Injunctive Relief) and Exhibit A. Each of the undersigned has read this Agreement, agrees that execution of this Agreement by each is in partial consideration for, and a condition to, the granting of this franchise and consent to the Transfer and Restructure, and acknowledges that Franchisor would not have granted this franchise or consented to the Transfer and Restructure without the foregoing agreements by each of the Principal Owners.

Principal Owners:

_____

Name:  Sonial Patel

Agreement of Principal Owners

## EXHIBIT A
## FRANCHISEE OWNER INFORMATION

Principal Owners. Franchisee represents and warrants that the following is a complete and accurate list of all Principal Owners of Franchisee, including the full name and mailing address of each Principal Owner, and fully describes the nature and extent of each Principal Owner's interest in Franchisee.

Principal Owner's Name & Address                     Description of Interest

Sonial Patel                                         98.5% Member of Franchisee
3463 Brookleigh Lane
Brookhaven, GA 30319

Shama Patel                                          1% Member of Franchisee
2253 Grady Ridge Trail
Duluth, Georgia 30097

St. Mary's Capital Inc.                              0.5% Member of Franchisee
2253 Grady Ridge Trail
Duluth, Georgia 30097

    Sonial Patel                 100% Shareholder of St. Mary's Capital Inc.
    3463 Brookleigh Lane
    Brookhaven, GA 30319

FRANCHISEE:

**SUGARLOAF CAPITAL BUFORD LLC**, a
Georgia limited liability company

By:  **ST. MARY'S CAPITAL, INC.**,
a Georgia corporation,
Its Managing Member

By: _____
Name: Sonial Patel
Title:  President

Date: _____4-24-2018_____

## EXHIBIT A

IN WITNESS WHEREOF, the parties have duly executed this Consent and Third Amendment on the Consent Date.

FRANCHISOR:                                    FRANCHISEE:

LA QUINTA FRANCHISING LLC,                     SUGARLOAF CAPITAL BUFORD LLC,
a Nevada limited liability company             a Georgia limited liability company

By:                                            By:  ST. MARY'S CAPITAL, INC.,
Name:  Rajiv Trivedi                           a Georgia corporation,
Title:    Executive Vice President and         Its Managing Member
          Chief Development Officer

Date:  4-26-18                                 By:
                                               Name:  Sonial Patel
                                               Title:   President

                                               Date:  4-24-2018

                                        7

#0264 Duluth, GA
Consent to Restructure of Ownership Interests and Third Amendment Rev1